

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OUMOU BAH, AS THE ADMINISTRATOR OF THE ESTATE OF MOHAMED BAH,<br><br>Plaintiff,<br>vs.<br><br>THE CITY OF NEW YORK, and POLICE OFFICERS JOHN DOES 1-50<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

By and through her attorneys, Randolph M. McLaughlin, Debra S. Cohen, Jeffrey M. Norton, Franciscus Diaba, Mayo Bartlett, and Abdulwali Muhammad, Plaintiff Oumou Bah, as the Administrator of the Estate of Mohamed Bah, alleges upon knowledge, information, and/or belief as follows:

## PRELIMINARY STATEMENT

1.     This is a civil rights action in which Plaintiff Oumou Bah, Administrator of the Estate of Mohamed Bah, seeks relief for Defendants' violation of Mohamed Bah's rights, privileges, and immunities secured by 42 U.S.C. §1983, the Fourth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York.

2.     It is alleged that the Defendants, acting jointly and severally, committed a series of unlawful acts that culminated in the shooting death of Mohamed Bah, a 28 year old African immigrant, in his home on September 25, 2012 and, in so doing, deprived Mohamed of rights secured by the United States Constitution, federal law, and the Constitution and laws of the State of New York.

3.     It is further alleged that the Defendant City failed to adopt adequate policies and

procedures to safeguard emotionally disturbed persons with whom police officers would likely come in contact. As a result of the failure to adopt adequate policies as aforesaid, said Defendant failed to train or supervise its officers in properly responding to incidents involving emotionally disturbed persons. The failure to adopt such policies and/or the inadequacy of the policies that were adopted was likely to result in constitutional deprivations. Moreover, the failure to adopt adequate policies, and to train or supervise its police officers in how to handle properly situations involving emotionally disturbed persons, evidenced the City's deliberate indifference to the constitutional rights of Mohamed Bah, and resulted in the deprivation of his rights.

4.      As a remedy for the constitutional violations alleged herein, Plaintiff seeks an injunction requiring the City to institute and implement effective policies and procedures with respect to police responses to situations involving emotionally disturbed persons ("EDP") and to adopt the Crisis Intervention Team model, a collaborative program involving mental health professionals, or a similar program for responding to EDP calls. Plaintiff also seeks referral to the Court-appointed Monitor in *Floyd v. City of New York*, 08 Civ 01034 (SAS), to oversee the reform process and the City's compliance with any injunctive relief the Court may order.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and §1343. Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. §1367 to hear and decide claims arising under state law.

6.      Venue in the Southern District of New York is proper under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to this action occurred within the district.

## PARTIES

7.      Plaintiff Oumou Bah is a resident of the United States. Plaintiff is the Administrator of the Estate of Mohamed Bah.

8.      Defendant The City of New York ("City") is a duly constituted municipal corporation of the State of New York.  It is authorized under the laws of the State of New York to maintain a police department, the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

9.      Defendants John Does 1-50 are and/or were, at all times relevant herein, police officers, whose names are not presently known to Plaintiff, employees and agents of the NYPD. At all times relevant to the facts of the Complaint, said Defendants were acting under color of law and within the scope of their employment by the City. Said Defendants are sued in their individual and official capacities.

## FACTUAL ALLEGATIONS

10.     The incident complained of herein occurred on September 25, 2012 at approximately 6:40 p.m. through 8:30 p.m., while Mohamed Bah was at his home located at 113 Morningside Avenue, Apt. 5D, in New York County, City and State of New York.

11.     Mohamed Bah, 28, was a college student with the aim of getting a finance degree. His neighbors described him as polite, hard-working and mild mannered. He was working at night and going to school by day. He was an animal and music lover, a friend, a brother and a son to a family who loved him dearly. Just like most men his age, he had dreams and aspirations. He dreamed of one day getting married and helping his mother expand her business in Guinea.

He truly believed that the American Dream was still alive and real.

12.     On September 24, 2012 Mohamed's mother, Mrs. Hawa Bah, visited her son from Guinea. Mrs. Bah was concerned when she saw her son as his appearance had changed dramatically, and he seemed depressed. He also had a cut over his eye and was limping. Mohamed claimed that he had been beaten by police officers in the City.

