

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

OUMOU BAH, AS THE ADMINISTRATOR OF
THE ESTATE OF MOHAMED BAH,

                Plaintiff,

    vs.

THE CITY OF NEW YORK, DETECTIVE
EDWIN MATEO, individually and in his official
capacity, POLICE OFFICER ANDREW KRESS,
individually and in his official capacity, POLICE
OFFICER MICHAEL GREEN, individually and
in his official capacity, SERGEANT JOSEPH
MCCORMACK, individually and in his official
capacity, LIEUTENANT MICHAEL LICITRA,
individually and in his official capacity,
LIEUTENANT ROBERT GALLITELLI,
individually and in his official capacity, POLICE
OFFICER BRIAN STANTON, individually and in
his official capacity, POLICE OFFICER
ESMERALDA SANTANA, individually and in
her official capacity, POLICE OFFICER
VINCENT JOHNSON, individually and in his
official capacity, John Does 1-10, employees of
The City of New York.

                Defendants.

**13 CV 6690 (PKC)(KNF)**

**AMENDED COMPLAINT FOR
DECLARATORY RELIEF AND
DAMAGES**

**JURY TRIAL DEMANDED**

By and through her attorneys, Randolph M. McLaughlin, Debra S. Cohen, Jeffrey M. Norton, Franciscus L. Diaba, Mayo Bartlett, and Abdulwali Muhammad, Plaintiff Oumou Bah, as the Administrator of the Estate of Mohamed Bah, alleges upon knowledge, information, and/or belief as follows:

## PRELIMINARY STATEMENT

1.     This is a civil rights action in which Plaintiff Oumou Bah, Administrator of the Estate of Mohamed Bah, seeks relief for Defendants' violation of Mohamed Bah's rights,

privileges, and immunities secured by 42 U.S.C. §1983, 42 U.S.C. §12101 ("ADA"), *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, the Fourth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York.

2.     It is alleged that the Defendants, acting jointly and severally, committed a series of unlawful acts that culminated in the shooting death of Mohamed Bah, a 28 year old African immigrant and student, in his home on September 25, 2012, and, in so doing, deprived Mohamed of rights secured by the United States Constitution, federal law, and the Constitution and laws of the State of New York.

3.     It is further alleged that Defendant The City of New York ("City") failed to adopt adequate policies and procedures to safeguard emotionally disturbed persons with whom police officers would likely come in contact.  As a result of the failure to adopt adequate policies as aforesaid, said Defendant failed to train or supervise its officers in properly responding to incidents involving emotionally disturbed persons. The failure to adopt such policies and/or the inadequacy of the policies that were adopted was likely to result in constitutional deprivations. Moreover, the failure to adopt adequate policies, and to train or supervise its police officers in how to handle properly situations involving emotionally disturbed persons, evidenced the City's deliberate indifference to the constitutional rights of Mohamed Bah, and resulted in the deprivation of his rights.

4.     Additionally, the City failed to modify its policies, practices, and procedures to ensure that persons with disabilities were not denied services or treated in a discriminatory manner in violation of the affirmative duties conferred on the City under the ADA and the Rehabilitation Act.  Despite the City's knowledge of its obligations under the aforementioned

statutes and the likelihood that its officers would encounter EDPs in their homes and on the streets, the City, with deliberate indifference, failed to provide its police officers with adequate training for dealing with emotionally disturbed or mentally ill persons or for handling encounters with mentally ill residents without resorting to force.  The City, with deliberate indifference, failed to establish and maintain policies, practices and procedures to ensure that persons with disabilities were not discriminated against or otherwise harmed in the course of an encounter with the City's police officers.

5.       Plaintiff seeks a declaratory judgment that the City's EDP policy violates the federal laws aforesaid, the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiff also seeks a declaratory judgment that the failure of the City to institute and implement effective policies and procedures with respect to police responses to situations involving emotionally disturbed persons ("EDP") and/or to adopt the Crisis Intervention Team model, a collaborative program involving mental health professionals, or a similar program for responding to EDP calls amounts to a policy or practice of deliberate indifference to the rights, needs and interests of persons in emotional or in a mental health crisis. Plaintiff also seeks compensatory and punitive damages to the extent permitted by law.

**JURISDICTION AND VENUE**

6.       The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and §1343. Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. §1367 to hear and decide claims arising under state law.

7.       Venue in the Southern District of New York is proper under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to this action occurred within the district.

## PARTIES

8.      Plaintiff Oumou Bah is a resident of the United States. Plaintiff is the Administrator of the Estate of Mohamed Bah.

