UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OUMOU BAH, AS THE ADMINISTRATOR OF
THE ESTATE OF MOHAMED BAH,

             Plaintiff,

    vs.

THE CITY OF NEW YORK, et al.

             Defendants.

**13 CV 6690 (PKC)(KNF)**

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**NEWMAN FERRARA LLP**
Randolph M. McLaughlin
rmclaughlin@nfllp.com
Debra S. Cohen
dcohen@nfllp.com
Jeffrey M. Norton
jnorton@nfllp.com
1250 Broadway, 27th Floor
New York, New York 10001
Tel: 212-619-5400
Fax: 212-619-3090

Franciscus L. Diaba
fdiaba@diabalaw.com
375 Park Avenue
Suite 2607
New York, New York 10152
Tel: 212-634-9974
Fax: 646-390-2905

Mayo Bartlett
mgb@mayobartlett.com
Abdulwali Muhammad
wm@walimuhammadlaw.com
81 Main Street
Suite 118
White Plains, New York 10601
Tel: 914-224-3086
Fax: 914-468-6333

*Counsel for Plaintiff*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...............................................................................................ii

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF FACTS ...................................................................................................1

ARGUMENT......................................................................................................................13

I.   PLAINTIFF'S AMENDED COMPLAINT ALLEGES SUFFICIENT
     FACTUAL DETAIL TO PLAUSIBLY STATE CLAIMS FOR RELIEF ..............13

II.  PLAINTIFF HAS SUFFICIENTLY ALLEGED THE PERSONAL
     INVOLVEMENT OF THE INDIVIDUAL DEFENDANTS...................................13

     A. Plaintiff's § 1983 Claims are Sufficiently Pleaded Against Johnson,
        Stanton, Santana, Licitra, and McCormack ...............................................14

     B. Plaintiff has Sufficiently Pleaded A Supervisory Liability Claim
        Against Defendant Gallitelli .....................................................................17

III. PLAINTIFF'S § 1983 CLAIMS ARE WELL PLEADED AGAINST THE
     INDIVIDUAL DEFENDANTS..............................................................................19

     A. Plaintiff's Due Process Claim Is Well Pleaded....................................19

     B. Plaintiff's Equal Protection Claim Is Well Pleaded ............................20

IV.  PLAINTIFF HAS COMPLIED WITH THE NOTICE OF CLAIM
     REQUIREMENT....................................................................................................21

V.   PLAINTIFF MAY PLEAD NEGLIGENCE CLAIMS IN THE
     ALTERNATIVE.....................................................................................................23

VI.  PLAINTIFF'S TRAINING AND SUPERVISION CLAIMS ARE WELL
     PLEADED ..............................................................................................................24

CONCLUSION..................................................................................................................26

# TABLE OF AUTHORITIES

## **CASES**                                                                                      **Page**

*Amnesty Am. v. Town of W. Hartford*,
    361 F.3d 113 (2d Cir. 2004)................................................................................................ 24

*Anderson v. Branen*,
    17 F.3d 552 (2d Cir. 1994)................................................................................................. 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................................ 13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................................ 13

*Bernhard v. Dutchess Community College*,
    No. 80 CV 4871, 1982 WL 193 (S.D.N.Y. Feb. 19, 1982) ..................................................... 21

*Busch v. City of New York*,
    224 F.R.D. 81 (E.D.N.Y. 2004) ............................................................................................ 20

*Busch v. City of New York*,
    No. 00 Civ. 5221 (SJ), Dkt No. 221, Slip Op. (E.D.N.Y. Sep. 20, 2003) ............................... 20

*Busch v. City of New York*,
    No. 00 CV 5211 (SJ), 2003 U.S. Dist. LEXIS 27571 (E.D.N.Y. Sept. 11, 2003).................... 23

*Byrd v. Clark*,
    783 F.2d 1002 (11th Cir.1986) ............................................................................................ 15

*Cerbelli v. City of New York*,
    No. 99 Civ. 6846 (ARR) (RML), 2008 U.S. Dist. LEXIS 109341 (E.D.N.Y. Sept. 8, 2008).. 19

*Chamberlain v. City of White Plains*,
    No. 12 CV 5142(CS), 2013 WL 6477334 (S.D.N.Y. 2013).................................. 15, 22, 24, 25

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998)............................................................................................................ 14

*Dineen ex rel. Dineen v. Stramka*,
    228 F. Supp. 2d 447 (S.D.N.Y. 2002)................................................................................... 23

*Ferran v. Town of Nassau*,
    11 F.3d 21 (2d Cir. 1993), *cert. denied*, 513 U.S. 1014 (1994)............................................... 20

*Gagnon v. Ball,*
  696 F.2d 17 (2d Cir. 1982)..................................................................................................... 15

*Glowczenski v. Taser Int'l Inc.,*
  No. CV 04 4052(WDW), 2010 U.S. Dist. LEXIS 47129 (E.D.N.Y. May 13, 2010).............. 23

*Henry v. Daytop Vill., Inc.,*
  42 F.3d 89 (2d Cir. 1994)....................................................................................................... 23

*Johnson v. Newburgh Enlarged School Dist.,*
  239 F.3d 246 (2d Cir. 2001)................................................................................................... 14

*Johnson v. Newburgh Enlarged School Dist.,*
  239 F.3d 246 (2d Cir. 2001)................................................................................................... 17

*Malay v. City of Syracuse,*
  638 F. Supp. 2d 303 (N.D.N.Y. 2009)................................................................................... 24

*Monell v. Dep't of Soc. Servs.,*
  436 U.S. 658 (1978)................................................................................................................. 1

*O'Neill v. Krzeminski,*
  839 F.2d 9 (2d Cir. 1988)....................................................................................................... 15

*Provost v. City of Newburgh,*
  262 F.3d 146 (2d Cir. 2001)................................................................................................... 17

*Skorupski v. County of Suffolk,*
  652 F. Supp. 690 (E.D.N.Y. 1987) ....................................................................................... 15

*Tyrell v. Seaford Union Free School District,*
  No. CV 08 4811 (SJF) (MLO), 2010 WL 1198055 (E.D.N.Y. March 25, 2010) ................... 22

*V.E.C. Corp. of Del. v. Hilliard,*
  10 CV 2542 (VB), 2011 WL 7101236 (S.D.N.Y. 2011)......................................................... 13

*Vilkhu v. City of New York,*
  No. 06 CV 2095 (CPS) (JO), 2008 U.S. Dist. LEXIS 36454 (E.D.N.Y. May 5, 2008)........... 23

*Village of Willowbrook v. Olech,*
  528 U.S. 562 (2000)............................................................................................................... 21

