USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _5-1-14_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
OUMOU BAH, AS THE ADMINISTRATOR OF
THE ESTATE OF MOHAMED BAH,

                                        Plaintiff,                          13 Civ. 6690 (PKC)(KNF)

            -against-                                                       MEMORANDUM
                                                                            AND ORDER

THE CITY OF NEW YORK, DETECTIVE
EDWIN MATEO, individually and in his official
capacity, POLICE OFFICER ANDREW KRESS,
individually and in his official capacity, POLICE
OFFICER MICHAEL GREEN, individually and
in his official capacity, SERGEANT JOSEPH
MCCORMACK, individually and in his official
capacity, LIEUTENANT MICHAEL LICITRA,
individually and in his official capacity,
LIEUTENANT ROBERT GALLITELLI,
individually and in his official capacity, POLICE
OFFICER BRIAN STANTON, individually and
in his official capacity, POLICE OFFICER
ESMERALDA SANTANA, individually and in
her official capacity, POLICE OFFICER
VINCENT JOHNSON, individually and in his
official capacity, John Does 1-10, employees of
The City of New York,

                                        Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

            Plaintiff Oumou Bah (the "Administrator"), as the administrator of the estate of

Mohamed Bah, brings this action against defendants the City of New York (the "City"),

Detective Edwin Mateo, Officer Andrew Kress, Officer Michael Green, Sergeant Joseph

McCormack, Lieutenant Michael Licitra, Lieutenant Robert Gallitelli, Officer Brian Stanton,

Officer Esmeralda Santana, Officer Vincent Johnson, and unnamed police officers alleging

claims arising out of the events leading to the death of Mohamed Bah ("Bah"). Specifically, the

Administrator alleges that the defendants violated Bah's constitutional rights by unlawfully entering his home, using excessive force, depriving him of life and liberty without due process of law, depriving him of his right not to be deprived of bodily integrity without due process of law, and depriving him of his right to equal protection under the laws in violation of 42 U.S.C. § 1983.  The Administrator also brings state law claims for negligence against all the defendants, conscious pain and suffering and wrongful death against the City, Kress, Mateo, and Green, assault and battery against the City, Kress, Mateo, Green, and McCormack, and negligent training and supervision against the City.

The City, Licitra, Gallitelli, Stanton, Santana, and Johnson (collectively the "Moving Defendants") have moved to dismiss various claims against them for failure to state a claim pursuant to Rule 12(b)(6), Fed. R. Civ. P.  Johnson, Stanton, Santana move to dismiss all state and federal claims against them.  Gallitelli moves to dismiss all claims against him, except for the negligence claim.  Licitra moves to dismiss the unlawful entry and excessive force claims against him.  The City moves to dismiss the negligent training and supervision claim against it. The Moving Defendants also move to dismiss the Administrator's equal protection claim, the unlawful entry claim, and the negligence claims premised on intentional acts, and all state law claims against the individual defendants for failure to comply with New York General Municipal Law § 50-e.

The Court concludes that the Amended Complaint (Docket # 19) states a claim against Stanton, Santana, Johnson, and Licitra for unlawful entry, and against Gallitelli for unlawful entry and supervisory liability.  The Court further concludes that the Administrator's notice of state law claims was proper under New York General Municipal Law § 50-e.  For reasons explained, the Moving Defendants' motion is granted with respect to (1) all challenged

claims against Stanton, Santana, and Johnson, except for the unlawful entry claims, (2) all

challenged claims against Gallitelli, except for the unlawful entry and supervisory liability

claims, (3) the excessive force claim against Licitra, (4) the equal protection claim against the

Moving Defendants, (5) any negligence claim against the Moving Defendants premised on an

allegedly intentional act, and (6) the negligent training and supervision claim against the City.

The Moving Defendants' motion is denied with respect to all other challenged claims.

BACKGROUND

The following facts are taken from the Amended Complaint (the "AC"),

documents incorporated by reference in the AC, and matters of which judicial notice may

appropriately be taken.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 152–53 (2d Cir.

2002).  All facts are assumed to be true for the purpose of deciding defendants' motion to

dismiss.  All reasonable inferences are drawn in favor of the plaintiff as non-movant.  See In re

Elevator Antitrust Litig., 502 F.3d 47, 50–51 (2d Cir. 2007) (per curiam).

Mohamed Bah was a 28-year-old African immigrant and non-native English

speaker living in Manhattan, New York.  (AC ¶¶ 2, 20–21, 32.)  A college student, Bah attended

classes during the day and also worked nights.  (Id. ¶¶ 21.)  His neighbors described him as

"polite, hard-working and mild mannered."  (Id.)  During the summer of 2012, Bah began acting

erratically, lost weight, and exhibited indications that he was in an emotional or mental health

crisis.  (Id. ¶ 22.)

On September 24, 2012, his mother, Mrs. Hawa Bah ("Mrs. Bah"), a resident of

Guinea, arrived to visit her son.  (Id. ¶ 23.)  When she first saw Bah that day, she thought he

looked different and seemed depressed.  (Id.)  She also noted that he had a cut over his eye and

was limping.  (Id.)  When Mrs. Bah inquired about the injuries, Bah told her that he had been

beaten by police officers in the City.  (Id.)