13.     The next day, September 25, Mohamed Bah called to cancel the plans he made to spend the day with his mother and rescheduled for another date. The sudden change in plans heightened Mrs. Bah's concerns about her son, and she asked some family friends, who lived nearby, to go and check on Mohamed. The family friends went to see Mohamed and spoke with him. They too became concerned about his injury but Mohamed told them he needed rest.

14.     On September 25, Mrs. Bah arrived outside of Mohamed's building, along with four family friends. She dialed 911 at approximately 6:40 p.m., after calling two other numbers given to her by a friend to summon an ambulance. Her plan was to get an ambulance to take her son to the hospital. Instead of an ambulance, two police officers arrived. Mrs. Bah explained the situation in detail to the police officers, including the fact that her son was non-violent, alone in his apartment, and that he was in need of medical attention. There was no crime in progress. She made it clear that she did not call the police and that their services were not needed, as she just wanted an ambulance to take her son to the hospital. She also advised that her son appeared to be depressed.

15.     The police officers informed her that the ambulance was on its way and that they just needed to talk to Mohamed. The officers, Mrs. Bah, and the family friends went into Mohamed's apartment building and upstairs to his apartment door.  During the initial interactions with the officers, Mrs. Bah and the family friends were standing on a stairway immediately

adjacent to the apartment door.  From that vantage point, Mrs. Bah and the friends were able to see and observe the interaction with the responding officers.

16.    The officers knocked on the apartment door. Mohamed opened the door, and told the police that he did not call them and to please leave the premises.  Instead, the officers, who did not advise Mohamed that his mother was present, attempted to force their way into the apartment. Mohamed repeatedly told them that he was fine and that he wished to be left alone. He closed the door and remained at all times within his apartment.

17.    Alarmed by the interaction with the police, Mrs. Bah asked to speak with her son directly, as Mohamed was unaware that she was present. The police refused her repeated requests and said they would handle matters. The responding officers called for backup police and ordered Mrs. Bah and the family friends to exit the building.

18.    Mrs. Bah and the friends exited the building, but remained outside in front of the apartment building. When Mrs. Bah saw numerous police officers arriving with tools to break the apartment door and some with what appeared to be guns drawn, she asked them to please leave and not to break the door, as her son was alone in the apartment and was not a danger to anyone. They ignored her pleas.

19.    On two occasions during the incident, Mrs. Bah asked a resident of the building to speak with the officers inside and advise them again that she was present, and that her son had a fear of police officers due to a prior incident when he was assaulted by the police.

20.    The resident went into the building and approached a supervising officer who wore a white shirt.  She told him on two occasions that Mrs. Bah was outside, that she wanted to speak with her son, that she could get him to open the door, and that he had a fear of the police. The white shirted officer told the resident that they were handling the situation and did not need

Mrs. Bah's assistance.

21.     Throughout the incident, Mrs. Bah pleaded with the police officers to allow her and her family friends to speak with her son since the police officers refused to leave, but the police officers ignored her pleas.

22.     As a result of their interactions with Mohamed, the police officers at the scene perceived him as being an emotionally disturbed person.   Instead of taking the proper precautions and following the NYPD emotionally disturbed persons ("EDP") protocol, the police officers escalated the situation.

23.     During the hour long siege, the officers yelled at Mohamed, taunted him, screamed that they were not leaving until he came outside, and repeatedly kicked his door. The behavior of the officers increased Mohamed's fear and apprehension, causing him to reasonably fear that the officers were there to harm him.

24.     During the siege, several officers stood on the fire escape landing outside the window to Mohamed's apartment.   Officers from the Emergency Services Unit were also present.  The responding officers had a police shield, Tasers, and other weapons. After Mohamed refused to open the door of his apartment, the police officers forced open Mohamed's door, tased him multiple times, fired a bean bag, and shot him at least eight times while he was in his apartment.

25.     Before the gun shots were fired, residents of the building heard the police yelling at Mohammed.  They also heard the sound of the door being forcibly opened and loud noises emanating from the apartment after the door was opened.  One resident who was present on a landing below Mohamed's apartment heard the officers screaming at Mohamed and then immediately heard multiple gun shots once the door was opened.  Mohamed was struck in the

head, arms and torso with at least eight bullets. After he was killed in his apartment, the officers dragged his body down the stairs and in the process smeared his blood on the apartment building floors.