9.      Defendant City of New York ("City") is a duly constituted municipal corporation of the State of New York.  It is authorized under the laws of the State of New York to maintain a police department, the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

10.      Defendant Edwin Mateo ("Mateo") is a Latino employee of the City and a member of the Emergency Services Unit ("ESU") of the NYPD.  He is one of the officers who fired fatal gunshots at Mohamed Bah.  At all times relevant to the facts of the Complaint, said Defendant was acting under color of law and within the scope of his employment by the City. Said Defendant is sued in his individual and official capacities.

11.      Defendant Andrew Kress ("Kress") is a white police officer in the employ of the City and is a member of the ESU of the NYPD.  He is one of the officers who fired fatal gunshots at Mohamed Bah.  At all times relevant to the facts of the Complaint, said Defendant was acting under color of law and within the scope of his employment by the City. Said Defendant is sued in his individual and official capacities

12.      Defendant Michael Green ("Green") is a white police officer in the employ of the City and is a member of the ESU of the NYPD.  He is one of the officers who fired fatal gunshots at Mohamed Bah.  At all times relevant to the facts of the Complaint, said Defendant was acting under color of law and within the scope of his employment by the City. Said Defendant is sued in his individual and official capacities.

13.     Defendant Joseph McCormack ("McCormack") is a white police officer in the employ of the City and is a member of the ESU of the NYPD.  He is a sergeant in the ESU and discharged a Taser during the course of the encounter with Mr. Bah. At all times relevant to the facts of the Complaint, said Defendant was acting under color of law and within the scope of his employment by the City. Said Defendant is sued in his individual and official capacities.

14.     Defendant Michael Licitra ("Licitra") is a white police officer in the employ of the City and is a lieutenant in the ESU and was the supervisor of the ESU personnel at the scene. At all times relevant to the facts of the Complaint, said Defendant was acting under color of law and within the scope of his employment by the City. Said Defendant is sued in his individual and official capacities.

15.     Defendant Robert Gallitelli ("Gallitelli") is a lieutenant in the employ of the NYPD of the City.  On the date in question he was the 26th Precinct Platoon Commander, in charge of the police officers who initially responded to the scene, and was their superior and supervisor.

16.     Defendant Brian Stanton ("Stanton") is a police officer in the employ of the City and was one of the first officers who responded to the scene. At all times relevant to the facts of the Complaint, said Defendant was acting under color of law and within the scope of his employment by the City. Said Defendant is sued in his individual and official capacities.

17.     Defendant Esmeralda Santana ("Santana") is a police officer in the employ of the City and was one of the first officers who responded to the scene. At all times relevant to the facts of the Complaint, said Defendant was acting under color of law and within the scope of her employment by the City. Said Defendant is sued in her individual and official capacities.

18.     Defendant Vincent Johnson ("Johnson") is a police officer in the employ of the

City and was one of the first officers who responded to the scene. At all times relevant to the facts of the Complaint, said Defendant was acting under color of law and within the scope of his employment by the City. Said Defendant is sued in his individual and official capacities.

19.     John Does 1-10 are employees of the City who were present at the scene on or about September 25, 2012, and whose names are presently unknown to Plaintiff.  On information and belief, said Defendants dragged and/or participated in the dragging of Mohamed's injured body through the hallways of his building; thereby, violating his right of bodily integrity.  Their names will be added, upon motion, once Plaintiff has learned the names through the discovery process.

### FACTUAL ALLEGATIONS

20.     The incident complained of herein occurred on or about September 25, 2012 at approximately 6:40 p.m. through 8:30 p.m., while Mohamed Bah was at his home located at 113 Morningside Avenue, Apt. 5D, in New York County, City and State of New York.

21.     Mohamed Bah, 28, was a college student with the aim of getting a finance degree. His neighbors described him as polite, hard-working and mild mannered. He was working at night and going to school by day. He was an animal and music lover, a friend, a brother and a son to a family who loved him dearly. Just like most men his age, he had dreams and aspirations. He dreamed of one day getting married and helping his mother expand her business in Guinea. He truly believed that the American Dream was still alive and real.

22.     In recent months, his behavior had changed.  He was acting erratically, had lost weight, and exhibited indications that he was in an emotional or mental health crisis.

23.     On September 24, 2012 Mohamed's mother, Mrs. Hawa Bah, visited her son from Guinea. Mrs. Bah was concerned when she saw her son as his appearance had changed

dramatically, and he seemed depressed. He also had a cut over his eye and was limping. Mohamed claimed that he had been beaten by police officers in the City.

24.     The next day, September 25, Mohamed Bah called to cancel the plans he made to spend the day with his mother and rescheduled for another date. The sudden change in plans heightened Mrs. Bah's concerns about her son, and she asked some family friends, who lived nearby, to go and check on Mohamed. The family friends went to see Mohamed and spoke with him. They too became concerned about him but Mohamed told them that he needed rest.