*Webb v. Hiykel,*
  713 F.2d 405 (8th Cir.1983) ................................................................................................. 15

*Yang Feng Zhao v. City of New York*,
  656 F. Supp. 2d 375 (S.D.N.Y. 2009) ...................................................................................... 21

## STATUTES

42 U.S.C. § 1983 ..................................................................................................................... *passim*

New York General Municipal Law § 50-e(6) .............................................................................. 21

## RULES

Fed. R. Civ. P. 12(b)(6) ......................................................................................................... *passim*

Fed. R. Civ. P. 8(e)(2) ................................................................................................................ 23

**PRELIMINARY STATEMENT**

Oumou Bah, as the Administrator of the Estate of Mohamed Bah ("Plaintiff"), respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss of Defendants: City of New York ("New York" or the "City"), Michael Licitra ("Licitra"), Joseph McCormack ("McCormack"), Robert Gallitelli ("Gallitelli"), Vincent Johnson ("Johnson"), Brian Stanton ("Stanton"), and Esmeralda Santana ("Santana") (collectively, "Defendants").

Defendants do not contest any claims on behalf of the now identified shooters of Mr. Bah. Nor do Defendants contest the municipal liability claims asserted against the City under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Instead, Defendants' Motion to Dismiss seeks to shield from liability those officers who were present and actively involved in the siege on Mr. Bah's home, which deteriorated due to inadequate supervision and training, a disregard for Mr. Bah's constitutional rights, and intentional or negligent acts. The Fourth and Fourteenth Amendment stand as bulwarks against such a gross abuse of power by municipal agents. Consequently, this Court should reject the Defendants' unjustified and meritless arguments and compel them to explain their actions through the crucible of discovery and trial.

**STATEMENT OF FACTS**

**The Siege of Mohamed Bah's Home**

On or about September 25, 2012, at approximately 6:40 p.m. through 8:30 p.m., Mohamed Bah was at his home located at 113 Morningside Avenue, Apt. 5D, in New York County, City and State of New York. Amended Complaint ("AC") ¶20. Mr. Bah, 28, was a college student with the aim of getting a finance degree. AC ¶21. He was working at night and going to school by day. *Id.* He dreamed of one day getting married and helping his mother expand her business in Guinea, West Africa. *Id.*

In the months before his untimely demise, his behavior had changed. AC ¶22. He was acting erratically, had lost weight, and exhibited indications that he was in an emotional or mental health crisis. *Id.* On September 24, 2012 Mohamed's mother, Mrs. Hawa Bah, visited her son from Guinea. AC ¶23. Mrs. Bah was concerned when she saw her son as his appearance had changed dramatically, and he seemed depressed. He also had a cut over his eye and was limping. *Id.* Mohamed claimed that he had been beaten by police officers in the City. *Id.* The next day, September 25, Mr. Bah called to cancel the plans he made to spend the day with his mother. AC ¶24. The sudden change in plans heightened Mrs. Bah's concerns about her son, and she asked some family friends, who lived nearby, to go and check on Mohamed. *Id.* The family friends went to see Mohamed and spoke with him. *Id.* They too became concerned about him but Mohamed told them that he needed rest. *Id.*

On September 25, Mrs. Bah arrived outside of Mohamed's building, along with four family friends. AC ¶25. She dialed 911 at approximately 6:40 p.m., after calling two other numbers given to her by a friend to summon an ambulance. *Id.* Mrs. Bah advised the 911 operator that she was concerned that her son was having a mental health crisis and needed to be transported to a hospital. *Id.* Defendants Gallitelli, Johnson, Stanton, and Santana arrived in response to a 10-54 (ambulance case) EDP radio signal. AC ¶26. The NYPD Patrol Guide defines an EDP, *inter alia*, as a person who appears mentally ill. *Id.* Mrs. Bah explained the situation in detail to the officers, including the fact that her son was non-violent, alone in his apartment, and that he was in need of medical attention, and appeared to be having a mental health crisis. AC ¶27. There was no crime in progress. *Id.* She made it clear that she did not call the police and that their services were not needed, as she just wanted an ambulance to take her son to the hospital. *Id.* She also advised that her son appeared to be depressed. *Id.*

2

The police officers informed her that the ambulance was on its way and that they just needed to talk to Mohamed. AC ¶28. The officers, Mrs. Bah, and the family friends went into Mohamed's apartment building and upstairs to his apartment door. *Id.* During the initial interactions with the aforementioned officers, Mrs. Bah and the family friends were standing on a stairway immediately adjacent to the apartment door. *Id.* From that vantage point, Mrs. Bah and the friends were able to observe the interaction between Mohamed and the responding officers. *Id.* The officers knocked on the apartment door, which Mohamed opened, and told the police that he did not call them and to please leave the premises. AC ¶29. Instead, the officers, who did not advise Mohamed that his mother was present or that she had called 911 for an ambulance for him, attempted to force their way into the apartment. *Id.* Mohamed repeatedly told them that he was fine and wished to be left alone. *Id.* He closed and locked the door and remained at all times within his apartment. *Id.* Alarmed by the interaction with the police, Mrs. Bah asked to speak with her son directly, as Mohamed was unaware that she was present. AC ¶30.  The officers, including their supervisor, Gallitelli, refused her repeated requests and said they would handle matters. *Id.* Based on their interactions with Mr. Bah, the responding officers determined that he was an EDP, called for ESU personnel to respond to the scene and ordered Mrs. Bah and the family friends to exit the building. AC ¶31. Gallitelli violated the NYPD EDP policy by failing to request assistance from an interpreter, as Mr. Bah and his family members who were present were from Guinea or other African countries, and their first language was not English. AC ¶32. Gallitelli also violated said policy by failing to request the assistance of Mrs. Bah in communicating with her son, and refusing her requests to speak with Mohamed. *Id.*

Mrs. Bah and the friends exited the building, but remained outside in front of the apartment building. AC ¶33. When Mrs. Bah saw numerous police officers arriving with tools to

3

break the apartment door and some with what appeared to be guns drawn, she asked them to please leave and not to break the door, as her son was alone in the apartment and was not a danger to anyone. *Id.* They ignored her pleas. *Id.* On two occasions during the incident, Mrs. Bah asked a resident of the building to speak with the officers inside and advise them again that she was present, and that her son told her that he had a fear of police officers due to a prior incident when he was assaulted by the police. AC ¶34. The resident went into the building and told a supervising officer who wore a white shirt on two occasions that Mrs. Bah was outside, that she wanted to speak with her son, that she could get him to open the door, and that he had a fear of the police. AC ¶35. The white shirted officer told the resident that they were handling the situation and did not need Mrs. Bah's assistance. *Id*. Throughout the incident, Mrs. Bah pleaded with the police officers to allow her and her family friends to speak with her son since the police officers refused to leave, but the police officers ignored her pleas. AC ¶36.