The next day, Bah called his mother to cancel the plans he made to spend the day with her and reschedule for another date.  (Id. ¶ 24.)  Bah's sudden change of plans concerned Mrs. Bah.  (Id.)  To allay her worries, Mrs. Bah asked some family friends, who lived close to her son, to check on him.  (Id.)  The friends visited Bah and spoke with him.  (Id.)  They became concerned, but Bah told them he only needed rest.  (Id.)

That evening, Mrs. Bah, believing that her son was having a mental health crisis, arrived outside Bah's building with four family friends.  (Id. ¶ 25.)  At approximately 6:40 p.m., after unsuccessfully calling two other numbers, Mrs. Bah called 911 to summon an ambulance.  (Id.)  She advised the 911 operator that her son was mentally distressed and needed to be transported to a hospital.  (Id.)

In response to Mrs. Bah's 911 call, defendants Gallitelli, Johnson, Stanton, and Santana (collectively the "Responding Officers") arrived.  (Id. ¶ 26.)  At all relevant times, the Responding Officers were acting under color of law and within the scope of their employment with the New York City Police Department (the "NYPD").  (Id. ¶¶ 15–18.)  Gallitelli was the precinct commander and supervising officer.  (Id. ¶¶ 15, 31.)

Once the Responding Officers arrived, Mrs. Bah explained the situation in detail.  (Id. ¶ 27.)  She explained that her son was non-violent, alone in his apartment, and that he was in need of medical attention, as it appeared he was having a mental health crisis.  (Id.)  Mrs. Bah further stated that there was no crime in progress and the police were not necessary.  (Id.)

The Responding Officers explained that an ambulance was on the way and that they just needed to speak with Bah.  (Id. ¶ 28.)  The Responding Officers, Mrs. Bah, and the family friends went into Bah's apartment building and upstairs to his apartment door.  (Id.)  As

the Responding Officers approached Bah's door, Mrs. Bah and the family friends stood on a stairway immediately adjacent to it.  (Id.)

In response to an officer's knock on his door, Bah told the police that he did not call them and that he wished them to leave.  (Id. ¶ 29.)  The Responding Officers, however, did not leave and attempted to force themselves into the apartment.  (Id.)  Bah repeatedly stated that he was fine and wanted to be left alone.  (Id.)  Bah then closed the door, locking himself in.  (Id.)  At no time did the Responding Officers tell Bah that his mother was present, or that she had called for an ambulance on his behalf.  (Id.)

After observing Bah's interaction with the police, Mrs. Bah repeatedly asked to speak with her son directly, as Bah was not aware of her presence.  (Id. ¶ 30.)  The Responding Officers refused her requests and told her they would handle the matter.  (Id.)

Based on their observation of Bah, the officers determined that he was an Emotionally Disturbed Person (an "EDP").  (Id. ¶ 31.)  The NYPD has adopted certain policies regarding interactions with EDPs that are to be followed once officers make a determination that an individual is an EDP.  (See id. ¶ 69–70.)  According to the EDP policy, officers are required to request the assistance of family members, allow family members to speak with the EDP, and, if necessary, request the assistance of an interpreter.  (Id. ¶ 32.)

The officers did not follow the nEDP policy and, rather, ordered Mrs. Bah and the friends out of the building and radioed for Emergency Service Unit ("ESU") personnel to assist.  (Id. ¶ 31.)  In the radio transmission, the officers requested the ESU personnel to "take [the] door down" and advised them that Bah was an EDP, was alone in the apartment, and had a knife.  (Myrvold Decl. Ex. B, at 1.)

In response to the request, defendants McCormack, Mateo, Kress, and Green (collectively the "ESU Officers") arrived at the building with Licitra, the ESU supervisor.  (AC ¶ 37.)  At all relevant times, the ESU Officers and Licitra were acting under color of law and within the scope of their employment with the NYPD.  (Id. ¶¶ 10–14.)  Upon their arrival, Mrs. Bah asked them to leave and explained that her son was alone in the apartment and not a danger to anyone.  (Id. ¶ 33.)  The ESU Officers ignored her and entered the building.  (See id.)

Upon entering the building, Licitra and the ESU Officers stood outside Bah's door and informed him that they would not leave until he came outside.  (Id. ¶ 47.)  For the next hour, the ESU Officers yelled at Bah, taunted him, and repeatedly kicked the door.  (Id.)  During this time, a building resident, at the behest of Mrs. Bah, twice entered the building and informed the officers that she was present, and that Bah had been previously assaulted by the police and had a fear of police officers.  (Id. ¶ 34–35.)  A supervising officer told the resident that the ESU Officers were handling the situation and they did not require Mrs. Bah's assistance.  (Id. ¶ 35.)

The ESU Officers blocked the peephole to Bah's door and tied a rope around the door handle, securing it to a banister in the stairwell.  (Id. ¶ 48.)  They next removed the peephole and, through the resulting hole in the door, inserted a chemical illumination device into the apartment.  (Id. ¶ 49.)  The ESU Officers then removed the rope securing the door and used a hydraulic device to breach the door.  (Id. ¶ 50.)  Through the breach, they inserted a pole camera into the apartment.  (Id.)  Images from the camera showed Bah standing in the apartment, praying.  (Id.)  The images did not show any other people in the apartment.  (Id.)