26.     As Mrs. Bah stood in front of the apartment building, she saw her son, carried on a stretcher, exiting the building. EMS workers administered CPR to Mohamed once he was outside the building. Mrs. Bah overheard an officer or EMS worker state that her son was alive. He was taken in an ambulance to the hospital, where he was pronounced dead.

**Emotionally Disturbed Persons and Encounters with the NYPD**

27.     The death of Mohamed is the latest in a long series of wrongful death incidents in the City in which the police have inappropriately responded to situations involving persons they perceive to be EDPs.

28.     The NYPD is often the first to respond to incidents involving EDPs. The NYPD handles over 100,000 EDP calls per year. These calls often result in unwarranted arrest, emotional and physical abuse, and even the death of those in crisis.

29.     The first landmark incident came in 1984. Police broke down the door of 66-year-old Eleanor Bumpurs in an effort to evict her from public housing and hospitalize her for what a psychiatrist sent by the City deemed to be psychosis. Carrying shields and a Y-shaped restraining bar, police attempted to subdue Bumpurs. In the ensuing struggle, Police Officer Stephen Sullivan fired two shots from his 12-gauge shotgun and killed her. As a result of the Bumpurs killing, the NYPD developed protocols for handling EDPs, but failed to include in said protocols the involvement of mental health professionals.

30.     In 1999, Gidone Busch, a bipolar 31-year-old who lived in Borough Park, was shot to death by police responding to a complaint that he was threatening a local boy with a

hammer. Busch was in his apartment when six police officers confronted him, but he backed out onto the sidewalk, where police used pepper spray on him. Four officers fired their guns and killed him. The officers claimed that he lunged at them with a hammer.

31.     In the space of a week in 2007, police officers shot and killed two emotionally disturbed men in Brooklyn. Khiel Coppin, 18, was holding a hairbrush under his shirt like a gun when police killed him in Bedford-Stuyvesant. David Kostovski, 29, was brandishing a broken bottle when he was shot in East New York.

32.     In 2008, police responded to a call from the mother of 35-year-old Iman Morales, who was not answering his front door. When police arrived at the Bedford-Stuyvesant apartment, Morales, naked, retreated out the window and onto a ledge 10 feet above the sidewalk. Police called for an inflatable air bag to place on the sidewalk under Morales, but did not wait for it to arrive before shooting him with a Taser. Morales went stiff, fell headfirst onto the sidewalk, and died.

33.     In 2012, the police responded to the home of Shauna Francis in Queens.  Ms. Francis was a diagnosed schizophrenic who had been refusing to take her medications.  Her sister had called 311 for an ambulance to take Ms. Francis to the hospital.  Instead the operator transferred the call to a 911 dispatcher who sent police officers to the Francis home.  During the incident several officers wrestled Ms. Francis to a bed. Four officers pressed her face down onto the mattress and handcuffed her.  She died on the bed as she suffocated under the weight of the officers.

34.     On September 14, 2013, police officers encountered Glenn Broadnax as he ran erratically in the streets surrounding Times Square.  The officers attempted to catch him, but he eluded them.  When Mr. Broadnax, who was emotionally disturbed and unarmed, reached into

his pants pockets, the officers fired at him multiple times and injured two bystanders.

**Police Policies and Procedures**

35.    In the wake of the Bumpurs killing, the NYPD adopted certain policies regarding interactions with EDPs.  According to the NYPD EDP policy, the use of deadly force is a last resort.  Officers are directed to deploy protective shields and to use non-lethal devices to ensure the safety of all those present.  Officers are also directed to request assistance from an interpreter if needed and to seek assistance from the subject's family or friends.

36.    In their interactions with Mohamed, the police officers violated the aforementioned policies.

37.    Missing from the NYPD policy is any requirement that mental health professionals be deployed to incidents involving EDPs.  Also, there are no explicit provisions for mental health training models or re-training in how to identify an EDP and the appropriate techniques to de-escalate an EDP encounter.

38.    While the EDP policy in New York is an improvement over the police practices at the time of the Bumpurs killing, police are not being adequately trained or supervised in the implementation of the policy.

39.    Additionally, the City has refused to adopt best practice policies that are in use in several cities across the country.  Those cities that have adopted a model more focused on training officers in mental health disciplines and involving mental health professionals have experienced less violence and death in police encounters with EDPs.