25.     On September 25, Mrs. Bah arrived outside of Mohamed's building, along with four family friends. She dialed 911 at approximately 6:40 p.m., after calling two other numbers given to her by a friend to summon an ambulance. Mrs. Bah advised the 911 operator that she was concerned that her son was having a mental health crisis and needed to be transported to a hospital.

26.     Defendants Gallitelli, Johnson, Stanton, and Santana arrived in response to a 10-54 (ambulance case) EDP radio signal. The NYPD Patrol Guide defines an EDP, *inter alia*, as a person who appears mentally ill.

27.     Mrs. Bah explained the situation in detail to the officers, including the fact that her son was non-violent, alone in his apartment, and that he was in need of medical attention, and appeared to be having a mental health crisis.  There was no crime in progress. She made it clear that she did not call the police and that their services were not needed, as she just wanted an ambulance to take her son to the hospital. She also advised that her son appeared to be depressed.

28.     The police officers informed her that the ambulance was on its way and that they just needed to talk to Mohamed. The officers, Mrs. Bah, and the family friends went into Mohamed's apartment building and upstairs to his apartment door.  During the initial interactions

with the aforementioned officers, Mrs. Bah and the family friends were standing on a stairway immediately adjacent to the apartment door.  From that vantage point, Mrs. Bah and the friends were able to observe the interaction between Mohamed and the responding officers.

29.     The officers knocked on the apartment door. Mohamed opened the door, and told the police that he did not call them and to please leave the premises.  Instead, the officers, who did not advise Mohamed that his mother was present or that she had called 911 for an ambulance for him, attempted to force their way into the apartment. Mohamed repeatedly told them that he was fine and that he wished to be left alone. He closed and locked the door and remained at all times within his apartment.

30.     Alarmed by the interaction with the police, Mrs. Bah asked to speak with her son directly, as Mohamed was unaware that she was present. The officers, including their supervisor, Gallitelli, refused her repeated requests and said they would handle matters.

31.     Based on their interactions with Mr. Bah, the responding officers determined that he was an EDP, called for ESU personnel to respond to the scene and ordered Mrs. Bah and the family friends to exit the building.

32.     Gallitelli violated the NYPD EDP policy by, *inter alia*, failing to request assistance from an interpreter, as Mr. Bah and his family members who were present were from Guinea or other African countries, and their first language was not English. Gallitelli also violated said policy by failing to request the assistance of Mrs. Bah in communicating with her son, and refusing her requests to speak with Mohamed.

33.     Mrs. Bah and the friends exited the building, but remained outside in front of the apartment building. When Mrs. Bah saw numerous police officers arriving with tools to break the apartment door and some with what appeared to be guns drawn, she asked them to please

leave and not to break the door, as her son was alone in the apartment and was not a danger to anyone. They ignored her pleas.

34.     On two occasions during the incident, Mrs. Bah asked a resident of the building to speak with the officers inside and advise them again that she was present, and that her son told her that he had a fear of police officers due to a prior incident when he was assaulted by the police.

35.     The resident went into the building and approached a supervising officer who wore a white shirt.  She told him on two occasions that Mrs. Bah was outside, that she wanted to speak with her son, that she could get him to open the door, and that he had a fear of the police. The white shirted officer told the resident that they were handling the situation and did not need Mrs. Bah's assistance.

36.     Throughout the incident, Mrs. Bah pleaded with the police officers to allow her and her family friends to speak with her son since the police officers refused to leave, but the police officers ignored her pleas.

37.     In response to the call for ESU personnel, Defendants Licitra, McCormack, Kress, Mateo, and Green responded.  Licitra was the ESU supervisor and responded to the scene in response to a division radio call from Gallitelli who requested that an ESU unit respond to 113 Morningside Avenue with regard to a barricaded EDP.  The request for the ESU response was transmitted over the special operations division radio and the initial transmission did not state that the EDP was armed with a knife.

38.     On information and belief, in violation of the NYPD EDP Policy the Precinct Commander/Duty Captain was not notified by the desk officer or other officers and did respond to the scene.  The failure to notify the Precinct Commander/Duty Captain violated the NYPD

EDP Policy.  Under said policy it is the responsibility of the Precinct Commander/Duty Captain to, *inter alia,* assume command, including firearms control; confer with the ranking ESU supervisor on the scene; develop plans and tactics to be utilized; direct whatever further action is necessary, including the use of negotiators; direct the use of alternate means of restraint, including, but not limited to, OC spray, tear gas, baton, restraining equipment or stun device.

39.     The failure to notify the Precinct Commander/Duty Captain resulted and/or caused a failure of command structure at the scene, a failure to properly supervise the ESU and other personnel, and contributed to the series of events that ultimately led to Mohamed's death.

40.     According to the NYPD EDP policy until the commander officer or duty captain arrives at the scene, the highest ranking uniformed police supervisor is in command and required to coordinate police operations.  At the scene there were two lieutenants – Gallitelli and Licitra.