In response to the call for ESU personnel, Defendants Licitra, McCormack, Kress, Mateo, and Green responded. AC ¶37. Licitra was the ESU supervisor and responded to the scene in response to a division radio call from Gallitelli who requested that an ESU unit respond to 113 Morningside Avenue with regard to a barricaded EDP. *Id.* The request for the ESU response was transmitted over the special operations division radio and the initial transmission did not state that the EDP was armed with a knife. AC ¶37. On information and belief, in violation of the NYPD EDP Policy the Precinct Commander/Duty Captain was not notified by the desk officer or other officers and did not respond to the scene. AC ¶38. The failure to notify the Precinct Commander/Duty Captain violated the NYPD EDP Policy. *Id.* Under said policy it is the responsibility of the Precinct Commander/Duty Captain to, *inter alia*, assume command, including firearms control; confer with the ranking ESU supervisor on the scene; develop plans

4

and tactics to be utilized; direct whatever further action is necessary, including the use of negotiators; direct the use of alternate means of restraint, including, but not limited to, OC spray, tear gas, baton, restraining equipment or stun device. *Id*. The failure to notify the Precinct Commander/Duty Captain resulted and/or caused a failure of command structure at the scene, a failure to properly supervise the ESU and other personnel, and contributed to the series of events that ultimately led to Mohamed's death. AC ¶39. According to the NYPD EDP policy until the commander officer or duty captain arrives at the scene, the highest ranking uniformed police supervisor is in command and required to coordinate police operations. AC ¶40. At the scene there were two lieutenants – Gallitelli and Licitra. *Id*. Said lieutenants failed to ensure that all officers were directed to maintain firearms control. AC ¶41. They failed to designate one or more officers to act as the designated shooter(s) in the event the use of deadly force becomes unavoidable. *Id*. The failure to designated shooter(s) resulted in a mass reflex response as more fully described below. *Id*. The said failures were in violation of the NYPD Barricaded Persons Policy and contributed to or caused Mohamed's death. *Id*.

According to the NYPD EDP policy, if the EDP is contained and believed to be armed or violent but due to containment poses no immediate threat of danger to any person, no additional action may be taken without the authorization of the commanding officer or duty captain at the scene. AC ¶42. As Mohamed was contained in a locked apartment and presented a threat to no person due to such containment, no action was to be taken without the authorization of the commanding officer or duty captain. AC ¶43. As the duty captain or commanding officer was not present to provide authorization, the actions taken as stated herein were in violation of the EDP policy. *Id*. Licitra and Gallitelli violated the NYPD EDP policy by failing to devise appropriate plans and tactics to deal with the situation presented as required by the EDP policy

5

and failed to notify the Precinct Commander/Duty Captain as aforementioned. AC ¶44. They

also violated the policy by taking actions that endangered the EDP wherein the EDP was

contained and no threat to anyone without appropriate authorization as aforementioned. *Id.* Said

Defendants wore ESU tactical gear, including, but not limited to, bullet proof vests and helmets.

AC ¶45. They also had Tasers, a Y-bar, a fire extinguisher, a rubber pellet projectile weapon, a

bunker shield, a pole camera, a hydraulic device for breaching doors, and firearms. *Id.* As a

result of their interactions with Mohamed, the police officers at the scene confirmed that he was

an emotionally disturbed person. AC ¶46.  Instead of taking the proper precautions and following

the NYPD emotionally disturbed persons ("EDP") protocol, as aforementioned, the officers

escalated the situation and were unauthorized in their actions, including the use of force. *Id.*

     Over the hour long siege, the ESU officers yelled at Mohamed, taunted him, screamed

that they were not leaving until he came outside, and repeatedly kicked his door. AC ¶47. The

behavior of the officers increased Mohamed's fear and apprehension, causing him to reasonably

fear that the officers were there to harm him. *Id.* The ESU personnel blocked the peephole to Mr.

Bah's door, tied a rope around the door handle and secured it to the banister, removed the

peephole and inserted a chemical illumination device into the apartment. AC ¶¶48-49. The ESU

personnel removed the rope from the banister and used a hydraulic device to breach Mr. Bah's

door, inserting a pole camera into the apartment. AC ¶50.  The ESU personnel could hear Mr.

Bah praying while he was in the apartment, and no one else was visible. *Id.*

     After these observations were made, the door was opened. AC ¶51. Defendant Kress

entered the apartment with the bunker shield and a Taser; Defendant Mateo was behind Kress,

and Defendant McCormack was behind Mateo. *Id.* At all times, Mr. Bah remained inside of his

apartment as the officers entered. *Id.* Defendant Kress fired his Taser at Mr. Bah. AC ¶52.  The

Taser dart was used negligently and was therefore ineffective. *Id.* Defendant Mateo fired the rubber pellet weapon. *Id.* Defendant McCormack fired his Taser from behind Mateo and over Mateo's shoulder. *Id.* The Taser dart was used negligently and was therefore ineffective. *Id.* However, Defendant Mateo was struck from behind by a Taser dart from Defendant McCormack and experienced a burning sensation from the dart. AC ¶53. As a result of the Taser contact with Mateo he fell to the ground, and knocked over other officers behind him. *Id.* These officers reported burning sensations that may have resulted from the Taser dart wire making contact with Mateo's projectile weapon. *Id.* After experiencing the burning sensation, Mateo yelled out "He's stabbing me. Shoot him." AC ¶54.  In fact, Mateo had been hit by McCormack's Taser. *Id.* Mateo discharged five rounds from his weapon, Defendant Kress discharged three, and Defendant Green discharged two. *Id.* The discharges appear to have been a mass reflexive response to Mateo's utterances and as a result of Mateo's firearm discharge. AC ¶55.