After observing Bah in the apartment, the ESU Officers entered the apartment.  (Id. ¶ 51.)  Kress entered first with a bunker shield and a Taser.  (Id.)  Mateo followed behind Kress.  (Id.)  McCormack followed behind Mateo.  (Id.)  After entering, Kress fired his Taser at

Bah.  (Id. ¶ 52.)  However, the Taser dart was "ineffective."  (Id.)  Mateo fired a rubber pellet

weapon at Bah.  (Id.)  McCormack fired his Taser at Bah, but hit Mateo in the back.  (Id. ¶¶ 52–

53.)  As a consequence, Mateo fell to the ground, knocking over the officers behind him.  (Id.

¶ 53.)

   After being hit by McCormack's Taser, Mateo yelled "He's stabbing me. Shoot

him."  (Id.)  Mateo discharged five rounds from his weapon at Bah.  (Id.)  Kress discharged three

rounds from his weapon at Bah.  (Id.)  Green, who was also present at the scene, discharged two

rounds from his weapon at Bah.  (See id. ¶¶ 51, 54.)  Consequently, Bah was hit by at least eight

bullets.  (Id. ¶ 56.)  According to one resident in the building, Bah was shot almost

"immediately" after the door was opened.  (Id.)

   Immediately after the incident, Detective Christopher Zaberto, who was nearby,

checked Kress, Green, and Mateo for injuries.  (See id. ¶ 57.)  Failing to find any injuries, he

informed the officers that they were unharmed.  (Id.)  Zaberto then checked Bah and, finding that

he was alive and conscious, began administering first aid.  (Id. ¶ 58.)

   Subsequently, unidentified officers removed Bah from the apartment, "dragged"

him through the hallway, and placed him on a stretcher.  (Id. ¶¶ 59–60, 96.)  As a consequence,

Bah's blood was smeared on the apartment building floors.  (Id. ¶ 59.)  Once outside, emergency

medical service workers administered CPR to Bah and placed him in an ambulance.  (Id. ¶ 60.)

Bah was pronounced dead after arriving at the hospital.  (Id.)

   On December 21, 2012, pursuant to New York General Municipal Law § 50-e, a

Notice of Claim (the "Notice") was served on the City.  (Id. ¶ 89.)  The Notice named the City

and, then unknown, John Doe police officers as defendants and provided information regarding

the actions the officers took.  (Myrvold Decl. Ex. C, at 1–3.)  According to the Notice, on the

evening of September 25, 2012, at approximately 6:40 p.m., Mrs. Bah dialed 911 to request an ambulance for her son.  (Id. at 2.)  The Notice further stated that police officers, but no ambulance, arrived in response to Mrs. Bah's call.  (Id.)  Finally, the Notice stated that, after the initial police arrival, additional officers arrived and "escalated the situation," resulting in Bah's death.  (Id. at 2–3.)  More than thirty days elapsed without the matter being resolved by the City.  (AC ¶ 89.)

    After the incident, the City did not release the names of the officers involved in the events leading to Bah's death.  (Id. ¶ 90.)  On March 24, 2013, a Freedom of Information Law ("FOIL") request was made to the City for documents related to the incident.  (Id. ¶ 91.)  On April 3, the City responded that it was reviewing the request, but did not provide any documents.  (Id.)  The City released the names of the responding officers after a court conference in the instant action.  (Id. ¶ 92.)

    The Administrator alleges that the defendants committed a series of unlawful acts, resulting in Bah's death, thereby depriving him of his rights to due process, to be secure in his person and home against unreasonable searches and seizures, to not be deprived of bodily integrity without due process of law, and to equal protection under the Fourth and Fourteenth Amendments of the United States Constitution.  (Id. ¶¶ 2, 95–98.)  The Administrator also alleges that the defendants' acts also constituted and unreasonable and unnecessary use of force and unlawful entry into Bah's home.  (Id. ¶ 99.)  The Administrator further alleges that Licitra and Gallitelli failed to properly supervise their subordinates, resulting in Bah's death.  (Id. ¶¶ 113–16.)  Finally, the Administrator alleges that, by failing to adopt adequate policies regarding EDPs, the City was deliberately indifferent to its duty to institute appropriate guidelines and training to ensure the safety of its residents.  (Id. ¶¶ 101–12.)  The Administrator

also brings state law claims for negligence against all the defendants, conscious pain and suffering and wrongful death against the City, Kress, Mateo, and Green, assault and battery against the City, Kress, Mateo, Green, and McCormack, and negligent training and supervision against the City.  (Id. ¶¶ 117–40.)

> This Court has jurisdiction because federal questions are presented.  28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the state law claims because they are so related to the federal claims as to form part of the same case or controversy.  28 U.S.C. § 1367(a).

## LEGAL STANDARD

> To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain . . . sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing a complaint, courts draw all reasonable inferences in favor of the non-movant.  See Elevator Antitrust Litig., 502 F.3d at 50.  Legal conclusions, however, are not entitled to any presumption of truth, and a court assessing the sufficiency of a complaint disregards them.  Iqbal, 556 U.S. at 678.  Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.