40.    In 1987, when a Memphis Police Department  ("MPD") officer shot and killed a mentally ill person, the MPD decided to revisit its policies for handling EDP calls and to reach out to mental health professionals and to the mentally ill themselves, and their families to craft a

new strategy.

41.     The result, soon termed the "Memphis Model," was a policy that involved mental health professionals. It relied heavily on Crisis Intervention Teams, or CITs, composed of police officers who had volunteered to undergo between 40 and 80 hours of extra training in responding to EDP calls.  Enough Memphis officers were trained that when an EDP call came through, at any hour and in any part of the city, dispatchers could refer the call to a Crisis Intervention Team – as opposed to the Emergency Services Unit or SWAT teams.

42.     CIT officers are trained in de-escalation. They are taught that shouting at people in mental distress does not help; that surrounding them, threatening them, and rushing them is almost invariably counterproductive.

43.     The results of implementing the CIT program in Memphis were dramatic. In the three years before CIT was instituted, mental-health-related calls led to injuries 35 times out of 100,000. In the three years after CIT was in place, that rate dropped to seven injuries in 100,000 calls.

44.     Over the past 25 years, versions of the program have been adopted by police departments in more than 2,000 communities in over 40 states. It has been adopted state-wide in Maine, Connecticut, Ohio, Georgia, Florida, Utah, and Kentucky.  Municipalities that have adopted CIT models, include, but are not limited to, Seattle, Albuquerque, Portland, Los Angeles, Houston, Rochester, and Chicago. It has won plaudits from Amnesty International, the National Alliance on Mental Illness, the U.S. Justice Department, and the International Association of Chiefs of Police. The Council of State Governments has been advocating for the adoption of CIT-like programs across the country.

45.     Despite the number of violent deaths of EDPs in encounters with the police, and,

and the effectiveness of the CIT program in reducing violence and death during such situations, the NYPD has refused to adopt a similar model.

46.    The failure of the NYPD and the City to adopt the CIT model or similar models has resulted in continued and escalating violent incidents in cases involving police encounters with EDPs or persons they perceive to be emotionally disturbed.

47.    The failure of the NYPD and the City to mandate the involvement of mental health professionals in incidents when the police are responding to EDP calls has led to violence and death in such encounters.

48.    The failure of the NYPD and the City to require 40-80 hours of training, to designate specialized team of officers with mental health training, not ESU units, to respond to EDP calls, and to require in-service training of officers who may be called to respond to EDP situations has led to violence and the death of EDPs in police encounters.

49.    The foregoing failure to adopt policies, train and retrain officers and supervise same has also led to injuries to officers who respond to these calls and to members of the public.

50.    As a result of the failure to adopt an adequate policy for responding to EDPs the City has a policy or custom of not training or properly supervising its police officers or supervisors in responding to situations involving EDPs.

51.    The failure to have an adequate policy was a contributing factor in the death of Mohamed because the City had no appropriate policy in place for such situations and had not properly trained or supervised its officers responding to same.

52.    Said policies, training, and/or failure to adopt policies or to adequately train its employees as aforementioned resulted in the death of Mohamed Bah.

53.    Additionally, the failure of the officers who responded to the scene to follow the

current EDP policy also led and/or contributed to the death of Mohamed.

54.     The failure of the supervisors to follow the EDP policy and their failure to adequately supervise the officers under their command contributed to the cause of Mohamed's death.

55.     A Notice of Claim pursuant to New York General Municipal Law § 50-e was timely served upon Defendant City on December 21, 2012. More than thirty days have elapsed without the matter being resolved by City. The Notice of Claim provided detailed information regarding the actions that the officers took during the incident with Mohamed at his apartment and was sufficient to put the officers and the City on notice of the conduct that they were alleged to have engaged in.

56.     To date, the City has not released the names of the officers who responded to Mohamed's apartment or who shot him or otherwise interacted with him.

57.     On March 24, 2013, a FOIL request was made to the City seeking documents relevant to the incident complained of herein.  On April 3, 2013, the City responded that it was reviewing the request, but no documents have been provided in response to the FOIL request.

## FEDERAL CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*(Pursuant to 42 U.S.C. §1983 for Violations*
*of the Fourth and Fourteenth Amendments)*

58.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

59.     At the time of the incident complained of herein, the John Doe Defendants were all employees of the Defendant City and acted under color of law as police officers.

60.     The aforesaid actions of said Defendants deprived Mohamed of life and liberty

without due process of law in violation of the Fourteenth Amendment.