41.     Said lieutenants failed to ensure that all officers were directed to maintain firearms control.  They failed to designate one or more officers to act as the designated shooter(s) in the event the use of deadly force becomes unavoidable.  The failure to designated shooter(s) resulted in a mass reflex response as more fully described below.  The said failures were in violation of the NYPD Barricaded Persons Policy and contributed to or caused Mohamed's death.

42.     According to the NYPD EDP policy, if the EDP is contained and believed to be armed or violent but due to containment poses no immediate threat of danger to any person, no additional action may be taken without the authorization of the commanding officer or duty captain at the scene.

43.     As Mohamed was contained in a locked apartment and presented a threat to no person due to such containment, no action was to be taken without the authorization of the

commanding officer or duty captain.  As the duty captain or commanding officer was not present to provide authorization, the actions taken as stated herein were in violation of the EDP policy.

44.     Licitra and Gallitelli violated the NYPD EDP policy by failing to devise appropriate plans and tactics to deal with the situation presented as required by the EDP policy and failed to notify the Precinct Commander/Duty Captain as aforementioned.  They also violated the policy by taking actions that endangered the EDP wherein the EDP was contained and no threat to anyone without appropriate authorization as aforementioned.

45.     Said Defendants wore ESU tactical gear, including, but not limited to, bullet proof vests and helmets.  They also had Tasers, a Y-bar, a fire extinguisher, a rubber pellet projectile weapon, a bunker shield, a pole camera, a hydraulic device for breaching doors, and firearms.

46.     As a result of their interactions with Mohamed, the police officers at the scene confirmed that he was an emotionally disturbed person.  Instead of taking the proper precautions and following the NYPD emotionally disturbed persons ("EDP") protocol, as aforementioned, the police officers escalated the situation and were unauthorized in their actions, including the use of force.

47.     During the hour long siege, the ESU officers yelled at Mohamed, taunted him, screamed that they were not leaving until he came outside, and repeatedly kicked his door. The behavior of the officers increased Mohamed's fear and apprehension, causing him to reasonably fear that the officers were there to harm him.

48.     The ESU personnel blocked the peephole to Mr. Bah's door, and tied a rope around the door handle and secured it to the banister.

49.     The ESU personnel then removed the peephole and inserted into the peephole a chemical illumination device into the apartment.

-11-

50. The ESU personnel removed the rope from the banister and used a hydraulic device to breach Mr. Bah's door. They then inserted a pole camera into the apartment. They could see Mr. Bah standing in the apartment. The ESU personnel could hear Mr. Bah praying while he was in the apartment. No one else was visible in the apartment.

51. After these observations were made, the door was opened. Defendant Kress entered the apartment with the bunker shield and a Taser. Defendant Mateo was behind Kress, and Defendant McCormack was behind Mateo. Said officers entered the apartment. At all times, Mr. Bah remained inside of his apartment.

52. Defendant Kress fired his Taser at Mr. Bah. The Taser dart was used negligently and was therefore ineffective. Defendant Mateo fired the rubber pellet weapon. Defendant McCormack fired his Taser from behind Mateo and over Mateo's shoulder. The Taser dart was used negligently and was therefore ineffective.

53. However, Defendant Mateo was struck from behind by a Taser dart from Defendant McCormack and experienced a burning sensation from the dart. As a result of the Taser contact with Mateo he fell to the ground, and knocked over the other officers who were behind him. These officers reported burning sensations that may have resulted from the Taser dart wire making contact with Mateo's projectile weapon.

54. After experiencing the burning sensation, Mateo yelled out "He's stabbing me. Shoot him." In fact, Mateo had been hit by McCormack's Taser. Mateo discharged five rounds from his weapon, Defendant Kress discharged three rounds from his weapon, and Defendant Green discharged two rounds from his weapon.

55. The weapon discharges appear to have been a mass reflexive response to Mateo's utterances and as a result of the discharge of Mateo's firearm.

56.     Before the gun shots were fired, residents of the building heard the police yelling at Mohamed. They also heard the sound of the door being forcibly opened and loud noises emanating from the apartment after the door was opened. One resident who was present on a landing below Mohamed's apartment heard the officers screaming at Mohamed and then immediately heard multiple gun shots once the door was opened. Mohamed was struck in the head, arms and torso with at least eight bullets.

57.     Immediately after discharge of the firearms, Detective Christopher Zaberto checked Kress, Green, and Mateo to see if any of them had been stabbed with a knife. He reported negative results and the officers advised that they were okay.

58.     Zaberto checked Mr. Bah and reported that Mr. Bah was alive and conscious. Zaberto administered aid to Mr. Bah while he was still in the apartment.

59.     Mr. Bah was removed from the apartment and dragged through the hallways of his buildings and in the process his blood was smeared on the apartment building floors.