Before the gun shots were fired, residents of the building heard the police yelling at Mohamed. AC ¶56. They also heard the sound of the door being forcibly opened and loud noises emanating from the apartment after the door was opened. *Id.* One resident who was present on a landing below Mohamed's apartment heard the officers screaming at Mohamed and then immediately heard multiple gun shots once the door was opened. *Id.* Mohamed was struck in the head, arms and torso with at least eight bullets. *Id.* Immediately after discharge of the firearms, Detective Christopher Zaberto checked Kress, Green, and Mateo to see if any of them had been stabbed with a knife. AC ¶57. He reported negative results and the officers advised that they were okay. *Id.* Zaberto checked Mr. Bah and reported that Mr. Bah was alive and conscious. AC ¶58.  Zaberto administered aid to Mr. Bah while he was still in the apartment. *Id.*  Mr. Bah was removed from the apartment and dragged through the hallways of his buildings and in the

7

process his blood was smeared on the apartment building floors. AC ¶59. As Mrs. Bah stood in front of the apartment building, she saw her son, carried on a stretcher, exiting the building. AC ¶60. EMS workers administered CPR to Mohamed once he was outside the building. *Id.* Mrs. Bah overheard an officer or EMS worker state that her son was alive, thereafter was taken in an ambulance to the hospital, where he was pronounced dead. *Id.*

## Emotionally Disturbed Persons and Encounters with the NYPD

The death of Mohamed is the latest in a long series of wrongful death incidents in the City in which the police have inappropriately responded to situations involving persons they perceive to be EDPs. AC ¶61. The NYPD is often the first to respond to incidents involving EDPs. AC ¶62. The NYPD handles over 100,000 EDP calls per year. *Id.* These calls often result in unwarranted arrest, emotional and physical abuse, and even the death of those in crisis. *Id.*

The first landmark incident came in 1984. AC ¶63. Police broke down the door of 66-year-old Eleanor Bumpurs in an effort to evict her from public housing and hospitalize her for what a psychiatrist sent by the City deemed to be psychosis. *Id.* In the ensuing struggle, an officer fired two shots from his 12-gauge shotgun and killed her. *Id.* As a result of the Bumpurs killing, the NYPD developed protocols for handling EDPs, but failed to include in said protocols the involvement of mental health professionals. *Id.*

In 1999, Gidone Busch, a bipolar 31-year-old, was shot to death by police responding to a complaint that he was threatening a local boy with a hammer. AC ¶64. Busch was in his apartment when six police officers confronted him, but backed out onto the sidewalk where four officers shot and killed him, claiming that he lunged at them with a hammer. *Id.*

In the space of a week in 2007, police officers shot and killed two emotionally disturbed men in Brooklyn. AC ¶65. Khiel Coppin, 18, was holding a hairbrush under his shirt like a gun

when police killed him and David Kostovski, 29, was brandishing a broken bottle. *Id.*

In 2008, police responded to a call from the mother of 35-year-old Iman Morales, who was not answering his front door. AC ¶66. When police arrived at the apartment, Morales, naked, retreated out the window and onto a ledge 10 feet above the sidewalk. *Id.* Police called for an inflatable air bag to place on the sidewalk below, but did not wait for it to arrive before shooting him with a Taser. *Id.* Morales went stiff, fell headfirst onto the sidewalk, and died. *Id.*

In 2012, the police responded to the home of Shauna Francis in Queens. AC ¶67. Ms. Francis was a diagnosed schizophrenic who had been refusing to take her medications. *Id.* Her sister had called 311 for an ambulance to take Ms. Francis to the hospital. *Id.* Instead the operator transferred the call to 911, dispatching police officers. *Id.* During the incident several officers wrestled Ms. Francis to a bed. *Id.* Four officers pressed her face down onto the mattress and handcuffed her where she died, suffocated under the weight of the officers. *Id.*

On September 14, 2013, police officers encountered Glenn Broadnax as he ran erratically in the streets surrounding Times Square. AC ¶68. The officers attempted to catch him, but he eluded them. *Id.* When Mr. Broadnax, who was emotionally disturbed and unarmed, reached into his pants pockets, the officers fired at him multiple times and injured two bystanders. *Id.*

**Police Policies and Procedures**

In the wake of the Bumpurs killing, the NYPD adopted certain policies regarding interactions with EDPs. AC ¶69. According to the NYPD EDP policy, the use of deadly force is a last resort. *Id.* Officers are directed to deploy protective shields and to use non-lethal devices to ensure the safety of all those present. *Id.* Officers are also directed to request assistance from an interpreter if needed and to seek assistance from the subject's family or friends. *Id.*

In their interactions with Mohamed, the police officers violated the aforementioned

policies. AC ¶70. Said violations, include, but are not limited to, failing to involve his mother at the scene, failing to establish firearms control, failing to use the Y bar or water extinguisher or other devices, such as pepper spray or flash bang devices. *Id.* Missing from the NYPD policy is any requirement that mental health professionals be deployed to incidents involving EDPs. AC ¶71. Also, there are no explicit provisions for mental health training models or re-training in how to identify an EDP and the appropriate techniques to de-escalate an EDP encounter. *Id.*

While the EDP policy in New York is an improvement over the practices at the time of the Bumpurs killing, police are not being adequately trained or supervised in the implementation of the policy. AC ¶72. Additionally, the City has refused to adopt best practice policies that are in use in several cities across the country. AC ¶73. Cities that have adopted a model more focused on training officers in mental health disciplines and involving mental health professionals have experienced less violence and death in police encounters with EDPs. *Id.*

In 1987, when a Memphis Police Department ("MPD") officer shot and killed and EDP, the MPD decided to revisit its policies for handling such calls and to reach out to mental health professionals and to the mentally ill themselves, and their families to craft a new strategy. AC ¶74. The result, soon termed the "Memphis Model," was a policy that involved mental health professionals, and heavily on Crisis Intervention Teams, or CITs, composed of police officers who had volunteered to undergo between 40 and 80 hours of extra training. AC ¶75. Enough Memphis officers were trained that when an EDP call came through, at any hour and in any part of the city, dispatchers could refer the call to a CIT. *Id.* CIT officers are trained in de-escalation. AC ¶76. They are taught that shouting at people in mental distress does not help; that surrounding them, threatening them, and rushing them is almost invariably counterproductive. *Id.* The results of implementing the CIT program in Memphis were dramatic. AC ¶77. In the

10

three years after CIT was in place, that rate dropped to seven injuries in 100,000 calls. *Id.*

Over the past 25 years, versions of the program have been adopted by police departments in more than 2,000 communities in over 40 states. AC ¶78. It has been adopted state-wide in Maine, Connecticut, Ohio, Georgia, Florida, Utah, and Kentucky. *Id.* Municipalities that have adopted CIT models, include, but are not limited to, Seattle, Albuquerque, Portland, Los Angeles, Houston, Rochester, and Chicago. *Id.* It has won plaudits from Amnesty International, the National Alliance on Mental Illness, the U.S. Justice Department, and the International Association of Chiefs of Police. *Id.* The Council of State Governments has been advocating for the adoption of CIT-like programs across the country. *Id.* Despite the number of violent deaths of EDPs in encounters with the police, and the effectiveness of the CIT program in reducing violence and death during the same, the NYPD has refused to adopt a similar model. AC ¶79.