> "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).  "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."

DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (quoting Chambers, 282 F.3d at 152–53)).  "[A] plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."  Chambers, 282 F.3d at 153.  "[E]ven if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."  DiFolco, 622 F.3d at 111 (internal quotation marks and citation omitted).

DISCUSSION

I.   Defendants' Motion to Dismiss the Administrator's Constitutional Claims Is Granted in Part and Denied in Part.

The Moving Defendants argue that the ESU Officers' entry into Bah's apartment was lawful under the "emergency aid" exception to the warrant requirement.  They further argue that, even if the entry was unjustified, the ESU Officers would be entitled to qualified immunity. The Responding Officers also argue that they were not personally involved in any of the alleged violations attributable to the ESU Officers and, therefore, may not be held liable.  Licitra argues that, insofar as the AC does not allege that he personally entered Bah's apartment or used excessive force, he may also not be held liable.

a.   Unlawful Entry

Under the "emergency aid" exception to the warrant requirement, police officers may enter a home without a warrant in order to render emergency aid to an injured party, or to protect an occupant from imminent injury.  Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006).  In determining whether the exception applies, "the core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe

that there was an urgent need to render aid or take action." United States v. Simmons, 661 F.3d 151, 157 (2d Cir. 2011) (internal quotation marks and citations omitted).  This determination requires an examination of "the totality of circumstances confronting law enforcement agents in the particular case." United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990).

According to the AC, the ESU Officers were told, on at least two occasions, that Bah was not a threat, that he was alone in his apartment, and that his mother was present and would be able to help deescalate the situation.  (AC ¶¶ 34–35.)  Furthermore, the ESU Officers attempted to gain entry into the apartment for more than one hour before breaching the door.  (Id. ¶ 47.)  After breaching the door, the ESU Officers observed Bah standing in his apartment, praying.  (Id. ¶ 50.)  The ESU Officers also confirmed that Bah was not standing close to anybody else in the apartment.  (Id.)

Based on the facts alleged, it is plausible that immediate action was not necessary as the ESU Officers, at minimum, may have been able to enlist Mrs. Bah's help in speaking with Bah and did not have reason to believe that Bah posed a threat to anyone.  Furthermore, the AC does not indicate that the situation changed after the ESU Officers breached Bah's door in a way that would necessitate immediate action.  Therefore, the AC plausibly alleges that the ESU Officers' entry was unlawful.

When officers engage in an unlawful entry, their actions may still be protected under the doctrine of qualified immunity.  "[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).  When a qualified immunity defense is raised at the pleading stage, a court must determine whether a

complaint alleges a violation of a constitutional right and whether the right was "clearly established."  Id. at 232.

A right is "clearly established" when a reasonable official would know that his actions would violate that right.  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Qualified immunity will be available to the official if his actions were "objectively legally reasonable in light of the legal rules that were clearly established at the time [they were] taken."  Taravella v. Town of Wolcott, 599 F.3d 129, 133 (2d Cir. 2010) (internal quotation marks and citation omitted).  Thus, an official will be protected if it was "objectively reasonable" for the official to believe his actions were lawful.  Higazy v. Templeton, 505 F.3d 161, 169–70 (2d Cir. 2007).

As discussed above, the AC plausibly alleges an unlawful entry into Bah's apartment in violation of his rights under the Fourth Amendment.  Further, the AC plausibly alleges that the emergency aid doctrine did not apply and there were no exigent circumstances justifying the entry.  Consequently, because the circumstances, as alleged, would not "lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action," it would also not be objectively reasonable for the ESU Officers to believe that their actions were lawful.  See Simmons, 661 F.3d at 157.

Thus, at the pleading stage, the Court cannot conclude that the ESU Officers are entitled to qualified immunity as a matter of law.

b.  Personal Involvement of the Responding Officers

In order for the Responding Officers and Licitra to be liable for the ESU Officers' alleged unlawful entry, it must be plausible that they were personally involved in the alleged violation.  See Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) ("'It is well settled in this Circuit that personal involvement of defendants in an alleged constitutional violation is a prerequisite to an award of damages under § 1983.'" (quoting Wright v. Smith, 21 F.3d 496, 501

(2d Cir. 1994))). In situations where an officer does not directly participate in a constitutional violation, he may, nonetheless, be liable if he had a duty to intercede and the failure to intercede was a proximate cause of the harm. See Porter v. Goord, 467 Fed. App'x. 21, 23 (2d Cir. 2012) (citing O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988)). "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." O'Neill, 839 F.2d at 11.

The AC alleges that the Responding Officers were aware, as were Licitra and the ESU Officers, that Bah was non-violent and alone in his apartment. (See AC ¶¶ 27, 30.) Despite this information, the Responding Officers attempted to forcibly gain entry into Bah's apartment before calling the ESU Officers and requesting that they break down the door. (Id. ¶ 29; Myrvold Decl. Ex. B, at 1.) Further, as discussed above, the AC plausibly alleges an unlawful entry by the ESU Officers.