61.     Said actions also deprived Mohamed of his right to be secure in his person and home against unreasonable searches and seizures in violation of the Fourth Amendment.

62.     The aforesaid actions of said Defendants were an unreasonable and unnecessary use of excessive force and unlawful entry into Mohamed's home that deprived him of rights, privileges and immunities secured by the Fourth and Fourteenth Amendments of the United States Constitution, in violation of 42 U.S.C. §1983.

## SECOND CLAIM FOR RELIEF

*(Monell Claims Against Defendant City)*

63.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

64.     The injuries sustained by Mohamed Bah were the result of the City's adoption of inadequate policies regarding EDPs.   As a result of the failure of the City to adopt adequate policies, it also failed to properly train its officers how to handle EDP situations.   The failures aforementioned evidence a deliberate indifference on the part of said Defendant to the constitutional rights of EDPs and Mohamed.   As a result of said deliberate indifference, the officers and supervisors responding to Mohamed's apartment violated his constitutional rights.

65.     The injuries sustained by Mohamed Bah were the result of the failure of said Defendant to have policies for appropriately responding to service calls involving health emergencies or emotionally disturbed persons.

66.     The injuries sustained by Mohamed Bah were the result of the deliberate indifference of said Defendant to properly create guidelines and procedures in connection with service calls involving health emergencies or emotionally disturbed persons.

67.     The injuries sustained by Mohamed Bah were the result of the deliberate indifference of said Defendant to properly create alternative protocols when addressing service calls involving health emergencies or emotionally disturbed persons.

68.     The injuries sustained by Mohamed Bah were the result of the failure of said Defendant to train its police officers how to appropriately respond to service calls involving health emergencies or emotionally disturbed persons.

69.     The injuries sustained by Mohamed Bah were the result of the failure of said Defendant to adequately supervise police officers in connection with service calls involving health emergencies or emotionally disturbed persons.

70.     The injuries sustained by Mohamed Bah were the result of the failure of said Defendant to train and/or supervise its officers in the implementation of the EDP policy.

71.     The injuries sustained by Mohamed Bah were the result of the deliberate indifference and failure of said Defendant to effectively establish proper protocols addressing the use of force when addressing the mentally ill or emotionally disturbed persons.

72.     The injuries sustained by Mohamed Bah were the result of the failure of said Defendant to adequately train its officers in the continuum of force, the use of physical force, deadly force and Tasers in EDP cases.

73.     As a result of the aforementioned policies, practices, custom, usages, and failures of said Defendant, and the deliberate indifference to the duty to have such policies to ensure the safety of the residents of the City, Mohamed sustained the injuries and deprivations aforementioned in violation of 42 U.S.C. §1983 and the rights secured by the Fourth and Fourteenth Amendments.

## THIRD CAUSE OF ACTION

### *(Supervisory Liability)*

74.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

75.     John Doe 1-50 Defendants, who performed supervisory functions at the scene, were responsible for supervising the police officers who responded to the scene at Mohamed's residence. Said Defendants failed to properly supervise said officers and took no actions that would have prevented the injuries sustained by Mohamed.

76.     As a direct and proximate cause of said Defendants failure to properly supervise their subordinates, Mohamed's constitutional rights were violated as aforementioned in violation of 42 U.S.C. §1983.

## STATE CLAIMS FOR RELIEF

## FOURTH CLAIM FOR RELIEF

### *(For Conscious Pain And Suffering Against All Defendants)*

77.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

78.     Certain of the John Doe Defendants without just cause, or provocation, used force and/or deadly physical force against Mohamed. The use of such force was not justified or warranted under the circumstances and constituted unreasonable and unnecessary force.

79.     The use of such force did not immediately cause Mohamed's death.  As a result, he suffered and experienced a fear of impending death, severe emotional distress, and conscious pain and suffering.

80.     The Defendant City is responsible for the actions of said John Doe Defendants

that were taken in the scope of their employment as police officers.

## FIFTH CLAIM FOR RELIEF

### *(For Wrongful Death Against All Defendants)*

81.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

82.     Certain John Doe Defendants, acting within the scope of their employment, caused the death of Mohamed by the use of a firearm, without cause or justification.

83.     Said actions render them liable for the wrongful death of Mohamed.

84.     Defendant City is responsible for the actions of said Defendants that were taken in the scope of their employment as police officers.