60.     As Mrs. Bah stood in front of the apartment building, she saw her son, carried on a stretcher, exiting the building. EMS workers administered CPR to Mohamed once he was outside the building. Mrs. Bah overheard an officer or EMS worker state that her son was alive. He was taken in an ambulance to the hospital, where he was pronounced dead.

### Emotionally Disturbed Persons and Encounters with the NYPD

61.     The death of Mohamed is the latest in a long series of wrongful death incidents in the City in which the police have inappropriately responded to situations involving persons they perceive to be EDPs.

62.     The NYPD is often the first to respond to incidents involving EDPs. The NYPD handles over 100,000 EDP calls per year. These calls often result in unwarranted arrest,

emotional and physical abuse, and even the death of those in crisis.

63.     The first landmark incident came in 1984. Police broke down the door of 66-year-old Eleanor Bumpurs in an effort to evict her from public housing and hospitalize her for what a psychiatrist sent by the City deemed to be psychosis.  Carrying shields and a Y-shaped restraining bar, police attempted to subdue Bumpurs. In the ensuing struggle, Police Officer Stephen Sullivan fired two shots from his 12-gauge shotgun and killed her.  As a result of the Bumpurs killing, the NYPD developed protocols for handling EDPs, but failed to include in said protocols the involvement of mental health professionals.

64.     In 1999, Gidone Busch, a bipolar 31-year-old who lived in Borough Park, was shot to death by police responding to a complaint that he was threatening a local boy with a hammer. Busch was in his apartment when six police officers confronted him, but he backed out onto the sidewalk, where police used pepper spray on him. Four officers fired their guns and killed him. The officers claimed that he lunged at them with a hammer.

65.     In the space of a week in 2007, police officers shot and killed two emotionally disturbed men in Brooklyn. Khiel Coppin, 18, was holding a hairbrush under his shirt like a gun when police killed him in Bedford-Stuyvesant. David Kostovski, 29, was brandishing a broken bottle when he was shot in East New York.

66.     In 2008, police responded to a call from the mother of 35-year-old Iman Morales, who was not answering his front door. When police arrived at the Bedford-Stuyvesant apartment, Morales, naked, retreated out the window and onto a ledge 10 feet above the sidewalk. Police called for an inflatable air bag to place on the sidewalk under Morales, but did not wait for it to arrive before shooting him with a Taser. Morales went stiff, fell headfirst onto the sidewalk, and died.

67.    In 2012, the police responded to the home of Shauna Francis in Queens.  Ms. Francis was a diagnosed schizophrenic who had been refusing to take her medications.  Her sister had called 311 for an ambulance to take Ms. Francis to the hospital.  Instead the operator transferred the call to a 911 dispatcher who sent police officers to the Francis home.  During the incident several officers wrestled Ms. Francis to a bed. Four officers pressed her face down onto the mattress and handcuffed her.  She died on the bed as she suffocated under the weight of the officers.

68.    On September 14, 2013, police officers encountered Glenn Broadnax as he ran erratically in the streets surrounding Times Square.  The officers attempted to catch him, but he eluded them.  When Mr. Broadnax, who was emotionally disturbed and unarmed, reached into his pants pockets, the officers fired at him multiple times and injured two bystanders.

### Police Policies and Procedures

69.    In the wake of the Bumpurs killing, the NYPD adopted certain policies regarding interactions with EDPs.  According to the NYPD EDP policy, the use of deadly force is a last resort.  Officers are directed to deploy protective shields and to use non-lethal devices to ensure the safety of all those present.  Officers are also directed to request assistance from an interpreter if needed and to seek assistance from the subject's family or friends.

70.    In their interactions with Mohamed, the police officers violated the aforementioned policies. Said violations, include, but are not limited to, failing to involve his mother at the scene, failing to establish firearms control, failing to use the Y bar or water extinguisher or other devices, such as pepper spray or flash bang devices.

71.    Missing from the NYPD policy is any requirement that mental health professionals be deployed to incidents involving EDPs.  Also, there are no explicit provisions for

mental health training models or re-training in how to identify an EDP and the appropriate techniques to de-escalate an EDP encounter.

72.     While the EDP policy in New York is an improvement over the police practices at the time of the Bumpurs killing, police are not being adequately trained or supervised in the implementation of the policy.

73.     Additionally, the City has refused to adopt best practice policies that are in use in several cities across the country.  Those cities that have adopted a model more focused on training officers in mental health disciplines and involving mental health professionals have experienced less violence and death in police encounters with EDPs.

74.     In 1987, when a Memphis Police Department  ("MPD") officer shot and killed a mentally ill person, the MPD decided to revisit its policies for handling EDP calls and to reach out to mental health professionals and to the mentally ill themselves, and their families to craft a new strategy.