The failure of the NYPD and the City to adopt the CIT model or similar models has resulted in continued and escalating violent incidents in cases involving police encounters with EDPs or persons they perceive to be emotionally disturbed. AC ¶80. The failure of the NYPD and the City to mandate the involvement of mental health professionals in incidents when the police are responding to EDP calls has led to violence and death in such encounters. AC ¶81. The failure of the NYPD and the City to require 40-80 hours of training, to designate specialized team of officers with mental health training, not ESU units, to respond to EDP calls, and to require in-service training of officers who may be called to respond to EDP situations has led to violence and the death of EDPs in police encounters. AC ¶82. The foregoing failure to adopt policies, train and retrain officers and supervise same has also led to injuries to officers who respond to these calls and to members of the public. AC ¶83. As a result of the failure to adopt an adequate policy for responding to EDPs the City has a policy or custom of not training or

11

properly supervising its police officers or supervisors in responding to situations involving EDPs. AC ¶84. The failure to have an adequate policy was a contributing factor in the death of Mohamed because the City had no appropriate policy in place for such situations and had not properly trained or supervised its officers responding to same. AC ¶85. Said policies, training, and/or failure to adopt policies or to adequately train its employees as aforementioned resulted in the death of Mr. Bah. AC ¶86. Additionally, the failure of the officers who responded to the scene to follow the current EDP policy also led and/or contributed to the death of Mohamed. AC ¶87. The failure of the supervisors to follow the EDP policy and adequately supervise the officers under their command contributed to the cause of Mohamed's death. AC ¶88.

**Notice of Claim**

A Notice of Claim pursuant to New York General Municipal Law § 50-e was timely served upon Defendant City on December 21, 2012. AC ¶89. More than thirty days have elapsed without the matter being resolved by City. *Id.* The Notice of Claim provided detailed information regarding the actions that the officers took during the incident with Mohamed at his apartment and was sufficient to put the officers and the City on notice of the conduct alleged therein. *Id.* After the incident, the City did not release the names of the officers who responded to Mohamed's apartment or who shot him or otherwise interacted with him. AC ¶90. On March 24, 2013, a FOIL request was made to the City seeking documents relevant to the incident complained of herein. AC ¶91. On April 3, 2013, the City responded that it was reviewing the request, but no documents have been provided in response to the FOIL request. *Id.* The City only released to Plaintiff the names of the responding officers after a court conference subsequent to the filing of the Complaint in this action. AC ¶92.

**ARGUMENT**

## I.    PLAINTIFF'S AMENDED COMPLAINT ALLEGES SUFFICIENT FACTUAL DETAIL TO PLAUSIBLY STATE CLAIMS FOR RELIEF

Defendants contend that the Amended Complaint does not satisfy the pleading burden articulated by the United States Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Def. Mem. at 3-4.   Contrary to their arguments, the function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered to support" the legal claims. *V.E.C. Corp. of Del. v. Hilliard*, 10 CV 2542 (VB), 2011 WL 7101236, *2 (S.D.N.Y. 2011) *(internal citations omitted)*.   As the *Twombly* Court itself noted "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief which is plausible on its face." 550 U.S. at 570, n.14; *accord Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010) ("The notion that *Twombly* imposed a heightened standard . . . is belied by the *Twombly* opinion itself.").   Additionally, "dismissal is not appropriate when the relevant facts are solely within the possession and control of the defendants." *V.E.C. Corp. of Delaware*, 2011 WL 7101236 at *3 (citing *Arista Records, LLC*, 604 F.3d at 120).

As demonstrated above, the Amended Complaint is replete with factual details sufficient, at this stage of the proceeding, to demonstrate the existence of plausible claims for relief. Plaintiff has provided detailed factual allegations regarding the actions or inactions of the individual Defendants who have filed the instant motion, and the policies or lack thereof employed during the fatal standoff to sufficiently support the claims asserted against all Defendants.  Accordingly, Defendants' motion should be denied.

## II.    PLAINTIFF HAS SUFFICIENTLY ALLEGED THE PERSONAL INVOLVEMENT OF THE INDIVIDUAL DEFENDANTS

### A. Plaintiff's § 1983 Claims are Sufficiently Pleaded Against Johnson, Stanton, Santana, Licitra, and McCormack

Defendants Gallitelli, Johnson, Stanton and Santana contend that the allegations contained in the Amended Complaint are insufficient to establish a § 1983 claim because they claim that they were not personally involved in violations of Mr. Bah's constitutional rights. Def. Mem. at 5. Contrary to their argument, the allegations of the Amended Complaint and the City's own Report (McLaughlin Declaration ("Decl."), Exhibit A, Shooting Report, p. 6-8) provide a sufficient basis to establish as a matter of law the personal involvement in the constitutional violations inflicted upon Mr. Bah of those to arrive first on the scene, including Johnson, Stanton, and Santana.

As more fully discussed below, as of yet, it is not known which of the police officers and/or emergency medical personnel on the scene were responsible for dragging Mr. Bah along the floor of the several hallways between his fifth floor apartment and the street where an ambulance stood by. At this juncture, it cannot be determined the degree to which Defendants Gallitelli, Johnson, Stanton and/or Santana were personally involved in this egregious, "conscience shocking" violation of Mr. Bah's right to bodily integrity by either their direct participation in the dragging of Mr. Bah or their failure to fulfill their duty to prevent other officers from this sadistic and unjustifiable violation, clearly without a legitimate governmental objective, of his constitutional rights. *See County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998); *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 252 (2d Cir. 2001).

What is clearly known at this time is that any officer who fails to intervene to prevent other officers from causing harm can be held liable where that officer has reason to know that a

constitutional violation is being committed.[1] Liability attaches where the officer had a "realistic opportunity to intervene to prevent the harm occurring." *Chamberlain v. City of White Plains,* No. 12 CV 5142(CS), 2013 WL 6477334 at * 12 (S.D.N.Y. 2013) (annexed hereto as McLaughlin Decl., Exhibit B) (citing *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994)). In all of the circumstances resulting in constitutional violations here, it is alleged that these officers were at the scene and either personally committed the acts alleged or failed to intervene to prevent other officers from inflicting the harms alleged, despite having a realistic opportunity to do so during the siege at Mr. Bah's apartment.