Because the Responding Officers requested that the ESU Officers break down the door, it is plausible that the Responding Officers knew the ESU Officers would enter Bah's apartment. Similarly, it is also plausible that Licitra, as the ESU supervisor at the scene, was aware that the ESU officers would enter the apartment. As such, the Responding Officers and Licitra had a duty to intercede. By allowing the ESU Officers to unlawfully enter Bah's apartment, the Responding Officers and Licitra were plausibly a proximate cause of the unlawful entry.

As such, the AC plausibly alleges that the Responding Officers and Licitra breached their duty to intercede and therefore states a claim against them based on their failure to prevent the ESU Officers' unlawful entry.

According to the AC, the ESU Officers fired their weapons at Bah almost "immediately" after the door was opened.  (AC ¶ 56.)  Thus, even if the Responding Officers knew that the ESU Officers were going to fire their weapons at Bah, they would not have had a reasonable opportunity to intercede and may not be said to have been a proximate cause of the ESU Officers' further alleged violations.  Consequently, the AC does not state a claim against the Responding Officers for violations arising out of the ESU Officers' actions subsequent to their alleged unlawful entry.

Similarly, the AC does not allege that Licitra would have had a reasonable opportunity to intercede.  Though Licitra has been alleged to have been present, he is not alleged to have directly used force against Bah, to have entered the apartment, or caused, in any way the ESU Officers to use force against Bah.  (See AC ¶¶ 51–54.)  As such, it is not plausible that, once the door had been opened, Licitra would have had an opportunity to prevent the ESU Officer's subsequent use of force.  Thus, the AC does not state a claim against him for excessive force.

The Moving Defendants have not moved to dismiss the claim that officers violated Bah's right not to be deprived of bodily integrity without due process of law, which is specifically directed at the John Doe defendants, at the present time.  (See id. ¶ 96.)  Insofar as the John Does have not been alleged to have been identified as the individual Moving Defendants, this claim is not directed at them.  Consequently, the Court does not address it.

c.  Supervisory Liability

Gallitelli argues that the supervisory liability claim against him is deficient because he was not personally involved with any of the alleged constitutional violations.  In order for a supervisor to be liable for the constitutional violations of his subordinates, he must have personally participated in the alleged violation, been grossly negligent in supervising the

subordinates who allegedly committed the wrongful acts, or exhibited deliberate indifference to the plaintiff's rights by failing to act on information that tended to show that unconstitutional acts were occurring.  Provost v. City of Newburgh, 262 F.3d 146, 154 (2d Cir. 2001).

As discussed above, the AC plausibly alleges Gallitelli's personal involvement by failing to act to prevent the ESU Officers' allegedly unlawful entry.  Consequently, the AC also states a supervisory liability claim against Gallitelli arising out of the Responding Officers' alleged breach of the duty to intercede.

d.   Equal Protection.

The Responding Officers and the City assert that the Administrator has failed to allege any facts in support of her equal protection claim arising out of Bah's status as an EDP. When, as here, a party raises an equal protection claim relating to a non-suspect class, the party alleging a violation must show (1) disparate treatment between class members and similarly situated non-members, and (2) there is no rational relationship between the disparate treatment and a legitimate government interest.  See Hayden v. Paterson, 594 F.3d 150, 169 (2d Cir. 2010).

The AC states that the defendants' actions deprived Bah of equal protection of the laws, but does not plead the existence of any similarly situated individuals who were treated differently.  (See AC ¶ 98.)  The absence of allegations of similarly situated individuals is fatal to the Administrator's equal protection claim.  See Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59–60 (2d Cir. 2010); Pape v. Bd. of Educ. of the Wappingers Cent. Sch. Dist., No. 07-CV-8828 (KMK), 2009 WL 3151200, at *6 (S.D.N.Y. Sept. 29, 2009).

Without any factual basis to support it, the AC's conclusory allegation has not been "nudged . . . across the line from conceivable to plausible."  Iqbal, 556 U.S. at 680 (quoting Twombly, 550 U.S. at 547).  Consequently, the Administrator's equal protection claim must be dismissed.

- 15 -

II.  Defendants' Motion to Dismiss the Administrator's State Law Claims Is
<u>Granted in Part and Denied in Part.</u>

a.  <u>Notice of Claim</u>

The Responding Officers and Licitra move to dismiss the state law claims against

them because they are not mentioned by name in the Administrator's Notice of Claim served

upon the City.  "[I]n a federal court, state notice-of-claim statutes apply to state-law claims."

<u>Hardy v. N.Y. City Health & Hosp. Corp.</u>, 164 F.3d 789, 793 (2d Cir. 1999).

Under New York law, a plaintiff must file a Notice of Claim prior to the

commencement of an action against a city, or one of its officers.  N.Y. Gen. Mun. Law §§ 50-

e(1), 50-i(1).  A Notice of Claim must contain:

> (1) the name and post-office address of each claimant, and
> of his attorney, if any; (2) the nature of the claim; (3) the
> time when, the place where and the manner in which the
> claim arose; and (4) the items of damage or injuries
> claimed to have been sustained so far as then practicable
> . . . .