## SIXTH CLAIM FOR RELIEF

### *(For Assault and Battery Against All Defendants*)

85.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

86.     The actions of the John Doe Defendants were intentional, malicious and were committed with wanton disregard for the rights of Mohamed.

87.     The actions of said Defendants were unjustified and unnecessary in the performance of their duties as police officers and were unreasonable and unwarranted and constituted an excessive use of force.

88.     The actions aforesaid constituted unlawful assaults and batteries upon Mohamed.

89.     The said Defendants acted in concert and conspired to commit said assaults and batteries upon Mohamed.

90.     As a result of said conduct of said Defendants, Mohamed sustained serious and

severe injuries, both physical and emotional.

91.     Defendant City is responsible for the actions of said Defendants as the acts were committed within the scope of their employment as police officers.

## SEVENTH CLAIM FOR RELIEF

### *(For Negligence Against All Defendants)*

92.     Plaintiffs incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

93.     The individual officers, acting within the scope of their employment, negligently discharged their duties and thereby caused Mohamed to sustain the injuries and deprivations aforementioned.

94.     The acts of negligence of said officers included, but are not limited to, forcibly breaking the door of Mohamed's door, negligently discharging the Taser, and other conduct that was improper under the circumstances and caused Mohamed to become agitated, non-cooperative, and emotionally distraught.

95.     Defendant City is responsible for the negligence of its officers committed within the scope of their employment.

96.     Defendant City was negligent by failing to properly train or supervise its officers in how to properly respond to service calls involving emergency medical situations or involving emotionally disturbed persons.

97.     Defendant City was negligent by failing to properly train or supervise its police officers in the use of Tasers, physical force, deadly force, or the continuum of force.

98.     By the actions described above, each and every Defendant, jointly and severally, has committed the foregoing wrongful acts against Mohamed, which are tortious under the

Constitution and laws of the State of New York.

99.    The aforementioned acts and conduct proximately caused the injuries sustained by Mohamed and violated the statutory and common law rights guaranteed to them by the Constitution and the laws of the State of New York.

## PUNITIVE DAMAGES

100.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

101.    The acts of the individual Defendants were willful, wanton, malicious and oppressive and were motivated solely by a desire to harm Mohamed without regard for his well-being and were based on a lack of concern and ill-will towards Mohamed.  Such acts therefore warrant an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

   a. An order requiring the City to institute and implement adequate policies and procedures with respect to police responses to situations involving EDPs;

   b. An order requiring the City to adopt the Crisis Intervention Team model or a similar program for responding to EDP calls;

   c. An order requiring the City to deploy NYPD officers to EDP calls with appropriate and adequate supervision;

   d. Referral to the Court-appointed Monitor in *Floyd v. City of New York,* 08 Civ 1034 (SAS), to oversee the reform process and to oversee the City's compliance with any injunctive relief the Court may otherwise order;

   e. Compensatory damages in an amount to be determined at trial;

f.   Punitive damages;

g.   An award of the costs and expenses of this action including attorneys' fees to the

Plaintiff pursuant to 43 U.S.C. §1988; and

h.   Any such other and further relief as this Court may deem appropriate.

**A JURY TRIAL IS DEMANDED**

DATED:        New York, New York
              September 23, 2013

                                        NEWMAN FERRARA LLP

                              By:

                                        Randolph M. McLaughlin
                                        rmclaughlin@nfllp.com
                                        Debra S. Cohen
                                        dcohen@nfllp.com
                                        Jeffrey M. Norton
                                        jnorton@nfllp.com
                                        1250 Broadway, 27th Floor
                                        New York, New York 10001
                                        Tel: 212-619-5400
                                        Fax: 212-619-3090

                                        Franciscus L. Diaba
                                        fdiaba@diabalaw.com
                                        375 Park Avenue
                                        Suite 2607
                                        New York, New York 10152
                                        Tel: 212-634-9974
                                        Fax: 646-390-2905

                                        Mayo Bartlett
                                        mgb@mayobartlett.com
                                        Abdulwali Muhammad
                                        wm@walimuhammadlaw.com
                                        81 Main Street
                                        Suite 118
                                        White Plains, New York 10601
                                        Tel: 914-224-3086
                                        Fax: 914-468-6333

                                        *Counsel for Plaintiff*