75.     The result, soon termed the "Memphis Model," was a policy that involved mental health professionals. It relied heavily on Crisis Intervention Teams, or CITs, composed of police officers who had volunteered to undergo between 40 and 80 hours of extra training in responding to EDP calls.  Enough Memphis officers were trained that when an EDP call came through, at any hour and in any part of the city, dispatchers could refer the call to a Crisis Intervention Team – as opposed to the Emergency Services Unit or SWAT teams.

76.     CIT officers are trained in de-escalation. They are taught that shouting at people in mental distress does not help; that surrounding them, threatening them, and rushing them is almost invariably counterproductive.

77.     The results of implementing the CIT program in Memphis were dramatic. In the

three years before CIT was instituted, mental-health-related calls led to injuries 35 times out of 100,000. In the three years after CIT was in place, that rate dropped to seven injuries in 100,000 calls.

78.     Over the past 25 years, versions of the program have been adopted by police departments in more than 2,000 communities in over 40 states. It has been adopted state-wide in Maine, Connecticut, Ohio, Georgia, Florida, Utah, and Kentucky. Municipalities that have adopted CIT models, include, but are not limited to, Seattle, Albuquerque, Portland, Los Angeles, Houston, Rochester, and Chicago. It has won plaudits from Amnesty International, the National Alliance on Mental Illness, the U.S. Justice Department, and the International Association of Chiefs of Police. The Council of State Governments has been advocating for the adoption of CIT-like programs across the country.

79.     Despite the number of violent deaths of EDPs in encounters with the police, and, and the effectiveness of the CIT program in reducing violence and death during such situations, the NYPD has refused to adopt a similar model.

80.     The failure of the NYPD and the City to adopt the CIT model or similar models has resulted in continued and escalating violent incidents in cases involving police encounters with EDPs or persons they perceive to be emotionally disturbed.

81.     The failure of the NYPD and the City to mandate the involvement of mental health professionals in incidents when the police are responding to EDP calls has led to violence and death in such encounters.

82.     The failure of the NYPD and the City to require 40-80 hours of training, to designate specialized team of officers with mental health training, not ESU units, to respond to EDP calls, and to require in-service training of officers who may be called to respond to EDP

situations has led to violence and the death of EDPs in police encounters.

83.     The foregoing failure to adopt policies, train and retrain officers and supervise same has also led to injuries to officers who respond to these calls and to members of the public.

84.     As a result of the failure to adopt an adequate policy for responding to EDPs the City has a policy or custom of not training or properly supervising its police officers or supervisors in responding to situations involving EDPs.

85.     The failure to have an adequate policy was a contributing factor in the death of Mohamed because the City had no appropriate policy in place for such situations and had not properly trained or supervised its officers responding to same.

86.     Said policies, training, and/or failure to adopt policies or to adequately train its employees as aforementioned resulted in the death of Mohamed Bah.

87.     Additionally, the failure of the officers who responded to the scene to follow the current EDP policy also led and/or contributed to the death of Mohamed.

88.     The failure of the supervisors to follow the EDP policy and their failure to adequately supervise the officers under their command contributed to the cause of Mohamed's death.

89.     A Notice of Claim pursuant to New York General Municipal Law § 50-e was timely served upon Defendant City on December 21, 2012. More than thirty days have elapsed without the matter being resolved by City. The Notice of Claim provided detailed information regarding the actions that the officers took during the incident with Mohamed at his apartment and was sufficient to put the officers and the City on notice of the conduct that they were alleged to have engaged in.

90.     After the incident, the City did not release the names of the officers who

responded to Mohamed's apartment or who shot him or otherwise interacted with him.

91.     On March 24, 2013, a FOIL request was made to the City seeking documents relevant to the incident complained of herein.  On April 3, 2013, the City responded that it was reviewing the request, but no documents have been provided in response to the FOIL request.

92.     The City only released to Plaintiff the names of the responding officers after a court conference subsequent to the filing of the Complaint in this action.

## FEDERAL CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*(Pursuant to 42 U.S.C. §1983 for Violations of
the Fourth and Fourteenth Amendments against the Individual Defendants)*

93.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

94.     At the time of the incident complained of herein, the Individual Defendants were all employees of the Defendant City and acted under color of law as police officers.

95.     The aforesaid actions of said Defendants deprived Mohamed of life and liberty without due process of law in violation of the Fourteenth Amendment.

96.     The dragging of Mohamed's injured body by John Does 1-10, employees of the City whose names are presently unknown to the Plaintiff, through the hallways of his apartment building whereby his blood was smeared along the floors of the halls deprived Mohamed of his right to bodily integrity in violation of the Fourteenth Amendment.  Such actions shock the conscience and should be not tolerated in a civilized society or permitted by employees of the City.

97.     Said actions also deprived Mohamed of his right to be secure in his person and home against unreasonable searches and seizures in violation of the Fourth Amendment.