These Defendants were approached by three to four of Mr. Bah's family members (*Id.* at p. 7), including Mr. Bah's mother. The officers identified the speech of Mr. Bah as incoherent and unintelligible. *Id.* at p. 7. Yet despite NYPD EDP policy, these Defendants did nothing to convey the information provided by family members to the other officers; nor, after observing Mr. Bah close and lock the apartment door did they do anything to enlist the help offered by family members or obtain a translator. *Id.* Similarly, Santana also interacted with Mr. Bah's mother, who identified her son as being in an emotionally disturbed state. *Id.* at p. 8. Of particular note is that Mr. Bah's mother did not identify him as armed, but only agitated, and yet Santana, like Stanton, did not involve her or the other family members present in either identifying the need for an interpreter, or de-escalating the situation. AC ¶¶ 32, 33. Likewise, Johnson heard Mrs. Bah identify her son as erratic but non-violent, and was explicitly told that

---

[1]    This duty of a law enforcement officer to "intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers" has been affirmatively established in the Second Circuit. *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (citing *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir.1986) (excessive force)); *Webb v. Hiykel*, 713 F.2d 405, 408 (8th Cir.1983) (excessive force); *Gagnon v. Ball*, 696 F.2d 17, 21 (2d Cir. 1982) (false arrest); *Skorupski v. County of Suffolk*, 652 F. Supp. 690, 694 (E.D.N.Y. 1987) (excessive force)).

he was alone in the apartment.  McLaughlin Decl., Exhibit A, p. 8.  Defendant Johnson, like Stanton and Santana, despite obtaining this information, did not enlist the help or translation of Mrs. Bah, nor identify the need for translation to anyone else – and instead entered the building with only the other officers. *Id*. at p. 7-8; AC ¶¶ 28-31.

Defendants Licitra and McCormack were also present on the scene during this time, by their own accounts.  McLaughlin Decl., Exhibit A, p. 9-11.  Sergeant McCormack adjusted the rope that was tied to Mr. Bah's door, loosened it to permit entry to Mr. Bah's apartment, and subsequently failed to maintain control of Mr. Bah's door. *Id*. at 11.  During the time that the rope was loosened to permit police entry to the apartment, Defendant Licitra recounted that a Hostage Negotiation Team was gathering information from Mrs. Bah. *Id*. at 9. Licitra was also aware of the other tactical and non-lethal gear on the scene and that no additional attempts were made by the negotiation team after a telephone call failed to establish contact.  *Id*. Thereafter, McCormack failed to discharge his Taser properly to subdue Mr. Bah, while standing behind another officer, after which Mr. Bah was shot rapidly and in quick succession.  *Id* at 10-11.  Both Defendants remained on the scene and possessed information about the available non-lethal options at the officers' disposal to subdue Mr. Bah, not of which were effectively discharged.

There is no question that the individual Defendants' failures to follow NYPD EDP protocol, enlist translation, identify the need for translation services either through a family member or professionally, or convey the vital information they gleaned from their interaction and observation of Mr. Bah, set in motion the unnecessary escalation of force against Mr. Bah. As such, each directly participated in the actions complained of herein, and denied Mr. Bah's Fourth and Fourteenth Amendment Rights to Due Process.  The failure of these officers to permit Mrs. Bah to speak with her son so that she could advise him that Mrs. Bah had called for an

16

ambulance contributed to the escalating scene at Mr. Bah's apartment that ultimately led to his death.  While all the facts may not be fully known at this time, through discovery, Plaintiff will be able to develop a complete factual record and substantiate the role that each of these Defendants played in the escalation of events. Accordingly, the constitutional violations upon which Plaintiff's claims are premised are plausibly attributable to the individual Defendants named herein.

### B.      Plaintiff has Sufficiently Pleaded A Supervisory Liability Claim Against Defendant Gallitelli

Defendants urge the Court to dismiss Plaintiffs' claim for supervisory liability against Defendant Gallitelli, because they assert the claims are not plausible.  Def. Mem. at 7.  The parties do not dispute the standard to be employed in determining whether a supervisor can be held liable under a failure to supervise.  The case law clearly establishes three potential bases for such liability: (1) personal involvement in the constitutional deprivation; (2) gross negligence in supervising subordinates; and (3) deliberate indifference to the rights of the plaintiff. *E.g., Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir. 2001). The Second Circuit has distinguished direct participation (personal involvement) from other bases of supervisory liability, such as gross negligence or deliberate indifference, stating, "[i]t does not foreclose the liability of a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights but does so in a manner that might be said to be 'indirect' such as *ordering* or helping others to do the unlawful acts, rather than doing them him-or herself.'' *Id.* at 155 (*emphasis added). Johnson v. Newburgh Enlarged School Dist.*, 239 F.3d 246, 255 (2d Cir. 2001) further articulated that the court's "task is to consider whether, as a matter of law, the factual allegations and all reasonable inferences therefrom are insufficient to establish the required showing of personal involvement."

The Amended Complaint alleges that Gallitelli performed supervisory functions at the scene, was responsible for supervising the responding officers, and took no actions that would have prevented the unconstitutional violations against decedent. AC ¶114. Furthermore, discovery will continue to illuminate what Defendants' initial disclosures already demonstrate – supervisory decision making contrary to NYPD EDP policy and common sense de-escalation tactics.

In Defendants' own Report (McLaughlin Decl., Exhibit A, p. 6-7) Gallitelli's supervisory decisions are recounted. Gallitelli observed Mr. Bah's mother at the scene, and was told by Mrs. Bah that her son was acting irrationally. Exhibit A, p. 7. Further, while Gallitelli requested the response of ESU, ESU in turn cleared personnel from the fourth floor, and EMS was instructed to be on a different floor of the building, despite Mr. Bah's pleas that her son receive medical attention and interaction with her. *Id*. In fact, it was only after hearing gunshots that Galitelli directed EMS to render medical attention, despite apparently being in no position to hear commands from ESU. *Id*. As such, Gallitelli had personal interaction with Mrs. Bah, was aware of her call for medical services for her son, and yet no such services were deployed by Gallitelli until after gunshots were fired. *Id*. Further, Galitelli failed to intervene to prevent ESU's escalation by not requesting an interpreter, or non-lethal interventions, prior to leaving the fifth floor. *Id*. Thus, Gallitelli's personal involvement has been established in failing to follow the de-escalation NYPD protocols intended for such a situation, and will only be further explored through discovery. AC ¶¶ 114, 116. Therefore plaintiffs have pleaded plausible allegations at this stage of the proceeding to establish supervisory liability against Defendant Gallitelli.

In addition to the foregoing, it is alleged in the Amended Complaint that Mrs. Bah sent a resident of the building to speak with a supervisor and to advise him that she wanted to speak

with her son and that she could get him to open the door. AC ¶35.  The resident approached a supervisor wearing a white shirt and communicated Mrs. Bah's concerns. *Id.*  On information and belief, this supervisor was Gallitelli as he was present on a lower floor than the ESU police officers who were outside Mr. Bah's apartment.  Despite his knowledge that Mrs. Bah was requesting the opportunity to speak with her son and that she could assist in getting him to come out of his apartment, Gallitelli did not communicate this information to any other officer and did not accede to Mrs. Bah's request.  His failure to do so, in part, led to the escalation of the events that transpired outside of Mr. Bah's apartment and contributed to the death of Mr. Bah.