N.Y. Gen. Mun. Law § 50-e(2).  In this District, citing First Department precedent, courts have

also required a Notice of Claim to explicitly name individual defendants as well.  <u>E.g.</u>, <u>T.P. ex</u>

<u>rel. Patterson v. Elmsford Union Free Sch. Dist.</u>, No. 11 CV 5133(VB), 2012 WL 5992748, at *8

(S.D.N.Y. Nov. 27, 2012); <u>DC v. Valley Cent. Sch. Dist.</u>, No. 7:09-cv-9036 (WWE), 2011 WL

3480389, at *1 (S.D.N.Y. June 29, 2011) ("'General Municipal Law § 50–e makes unauthorized

an action against individuals who have not been named in a notice of claim.'" (quoting

<u>Tannenbaum v. City of N.Y.</u>, 819 N.Y.S.2d 4, 5 (1st Dep't 2006)).

Recently, the Fourth Department, overturning its prior precedent, which had

followed the First Department, issued an opinion criticizing the requirement, creating a

department split.  <u>Goodwin v. Pretorius, M.D.</u>, 962 N.Y.S.2d 539, 542, 545 (4th Dep't 2013)

("Although precedents involving statutory interpretation are entitled to great stability, we

- 16 -

conclude that the courts have misapplied or misunderstood the law in creating, by judicial fiat, a requirement for notices of claim that goes beyond those requirements set forth in the statute.") (internal quotation marks, alterations, and citations omitted).  The Court of Appeals has yet to speak on the issue. Reyes v. City of N.Y., No. 11 Civ. 7084(AT), 2014 WL 173412, at *7 (S.D.N.Y. Jan. 16, 2014).

In the absence of direct New York authority, the Court must make its "best estimate" as to how the Court of Appeals would rule on the issue.  Francis v. INA Life Ins. Co. of N.Y., 809 F.2d 183, 185 (2d Cir. 1987).  "In making that determination, [the Court] is free to consider all the resources the highest court of the state could use, including decisions reached in other jurisdictions."  Id. (internal citations omitted).

By its text, General Municipal Law § 50-e details four requirements for a Notice of Claim—(1) the names and addresses of each claimant, (2) the nature of the claim, (3) details regarding the time, place, and manner in which the claim arose, and (4) the damages claimed. N.Y. Gen. Mun. Law § 50-e(2).  Interpreting the text, the Court of Appeals has stated:

> Reasonably read, the statute does not require those things to be stated with literal nicety or exactness.  The test of the sufficiency of a Notice of Claim is merely whether it includes information sufficient to enable the city to investigate.  Nothing more may be required.  Thus, in determining compliance with the requirements of General Municipal Law § 50-e, courts should focus on the purpose served by a Notice of Claim: whether based on the claimant's description municipal authorities can locate the place, fix the time and understand the nature of the accident.

Brown v. City of N.Y., 95 N.Y. 389, 393 (2000) (internal quotation marks and citations omitted).

In Tannenbaum, the First Department stated for the first time that a Notice of Claim also required individual defendants to be named.  Goodwin, 962 N.Y.S.2d at 543.  For this proposition, the Tannenbaum Court relied on White v. Averill Park Cent. School Dist., 759

- 17 -

N.Y.S.2d 641 (Sup. Ct. Rensselaer Cnty. 2003).  See Tannenbaum, 819 N.Y.S.2d at 5.

According to the Fourth Department, White was the first case on record with such a holding.

Goodwin, 962 N.Y.S.2d at 542.  Criticizing the decision, the Fourth Department stated:

> The decision in White is devoid of any legal authority
> supporting the Justice's view that individual employees
> must be named in a notice of claim as a condition precedent
> to the commencement of an action against them.  The
> Justice who authored the decision in White concluded that,
> without naming the individual employees, the municipality
> does not have "enough information to enable [it] to
> adequately investigate the claim."  759 N.Y.S.2d at 644.
> He thus concluded that "permitting plaintiffs to prosecute
> causes of action against individuals who were not named in
> the[] notice of claim is contrary both to the letter and the
> purpose of [General Municipal Law § 50-e]."  Id.

Id.

Finding no statutory basis for the requirement, the Fourth Department held that

"[i]nasmuch as the notice of claim requirement as in derogation of a plaintiff's common-law

rights, the statute creating such a requirement should be strictly construed in the plaintiff's favor"

and that the "underlying purpose of the statute may be served without requiring a plaintiff to

name the individual agents, officers or employees in the notice of claim."  Id. at 546 (internal

quotation marks, alterations, and citation omitted).

Since the Fourth Department decided Goodwin, three courts in this District

addressed whether individual defendants were required to be named in the Notice of Claim.  See

Reyes v. City of N.Y., No. 11 Civ. 7084(AT), 2014 WL 173412, at *8 (S.D.N.Y. Jan. 16, 2014);

Chamberlain v. City of White Plains, No. 12-CV-5142 (CS), 2013 WL 6477334, at *22

(S.D.N.Y. Dec. 10, 2013); Rodriguez v. Rivera, No. 12 CV 5823(VB), 2013 WL 5544122, at

*11–12 (S.D.N.Y. Sept. 16, 2013).