98.     Said actions also deprived Mohamed of his right to equal protection of the laws in violation of the Fourteenth Amendment.

99.     The aforesaid actions of said Defendants were an unreasonable and unnecessary use of excessive force and unlawful entry into Mohamed's home that deprived him of rights, privileges and immunities secured by the Fourth and Fourteenth Amendments of the United States Constitution, in violation of 42 U.S.C. §1983.

### SECOND CLAIM FOR RELIEF

*(Monell Claims Against Defendant City)*

100.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

101.     The injuries sustained by Mohamed Bah were the result of the City's adoption of inadequate policies regarding EDPs.   As a result of the failure of the City to adopt adequate policies, it also failed to properly train its officers how to handle EDP situations.  The failures aforementioned evidence a deliberate indifference on the part of said Defendant to the constitutional rights of EDPs and Mohamed.  As a result of said deliberate indifference, the officers and supervisors responding to Mohamed's apartment violated his constitutional rights.

102.     The injuries sustained by Mohamed Bah were the result of the failure of said Defendant to have policies for appropriately responding to service calls involving health emergencies or emotionally disturbed persons.

103.     The injuries sustained by Mohamed Bah were the result of the deliberate indifference of said Defendant to properly create guidelines and procedures in connection with service calls involving health emergencies or emotionally disturbed persons.

104.     The injuries sustained by Mohamed Bah were the result of the deliberate

indifference of said Defendant to properly create alternative protocols when addressing service calls involving health emergencies or emotionally disturbed persons.

105.    The injuries sustained by Mohamed Bah were the result of the failure of said Defendant to train its police officers how to appropriately respond to service calls involving health emergencies or emotionally disturbed persons.

106.    The injuries sustained by Mohamed Bah were the result of the failure of said Defendant to adequately supervise police officers in connection with service calls involving health emergencies or emotionally disturbed persons.

107.    The injuries sustained by Mohamed Bah were the result of the failure of said Defendant to train and/or supervise its officers in the implementation of the EDP policy.

108.    The injuries sustained by Mohamed Bah were the result of the deliberate indifference and failure of said Defendant to effectively establish proper protocols addressing the use of force when addressing the mentally ill or emotionally disturbed persons.

109.    The injuries sustained by Mohamed Bah were the result of the failure of said Defendant to adequately train its officers in the continuum of force, the use of physical force, deadly force and Tasers in EDP cases.

110.    Based on the foregoing, the City, with knowledge of the affirmative duty under the ADA and the Rehabilitation Act failed to provide its officers with appropriate training for dealing with emotionally disturbed or mentally ill persons or for handling encounters with mentally ill residents in their homes or in the streets, without resorting to force and failed to establish and maintain policies, practices and procedures to ensure that persons with disabilities were not discriminated against or otherwise harmed in the course of their contact with the police.

111.    As a result of the allegations aforesaid, the City failed to modify policies,

practices and procedures to ensure that persons with disabilities are not denied services or treated in a discriminatory manner in violation of the ADA and the Rehabilitation Act of 1973.

112.    As a result of the aforementioned policies, practices, custom, usages, and failures of said Defendant, and the deliberate indifference to the duty to have such policies to ensure the safety of the residents of the City, Mohamed sustained the injuries and deprivations aforementioned in violation of 42 U.S.C. §1983, 42 U.S.C. §12101, Section 504 of the Rehabilitation Act of 1973, and the rights secured by the Fourth and Fourteenth Amendments.

## THIRD CAUSE OF ACTION

### *(Supervisory Liability)*

113.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

114.    Defendants Licitra and Gallitelli performed supervisory functions at the scene, and were responsible for supervising the police officers who responded to the scene at Mohamed's residence. As stated above, said Defendants failed to properly supervise said officers and took no actions that would have prevented the injuries sustained by Mohamed.

115.    As mentioned above, said Defendants failed to maintain firearms control and failed to adhere to the EDP protocols and practices.

116.    As a direct and proximate cause of said Defendants' failure to properly supervise their subordinates, Mohamed's constitutional rights were violated as aforementioned in violation of 42 U.S.C. §1983.

## STATE CLAIMS FOR RELIEF

### FOURTH CLAIM FOR RELIEF

*(For Conscious Pain and Suffering against Defendants Kress, Mateo, Green and City)*

117.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

118.    Defendants Kress, Mateo, and Green without just cause, or provocation, used force and/or deadly physical force against Mohamed. The use of such force was not justified or warranted under the circumstances and constituted unreasonable and unnecessary force.

119.    The use of such force did not immediately cause Mohamed's death.  As a result, he suffered and experienced a fear of impending death, severe emotional distress, and conscious pain and suffering.

120.    The Defendant City is responsible for the actions of said Defendants that were taken in the scope of their employment as police officers.