Despite these clear, documented instances of personal involvement and decision making by Gallitelli, Defendants further contend that any alleged failures to comply with the NYPD EDP policy do not amount to constitutional violations. Def. Mem. at 8.  In support of this argument, Defendants rely on the vastly distinguishable case, *Cerbelli v. City of New York*, No. 99 Civ. 6846 (ARR) (RML), 2008 U.S. Dist. LEXIS 109341 (E.D.N.Y. Sept. 8, 2008), where the decedent entered a NYPD precinct with a knife, high on cocaine, and forcefully contacted one of the officers. The facts of that case are a far cry from the complete departure from the NYPD EDP policy which resulted in Mr. Bah's unnecessary death. AC ¶¶ 32 (failing to request an interpreter), 41 (failure to maintain firearms control), 44 (appropriate plans and tactics not set). Unlike in *Cerbelli*, Defendant Gallitelli did not provide adequate information to those on the relevant floor of the apartment building, nor did he stay on the relevant floor of the apartment building to provide the direction to the ESU officers.  Thus, Gallitelli had personal involvement in the events that ultimately led to Mr. Bah's death.

## III.   PLAINTIFF'S §1983 CLAIMS ARE WELL PLEADED AGAINST THE INDIVIDUAL DEFENDANTS

### A.  Plaintiff's Due Process Claim Is Well Pleaded

Defendants fail to challenge Plaintiff's well pleaded basis for §1983 liability, arising from the individual Defendants' failure to respect Mr. Bah's constitutional right to due process. The Amended Complaint asserts deprivations of Mr. Bah's right to substantive due process, under the Fourteenth Amendments arising from the treatment of his severely injured, bleeding body after he was shot by police officers. AC ¶ 95 ("deprived Mohamed of life and liberty without due process of law").

A colorable substantive due process claim has been alleged against these individual officers based on their failure to take reasonable and necessary steps to obtain medical treatment for Mr. Bah when they arrived at the scene in response to his mother's call for help. Their failings set in motion the series of events that were a proximate cause of Mr. Bah's death at the hands of police rather than treatment by trained mental health professionals. *See Busch v. City of New York*, No. 00 Civ. 5221 (SJ), Dkt No. 221, Slip Op. (E.D.N.Y. Sep. 20, 2003) (annexed hereto as McLaughlin Decl., Exhibit C); *Busch v. City of New York,* 224 F.R.D. 81,93 (E.D.N.Y. 2004) (jury question whether substantive due process violation for failure to take EDP to hospital).

### B. Plaintiff's Equal Protection Claim Is Well Pleaded

Defendants contend that Plaintiff's failure to plead a race-related Fourteenth amendment equal protection claim is fatal. However, Defendants misconstrue Plaintiff's claim and the legal standard. Def. Mem. at 15.

Plaintiff's Equal Protection Claim arises from Mr. Bah's classification as an EDP. In fact, Plaintiff's Fourteenth Amendment claim was properly pleaded under §1983 and courts have recognized such a claim. *E.g. Ferran v. Town of Nassau,* 11 F.3d 21 (2d Cir. 1993), *cert. denied,* 513 U.S. 1014 (1994). The United States Supreme Court has "recognized successful equal

protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Thus, Mr. Bah's differential treatment in the officers' use of excessive force, unlawful entry, and intentional and negligent acts, and failure to train and supervise arose from the selective treatment based on the impermissible consideration that Mr. Bah was an EDP.[2]

## IV.   PLAINTIFF HAS COMPLIED WITH THE NOTICE OF CLAIM REQUIREMENT

Defendants erroneously assert that the failure to name individual officers in Plaintiff's Notice of Claim is fatal to the state law causes of action against said officers. Def. Mem. at 16-17. However, Plaintiff's inability to name the responsible officers, unknown to her at the time of serving her Notice of Claim, is without moment. The purpose of a notice of claim is to provide sufficient notice to the municipality of the pendency of claims. In *Bernhard v. Dutchess Community College*, No. 80 CV 4871, 1982 WL 193, *2 (S.D.N.Y. Feb. 19, 1982), the Court observed that the New York Court of Appeals "has pointed out that the 'notice of claim concept' is in *derogation* of a claimant's common law rights against a municipal employee . . . [and] should be construed in favor of a claimant." Moreover, defects in a notice of claim may be corrected, supplied or disregarded in the discretion of the court. General Municipal Law §50-e (6) (Omissions may be disregarded if made in good faith and no prejudice to other party); *Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 402 n.25 (S.D.N.Y. 2009) (court can

---

[2]     Defendants do not dispute that the act of dragging Mr. Bah's body through the hallways of his apartment building (AC ¶96) is an additional act of differential treatment and a further violation of the Fourteenth Amendment, due to Mr. Bah's EDP status. Nor do the Defendants dispute that the Amended Complaint provides numerous examples of differential, and uniquely deplorable treatment in police-EDP encounters. AC ¶61-68.

disregard error if made in good faith and no prejudice); *Tyrell v. Seaford Union Free School District,* No. CV 08 4811 (SJF) (MLO), 2010 WL 1198055 (E.D.N.Y. March 25, 2010) (same).

The argument that officers unknown to Plaintiff need not be named in the Notice of Claim was adopted by the Southern District most recently in *Chamberlain*. When faced with an identical scenario in *Chamberlain v. City of White Plains*, the Southern District came to the "well-reasoned conclusion that there is no requirement that individual defendants be specifically named in the Notice of Claim." *Chamberlain*, at *22. The *Chamberlain* court drew from the Appellate Division, Fourth Department opinion in *Goodwin v. Pretorius,* 105 A.D.3d 207, 962 N.Y.S.2d 539, 545 (App. Div. 4th Dep't 2013) ("[C]ourts have misapplied or misunderstood the law in creating, by judicial fiat, a requirement for notices of claim that goes beyond those requirements set forth in the statute. If the legislature had intended that there be a requirement that the individual employees be named in the notices of claim, it could easily have created such a requirement."). The Court in *Chamberlain* concluded that dismissal of the individual state law claims would be inappropriate where "Plaintiff's Notice of Claim contains more than enough information to allow the City to properly investigate the alleged incident and identify the police officers involved" even if the names of said officers were not known to the Plaintiff at the time of the filing of the Notice of Claim. *Chamberlain*, at *22.