In <u>Rodriguez</u>, the plaintiff had filed a Notice of Claim naming some defendants by name, and others as John or Jane Doe defendants in the caption.  <u>Rodriguez</u>, 2013 WL 5544122, at *12.  In determining the sufficiency of the Notice, Judge Briccetti first noted that "'General Municipal Law § 50-e makes unauthorized an action against individuals who have not been named in a notice of claim,'" and made no reference to the recent split on the requirement. <u>See</u> <u>id.</u> at *11 (quoting <u>DC</u>, 2011 WL 3480389, at *1).  Ultimately dismissing the claim for insufficient notice, Judge Briccetti stated:

> Assuming that an individual may be identified as a John or Jane Doe when the specific identities of persons are unknown to plaintiff, the Court finds the notice is nonetheless insufficient because there are no additional facts or references in the notice of claim to indicate who these John and Jane Doe defendants were and what theories of liability applied to them.

<u>Id.</u> at *12.

In <u>Chamberlain</u>, the plaintiff had filed a Notice of Claim, but failed to name any individual defendants in the Notice, either in the caption, or the main text.  <u>Chamberlain</u>, 2013 WL 6477334, at * 21.  Directly addressing the split, Judge Seibel, in the absence of more direct guidance, adopted the <u>Goodwin</u> Court's conclusion that there was no requirement that individual defendants be specifically named in a notice of claim.  <u>Id.</u> at *22.  In so holding, Judge Seibel reasoned:

> While it may generally be true that a plaintiff may not file a notice of claim naming a municipal entity and then commence an action against a roster of individual municipal employees, the primary inquiry regarding a Notice of Claim is not whether the individuals were identified <u>by name</u> in the Notice of Claim, but whether they were described sufficiently for the municipality to be able to investigate the claim.  As long as the Notice of Claim includes information sufficient to enable the city to investigate and identify the municipal employees involved,

> a failure to specifically name individual defendant
> employees should not bar suit against them.

Id. (internal quotations marks, alterations, and citations omitted).

Similarly, in Reyes, the plaintiff had filed a Notice of Claim with the City, but, with one exception, failed to name any individual defendants in the Notice.  Reyes, 2014 WL 173412, at *7.  Adopting the reasoning in Chamberlain, Judge Torres concluded that the Court of Appeals would likely adopt Goodwin and found that it was "irrelevant" that the Notice did not name each individual defendant.  Id. at *8.[1]

With deference to those of differing views, this Court agrees with the Chamberlain and Reyes Courts that the Court of Appeals will likely adopt Goodwin.  As the Court of Appeals noted, "[t]he prime, if not the sole, objective of the notice requirements of [§ 50-e] is to assure the [C]ity an adequate opportunity to investigate the circumstances surrounding the accident and to explore the merits of the claim while information is still readily available."  Teresta v. City of N.Y., 304 N.Y. 440, 443 (1952); accord Dubowy v. City of N.Y., 759 N.Y.S.2d 325, 326 (1st Dep't 2003).  Further, as a practical matter, a potential claimant may be unable to ascertain the individual defendants within the ninety day notice period.  See Schiavone v. Cnty. of Nassau, 380 N.Y.S.2d 711, 711 (2d Dep't 1976).  As such, the Court will "focus on the purpose served by a Notice of Claim: whether based on the claimant's description municipal authorities can locate the place, fix the time and understand the nature of the accident."  Brown, 95 N.Y.2d at 393.

The Administrator filed a Notice of Claim on December 21, 2011 and, in the caption, named as defendants the City and "Police Officers John Does # 1-50."  (AC ¶ 89;

---

[1] Judge Torres subsequently readopted the holding of Goodwin in Charles v. City of N.Y., No. 11 Civ. 2783(AT), 2014 WL 1284975, at *9 (S.D.N.Y. Mar. 31, 2014).

Myrvold Decl. Ex. C, at 1.)  According to the Notice, on the evening of September 25, 2011, at approximately 6:40 p.m., Mrs. Bah dialed 911 to request an ambulance for her son.  (Myrvold Decl. Ex. C, at 2.)  Instead of an ambulance, police officers arrived.  (Id.)  The Notice further states that, after the initial police arrival, additional police officers arrived and "escalated the situation."  (Id. at 2–3.)  Finally, the Notice states that the officers caused Bah's death.  (Id. at 3.)

When the Administrator filed her Notice, and when she filed her initial Complaint, the names of the individual defendants were not known to her.  (See AC ¶ 92.) Consequently, it would not have been feasible for her to name the individual defendants in the Notice.  The information provided in the Notice, however, was sufficient for the City to be able to identify the officers present, allowing the Administrator to subsequently name them as defendants in the action.  (See id.)