### FIFTH CLAIM FOR RELIEF

*(For Wrongful Death against Defendants Kress, Mateo, Green and City)*

121.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

122.    Defendants Kress, Mateo and Green, acting within the scope of their employment, caused the death of Mohamed by the use of a firearm, without cause or justification.

123.    Said actions render them liable for the wrongful death of Mohamed.

124.    Defendant City is responsible for the actions of said Defendants that were taken in the scope of their employment as police officers.

## SIXTH CLAIM FOR RELIEF

*(For Assault and Battery against Defendants Kress, Mateo, Green, McCormack, and City)*

125.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

126.    The actions of the said Defendants were intentional, malicious and were committed with wanton disregard for the rights of Mohamed.

127.    The actions of said Defendants were unjustified and unnecessary in the performance of their duties as police officers and were unreasonable and unwarranted and constituted an excessive use of force.

128.    The actions aforesaid constituted unlawful assaults and batteries upon Mohamed.

129.    The said Defendants acted in concert and conspired to commit said assaults and batteries upon Mohamed.

130.    As a result of said conduct of said Defendants, Mohamed sustained serious and severe injuries, both physical and emotional.

131.    Defendant City is responsible for the actions of said Defendants as the acts were committed within the scope of their employment as police officers.

## SEVENTH CLAIM FOR RELIEF

*(For Negligence against All Defendants)*

132.    Plaintiffs incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

133.    The individual officers, acting within the scope of their employment, negligently discharged their duties by failing to exercise a reasonable degree of care, and thereby caused Mohamed to sustain the injuries and deprivations aforementioned.

134.    The acts of negligence of said officers included, but are not limited to, forcibly breaking the door of Mohamed's door, negligently discharging the Taser, and other conduct that was improper under the circumstances and caused Mohamed to become agitated, non-cooperative, and emotionally distraught.

135.    The actions of said defendants violated the Patrol Guide, including, but not limited to the EDP Policy, the Barricaded Policy, Use of Force and Deadly Force policies.

136.    Defendant City is responsible for the negligence of its officers committed within the scope of their employment.

137.    Defendant City was negligent by failing to properly train or supervise its officers in how to properly respond to service calls involving emergency medical situations or involving emotionally disturbed persons.

138.    Defendant City was negligent by failing to properly train or supervise its police officers in the use of Tasers, physical force, deadly force, or the continuum of force.

139.    By the actions described above, each and every Defendant, jointly and severally, has committed the foregoing wrongful acts against Mohamed, which are tortious under the Constitution and laws of the State of New York.

140.    The aforementioned acts and conduct proximately caused the injuries sustained by Mohamed and violated the statutory and common law rights guaranteed to them by the Constitution and the laws of the State of New York.

## PUNITIVE DAMAGES

141.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

142.    The acts of the Individual Defendants were willful, wanton, malicious and

oppressive and were motivated solely by a desire to harm Mohamed without regard for his well-being and were based on a lack of concern and ill-will towards Mohamed. Such acts therefore warrant an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a. An order declaring that the City's current EDP policy violates 42 U.S.C. §1983, and the Fourth and the Fourteenth Amendments to the United States Constitution;

b. An order declaring that the City's current EDP policy violates the Americans with Disabilities Act;

c. An order declaring that the City's current EDP policy violates the Rehabilitation Act of 1973;

d. An order declaring that the City failed to institute and implement adequate policies and procedures with respect to police responses to situations involving EDPs;

e. Twenty million dollars in compensatory damages;

f. Fifty million dollars in punitive damages against the Individual Defendants;

g. An award of the costs and expenses of this action including attorneys' fees to the Plaintiff pursuant to 43 U.S.C. §1988; and

h. Any such other and further relief as this Court may deem appropriate.

## A JURY TRIAL IS DEMANDED

DATED:    New York, New York
          December 9, 2013

                              NEWMAN FERRARA LLP

                         By: _____
                              Randolph M. McLaughlin
                              rmclaughlin@nfllp.com
                              Debra S. Cohen
                              dcohen@nfllp.com
                              Jeffrey M. Norton
                              jnorton@nfllp.com
                              1250 Broadway, 27th Floor
                              New York, New York 10001
                              Tel: 212-619-5400
                              Fax: 212-619-3090

                              Franciscus L. Diaba
                              fdiaba@diabalaw.com
                              375 Park Avenue
                              Suite 2607
                              New York, New York 10152
                              Tel: 212-634-9974
                              Fax: 646-390-2905

                              Mayo Bartlett
                              mgb@mayobartlett.com
                              Abdulwali Muhammad
                              wm@walimuhammadlaw.com
                              81 Main Street
                              Suite 118
                              White Plains, New York 10601
                              Tel: 914-224-3086
                              Fax: 914-468-6333

                              *Counsel for Plaintiff*