Applied here, Plaintiff's Notice provided great detail regarding the actions of the police officers such that the City knew or should have known the identities of the officers referred to in Plaintiff's Notice, sufficiently in advance of such information being released to the public, or to Plaintiff. A copy of the Notice of Claim was annexed as Exhibit C to the Affirmation of Barry M. Marivold. Additionally, the individual officers were not prejudiced by the failure to include their names in the Notice as they were certainly aware of the fact that they had engaged in certain

22

actions involving Mr. Bah and contributed to the Report dated September 25, 2012 (McLaughlin Declaration, Exhibit A), which was only served on Plaintiff's counsel on November 22, 2013. Thus, Plaintiff could not have complied with a more stringent standard of naming officers, who were constructively noticed prior to Plaintiff's filing.

## V.   PLAINTIFF MAY PLEAD NEGLIGENCE CLAIMS IN THE ALTERNATIVE

Defendants contend that Plaintiff's negligence claims should be dismissed because they cannot coexist with claims of intentional conduct. Def. Mem. at 17-22. Contrary to Defendants' argument, under Fed. R. Civ. P. 8(e)(2) a plaintiff is permitted to "plead two or more statements of a claim . . . regardless of consistency." *Henry v. Daytop Vill., Inc.,* 42 F.3d 89, 95 (2d Cir. 1994). The Court in *Henry* noted that "[t]he flexibility afforded under Rule 8(e)(2) is especially appropriate in civil rights cases, in which complex inquiries into the parties' intent may sometimes justify raising multiple, inconsistent claims." *Id.; accord Adler v. Pataki,* 185 F.3d 35, 41 (2d Cir. 1999) ("[W]e have ruled that Rule 8(e)(2) offers sufficient latitude to construe separate allegations in a complaint as alternative theories.").

Despite the Federal Rules granting explicit permission to the contrary, Defendants rely on *Dineen ex rel. Dineen v. Stramka*, 228 F. Supp. 2d 447 (S.D.N.Y. 2002) to support narrowing Plaintiff's claims at the motion to dismiss stage. However, that decision is procedurally inapposite as the Court there was considering a summary judgment motion. *Id*. The same is true of the other summary judgment cases Defendants rely on. Def. Mem 18, citing *Oliver v. Cuttler*, 968 F. Supp. 83, 92 (E.D.N.Y. 1997); *Busch v. City of New York*, No. 00 CV 5211 (SJ), 2003 U.S. Dist. LEXIS 27571, at *22 (E.D.N.Y. Sept. 11, 2003); *Glowczenski v. Taser Int'l Inc.*, No. CV 04 4052(WDW), 2010 U.S. Dist. LEXIS 47129, at *22 (E.D.N.Y. May 13, 2010); *Vilkhu v. City of New York*, No. 06 CV 2095 (CPS) (JO), 2008 U.S. Dist. LEXIS 36454, at *28-30 (E.D.N.Y. May 5, 2008). At this stage of the proceedings, such alternative pleading is permitted

by the Federal Rules and Second Circuit precedent, as against both individual officers and the City.

## VI.   PLAINTIFF'S TRAINING AND SUPERVISION CLAIMS ARE WELL PLEADED

Defendants urge the Court to dismiss Plaintiff's claims against the City for negligent training and supervision because they assert the claims are not plausible. Def. Mem. at 22. However dismissal is inappropriate, specifically with respect to a failure to train claim where "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation." *Malay v. City of Syracuse*, 638 F. Supp. 2d 303, 315 (N.D.N.Y. 2009).[3] Plaintiff has plainly satisfied this standard. AC ¶ 61-88.

Defendants' very assertion here (Def. Mem. at 22), was rejected in *Chamberlain*, on a single incident theory arising only from the decedent's death.   There, the Southern District recognized that "the Supreme Court in *Connick* reaffirmed the viability, in limited circumstances, of the 'single-incident' theory of liability... Under that theory, a municipality can be found to be deliberately indifferent based on a single constitutional violation where the unconstitutional consequences of failing to train [are] so patently obvious that a city should be liable under [Section] 1983 without proof of a pre-existing pattern of violations." *Chamberlain*, at *16 (internal citations omitted).   The court went on to articulate how a claim surpasses a motion to dismiss on a single incident theory where the violation is a "highly predictable consequence" of the failure to train and "may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to

---

[3]     Denying motion to dismiss a failure to train claim where "the issue of whether such a failure stems from a deliberate or conscious choice by the City will be left to be resolved after discovery." (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004)).

make meaningful efforts." *Id.* (internal citations omitted) (finding the shooting of an EDP in his home when police were summoned by a medical alert call demonstrated deliberate indifference on a motion to dismiss sufficient to sustain training and supervision claims).

Applied here, the failure of the supervisors to develop a tactical plan that would have avoided using force to enter the apartment constituted gross negligence to the point of deliberate indifference. The officers who were under their direct supervision followed the lead and direction of the supervisors. The supervisors at no point headed the pleas of Mrs. Bah to speak with her son or obtain a translator. Despite the knowledge that this situation involved an EDP and that officers were deployed for a duration of time in an agitating manner, with numerous types of weapons, supervisors on the scene failed to instruct or supervise their subordinates as to the proper use of such devices to deescalate the situation. Each supervisor also knew or should have known of the New York City EDP policy and that it was inadequate to provide guidance to officers who responded to Mr. Bah's apartment. As such, it can be plausibly claimed that the supervisory officers either participated actively or were deliberately indifferent to the rights of Mr. Bah by failing to instruct subordinates in the use of force and deployment of weapons.

Beyond the single incident theory, Plaintiff has also endeavored to plead that the City's failure to train and/or supervise has resulted in a number of EDP fatalities, as a consistent result of the City's training and supervisory failures. AC ¶ 61-88. This amassed evidence is well pleaded, and further supports that the claim should proceed to discovery.

## CONCLUSION

For the reasons set forth herein, Plaintiff submits that the Court should deny Defendants' Motions to Dismiss in its entirety.  In the event the Court finds the Amended Complaint does not adequately state plausible claims against any Defendant, on any basis, Plaintiff would respectfully request an opportunity to cure such purported defect.

Dated:  New York, New York
        February 10, 2013

                              NEWMAN FERRARA LLP

                         By: _____
                              Randolph M. McLaughlin
                              rmclaughlin@nfllp.com
                              Debra S. Cohen
                              dcohen@nfllp.com
                              Jeffrey M. Norton
                              jnorton@nfllp.com
                              1250 Broadway, 27th Floor
                              New York, New York 10001
                              Tel: 212-619-5400
                              Fax: 212-619-3090

                              *Counsel for Plaintiff*

26