The Court concludes that the Notice contained sufficient detail to allow the City to investigate the claim and ascertain the identities of the John Doe officers.  Therefore, failure to name the officers directly in the Notice of Claim is not fatal to the Administrator's state law claims against them.  Furthermore, though the Administrator did not know the identity of the officers when she filed the Notice, she did list John Doe officers as parties in the caption.  This was sufficient to put the City on notice that the individual officers may be parties to a subsequently filed action.  See Rodriguez, 2013 WL 5544122, at *12 (indicating that listing unknown John and Jane Doe defendants in the caption may be sufficient notice); cf. Krupski v. Costa Crociere S.p.A., 560 U.S. 538, 548 (2010); Bishop v. Best Buy Co., No. 08 Civ. 8427(LBS), 2010 WL 4159566, at *3 (S.D.N.Y. Oct. 13, 2010) (allowing relation back under Rule 15(c), Fed. R. Civ. P., of claims against added parties, previously identified as John Does,

when the information in the original complaint provided enough information for counsel to identify them).

Consequently, the Responding Officers and Licitra's motion to dismiss the state law claims against them on the grounds that they were not named in the Notice of Claim is denied.

### b. Negligence

The Responding Officers, Licitra, and the City move to dismiss the negligence claims against the defendants to the extent that they are premised on intentional acts.  Under New York law, harm predicated on an intentional act may not give rise to a claim of negligence. United Nat'l Ins. Co. v. Tunnel, Inc., 988 F.2d 351, 353 (2d Cir. 1993); Babikian v. Nikki Midtown, LLC, 875 N.Y.S.2d 20, 21 (1st Dep't 2009) (dismissing causes of action for "negligent assault" and "negligent battery" as not being recognized causes of action under New York Law). Though litigants may allege alternate, or inconsistent, claims in a pleading, Rule 8(d), Fed. R. Civ. P., when the conduct alleged, if true, may only give rise to liability for an intentional act, a claim of negligence may be dismissed.  See Wahlstrom v. Metro-North Commuter R.R. Co., 89 F. Supp. 2d 506, 531–32 (S.D.N.Y. 2000) ("[B]ecause the actions alleged here were intentional and deliberate allegedly in their nature offensive, they are outside the ambit of actionable negligence.") (internal quotation marks and citations omitted); Schmidt v. Bishop, 779 F. Supp. 321, 324–25 (S.D.N.Y. 1991) ("New York courts have rejected uniformly such attempts to transmogrify intentional torts into 'negligence'."); Trott v. Merit Dep't Store, 484 N.Y.S.2d 827, 829 (1st Dep't 1985) ("From the facts alleged by plaintiff in his complaint, it is clear that no negligence claim can be justified upon these facts, and the sole viable cause of action (as between the first two causes of action) is for assault.")

According to the AC, the negligent acts of the defendants included, "but are not limited to," forcibly breaking the door to Bah's apartment, "negligently discharging the Taser," and other conduct that was "improper under the circumstances."  (AC ¶ 134.)  To the extent that the defendants' actions were alleged to have been intentional in the AC, claims of negligence premised on these acts must be dismissed.  (See, e.g., id. ¶ 52 ("Defendant Kress fired his Taser at Mr. Bah.").)

Johnson, Stanton, and Santana also argue that the AC does not state a claim of negligence against them.  With respect these defendants, the AC alleges that they (1) arrived on the scene, (2) attempted to gain entry into Bah's apartment, and (3) called for the ESU Officers.  (AC ¶¶ 26, 29, 31.)  The AC does not explain how these actions form a basis for a claim of negligence.  As such, the conclusory allegations that the officers acted negligently are not sufficient to state a claim.  See Twombly, 550 U.S. at 555.

Therefore, the negligence claims against Johnson, Stanton, and Santana, as well as any negligence claims against other defendants premised on intentional acts, are dismissed.

### c.  Negligent Training and Supervision

The AC alleges that all individual defendants were acting within the scope of their employment with the City at all times, and that the City failed to properly train or supervise them.  (AC ¶¶ 10–18, 136–38.)  Under New York law, "where an employee is acting within the scope of his or her employment, thereby rendering the employer liable for any damages caused by the employee's negligence under a theory of respondeat superior, no claim may proceed against the employer for negligent hiring or retention."  Karoon v. N.Y. City Transit Auth., 659 N.Y.S.2d 27, 29 (1st Dep't 1997) (emphasis added).

Generally, if the employee is not negligent, then the employer may not be liable, and, if the employee is negligent, the employer will be liable under a theory of respondeat

superior, regardless of whether its actions in hiring or training the employee were reasonable. Id. An exception to the general rule exists in cases where a plaintiff seeks punitive damages from the employer based on alleged gross negligence in the hiring or retention of the employee. Id. However, when, as here, a municipality is the employer, punitive damages will not be available as a matter of law. Sharapata v. Town of Islip, 56 N.Y.2d 332, 334 (1982).

Consequently, the AC fails to state a claim of negligent training and supervision against the City.

## CONCLUSION

For the foregoing reasons, the Moving Defendants' motion to dismiss (Docket # 30) is GRANTED with respect to (1) all challenged claims against Stanton, Santana, and Johnson, except for the unlawful entry claim, (2) all challenged claims against Gallitelli, except for the unlawful entry and supervisory liability claims, (3) the excessive force claim against Licitra, (4) the equal protection claim against the Moving Defendants, (5) any negligence claim against the Moving Defendants premised on an allegedly intentional act, and (6) the negligent training and supervision claim against the City. The Moving Defendants' motion is DENIED with respect to all other challenged claims.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
April 30, 2014

- 24 -