UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
OUMOU BAH, AS THE ADMINISTRATOR
OF THE ESTATE OF MOHAMED BAH,

|  |  |
|---|---|
| Plaintiff, | 13-cv-6690 (PKC) |
| -against- | MEMORANDUM<br>AND ORDER |
| THE CITY OF NEW YORK, ET AL., |  |
| Defendants. |  |

-----------------------------------------------------------x

CASTEL, U.S.D.J.

In the early evening of September 25, 2012, police officers responded to a 911 call from Mohamed Bah's mother, who sought an ambulance to take her emotionally disturbed son to the hospital. The officers unsuccessfully attempted to communicate with Bah and the Emergency Services Unit ("ESU") was called to Bah's apartment. After various attempts to observe Bah with cameras inserted into his apartment, Bah's door opened and the officers entered Bah's apartment. There is a dispute as to whether Bah wielded a knife. Bah was ultimately Tasered and shot by officers and died.

Plaintiff Oumou Bah, as the Administrator of the Estate of Mohamed Bah, brings claims under 42 U.S.C. § 1983 for excessive use of force and unlawful entry in violation of decedents' rights to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the U.S. Constitution, as well as state law claims of negligence, assault, battery, and wrongful death against various officers of the New York City Police Department ("NYPD") and the City of New York ("City"). Plaintiff also brings claims for supervisory liability against the supervising officers under section 1983. Fact discovery in this

action has concluded.  Defendants now move for summary judgment on all claims.  Additionally, defendants move in limine to exclude from evidence the expert reports of plaintiff's two expert witnesses and preclude them from testifying at trial.  Plaintiff moves for sanctions against defendants for spoliation of evidence.

Plaintiff claims that the officers used excessive force in violation of Bah's constitutional rights and subjected his apartment to unreasonable searches at various points leading up to the officers' entry to his apartment.  Defendants claim that the force used was not excessive and that the searches were reasonable.  Factual disputes exist between the parties, including as to Bah's location in relation to the ESU officers when the officers entered the apartment and whether Bah was still a threat to the officers when the fatal shot was fired.

Thus, defendants' motion for summary judgment is denied, except with respect to plaintiff's claims for negligence and due process violations against all defendants and plaintiff's section 1983 municipal liability claim against the City.  Plaintiff's municipal liability claim is dismissed because plaintiff has failed to bring forth evidence from which a reasonable finder of fact could find that the City acted with deliberate indifference in failing to train its officers or that additional or alternative training would have prevented excessive force from being used on Bah.  Plaintiff's state law negligence claims against the individual defendants are dismissed because plaintiff alleges that the individual defendants purposefully violated Bah's rights, and, as a matter of law, intentional actions may not be the basis for a finding of negligence.

Defendants move in limine to exclude testimony from plaintiff's two experts; forensic pathologist and medical examiner Michael M. Baden, M.D., and former police officer Gene Maloney.  (Dkt. No. 135.)  Defendants' motion is denied with respect to the testimony of Maloney and granted in part and denied in part with respect to the testimony of Dr. Baden.

Plaintiff has moved for sanctions against defendants for spoliation of evidence.  (Dkt. No. 132.)
The Court will hold an evidentiary hearing regarding the alleged spoliation and requested
sanctions.

Procedural History

This Court previously dismissed claims against defendants Brian Stanton,
Esmerelda Santana, Michael Licitra, Robert Gallitelli, and Vincent Johnson for use of excessive
force on Bah, dismissed plaintiff's equal protection claims against these same defendants, as well
as the City, and dismissed plaintiff's negligent training and supervision claim against the City.
(Dkt. No. 47.)  The Court also dismissed plaintiff's negligence claims against Johnson, Stanton,
and Santana, as well as any negligence claims against other defendants premised on intentional
acts.  (Dkt. No. 47.)  The period for pretrial discovery has concluded.

BACKGROUND

The following facts, taken from materials submitted in connection with the
present motion, are undisputed unless noted.  On September 25, 2012, Bah's mother spoke to a
911 operator and requested an ambulance take Bah to the hospital.  (Pl.'s Rule 56.1 CS ¶ 28.)  At
approximately 6:41 p.m. a transmission went over the 26th Precinct radio for a job involving an
emotionally disturbed person ("EDP") at 113 Morningside Avenue Apartment 5D.  (Pl.'s Rule
56.1 CS ¶ 29.)  Defendants Stanton, Santana, Johnson, and Lieutenant Gallitelli (the "Patrol
Officers") arrived at 113 Morningside Avenue in response to the transmission.  (Pl.'s Rule 56.1
CS ¶ 30.)  Some or all of the Patrol Officers spoke to Bah's mother outside the apartment
building, where she told them that "Bah was alone in the apartment and was not violent and/or
did not have any weapons."  (Pl.'s Rule 56.1 CS ¶ 32.)  The parties dispute precisely what was
said during the exchange, but agree that the Patrol Officers entered the apartment building,

walked up the stairs to Bah's apartment, and knocked on Bah's door.  (Pl.'s Rule 56.1 CS ¶¶ 32-37.)

Bah opened the door, and Stanton placed his foot towards the door jam.  (Pl.'s Rule 56.1 CS ¶ 42.)  Santana pushed the bottom of the apartment door with her foot.  (Id.)  Bah was naked and his eyes had a blank stare and appeared to be open wider than normal.  (Pl.'s Rule 56.1 CS ¶¶ 44-46.)

At least one officer observed Bah holding a kitchen knife in his right hand.  (Pl.'s Rule 56.1 CS ¶ 48.)  Principally on the basis that no knife was produced in discovery, plaintiff disputes that Bah was holding a knife.[1]  (Pl.'s Rule 56.1 CS ¶¶ 48, 169.)  Bah attempted to shut the door and at least one officer attempted to prevent the door from closing, although Bah ultimately managed to close the door.  (Pl.'s Rule 56.1 CS ¶¶ 49-50.)

After Bah closed the door Gallitelli used a radio to request that the ESU respond to Bah's apartment.  (Pl.'s Rule 56.1 CS ¶ 55.)  Five ESU officers responded to the scene: defendants Joseph McCormack, Edwin Mateo, Andrew Kress, Michael Green, and Lieutenant Michael Licitra.  (Pl.'s Rule 56.1 CS ¶ 69.)  When Licitra arrived he assumed and Gallitelli relinquished command of the area around Bah's apartment door.  (Pl.'s Rule 56.1 CS ¶ 119.)  The peephole in Bah's apartment door was removed to enable a view of the apartment.  (Pl.'s Rule 56.1 CS ¶ 101.)  A chemical light was inserted through the peephole to illuminate the apartment.  (Pl.'s Rule 56.1 CS ¶ 124.)  An officer successfully picked the lock on the door, but the door would not open due to an additional lock on the door.  (Pl.'s Rule 56.1 CS ¶ 127.)  The

---

[1] Plaintiff disputes that Bah held a knife at any point during his encounters with the police.  (See, e.g., Pl.'s Rule 56.1 CS ¶ 169.)  The knife and other evidence is the subject of plaintiff's motion for sanctions for spoliation of evidence (Dkt. No. 132).

ESU officers used a hydraulic jack to crack the door open in order to insert a pole camera to observe the inside of Bah's apartment.  (Pl.'s Rule 56.1 CS ¶¶ 131, 139, 144, 146.)

The pole camera was removed from Bah's apartment.  (Pl.'s Rule 56.1 CS ¶ 150.) At some point after the pole camera was removed, the door opened.  (Pl.'s Rule 56.1 CS ¶ 151.) There is a dispute over whether Bah opened the door or whether the door was opened by something done by the ESU officers.  (Id.)

There is no dispute that Licitra ordered the team to enter the apartment shortly after the door opened.  (Pl.'s Rule 56.1 CS ¶ 155.)  There is no dispute that inside the apartment two Tasers were discharged at Bah, (Pl.'s Rule 56.1 CS ¶¶ 166, 179), an Arwen was discharged at Bah, [2] (Pl.'s Rule 56.1 CS ¶ 175), ultimately ten rounds from the officers' service weapons were discharged at Bah, (Pl.'s Rule 56.1 CS ¶¶ 189-91), or that Bah was pronounced dead at 8:16 p.m., (Pl.'s Rule 56.1 CS ¶ 215.)  The parties dispute whether Bah attacked the officers with a knife immediately after the door opened.  (Pl.'s Rule 56.1 CS ¶ 154.)  The parties dispute whether Bah was immediately inside the threshold of the apartment when the door was opened, or whether he was several feet from the threshold of the apartment when the door was opened. (Pl.'s Rule 56.1 CS ¶ 161.)  The parties dispute whether Bah was approaching Kress with a knife when Kress deployed his Taser.  (Pl.'s Rule 56.1 CS ¶ 166.)  Based upon the autopsy report and testimony from plaintiff's expert, there is a dispute as to whether Bah was already on the ground when the fatal shot to his head was fired.  (Pl.'s Mem. in Opp. to Summ. J., 9; Decl. of Debra Cohen in Opp. to Summ. J., Ex. 47, Baden Report, 2-3; Defs.' Reply to Pl.'s Rule 56.1 CS ¶¶ 583-84.)

---

[2] An Arwen is a "less lethal" weapon that "fires a projectile with a very heavy impact" to incapacitate a target with "pain and shock."  (Defs.' Reply to Pl.'s Rule 56.1 CS ¶ 513.)

LEGAL STANDARD

On a motion for summary judgment, the Court views all evidence of record in the light most favorable to plaintiff as the non-moving party, and draws all reasonable inferences in plaintiff's favor.  See Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law," meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief as a matter of law.  Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'"  Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).  In reviewing a motion for summary judgment, the court may scrutinize the record, and grant or deny summary judgment as the record warrants.  Rule 56(c)(3), Fed. R. Civ. P.  In the absence of any disputed material fact, summary judgment is appropriate.  Rule 56(a), Fed. R. Civ. P.

DISCUSSION

I.      <u>Claims against the Individual Defendants.</u>

        Because facts material to plaintiff's claims for excessive force, unlawful entry, assault, battery, wrongful death, and supervisory liability are disputed by the parties, defendants' motion for summary judgment as to those claims is denied.

        Defendants also move for summary judgment on plaintiff's section 1983 claims for equal protection violations against Kress, Green, Mateo, and McCormack, who had not yet appeared in the action when this Court dismissed these claims against the other defendants (Dkt. No. 47).  For the reasons stated in the Court's opinion of May 1, 2014 (Dkt. No. 47), the Court dismisses plaintiff's claims for equal protection violations against Kress, Green, Mateo, and McCormack.

        The Court previously dismissed plaintiff's state law negligence claims against Johnson, Stanton, and Santana, as well as any negligence claims against other defendants premised on intentional acts.  (Dkt. No. 47.)  Plaintiff's theory of negligence is that the officers' lack of care in handling the situation with Bah negligently caused Bah's death.  However, regardless of what led to the circumstances in which force was used on Bah, both the entries into Bah's apartment and the use of force against him were intentional acts by the officers.  "When a plaintiff asserts excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." <u>Dineen v. Stramka</u>, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002); <u>accord</u> <u>Frederique v. Cty. of Nassau</u>, 168 F. Supp. 3d 455, 484 (E.D.N.Y. 2016).  Consequently, plaintiff's state law negligence claims fail as a matter of law.

Plaintiff concedes that there is not sufficient evidence in the record to establish the involvement of any of the defendants in any depravation of Bah's due process rights. (Pl.'s Mem. in Opp. to Summ. J., 22.) The Court thus grants defendants' motion for summary judgment with respect to plaintiff's section 1983 claims for due process violations.

II.    Qualified Immunity.

Second Circuit precedent dictates that:

> A decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden to demonstrate that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'

Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 255 (2d Cir. 2014) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)). Under the second prong, "a [g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Id. (alteration in original).

The Supreme Court recently clarified the proper standard for the evaluation of qualified immunity at the summary judgment stage, holding that "clearly established law should not be defined at a high level of generality," but rather "must be particularized to the facts of the case." White v. Pauly, No. 16-67, 2017 U.S. LEXIS 5, at *9 (Jan. 9, 2017) (internal quotation marks and citations omitted). In that case, the Supreme Court vacated the Tenth Circuit's judgment upholding the district court's denial of defendant police officer's motion for summary judgment on plaintiff's claims brought under section 1983 for excessive force in violation of plaintiff's Fourth Amendment rights. See id. at 5, 11. The Supreme Court found that the Tenth Circuit's qualified immunity analysis was defective because it "failed to identify a case where an

officer acting under similar circumstances as [defendant] was held to have violated the Fourth Amendment." Id. at 9.

Plaintiff's version of the facts supporting the excessive force claims is that the final shot to the head that killed Bah was fired at close range while Bah was lying wounded on the ground after being previously shot multiple times by the officers. According to plaintiff's version, Bah was no longer attacking the officers with a knife and posed no threat to the officers or anyone else. If proven, this would violate a clearly established right: "The earlier threat [with a knife] did not give [the officer] license to shoot to kill a man he knew, immediately before and at the moment of the shooting, was unarmed." Estate of Jaquez v. City of New York, 104 F. Supp. 3d 414, 437-38 (S.D.N.Y. 2015) (alterations in original); see also O'Bert v. Vargo, 331 F.3d 29, 39-40 (2d Cir. 2003).

With respect to plaintiff's unlawful entry claims, the record, viewed in a light most favorable to the plaintiff, presents a scenario in which the Patrol Officers arrived in response to a radio call related to an EDP, were told by Bah's mother that Bah was not violent, and knocked on Bah's apartment door. Bah opened the door and the officers observed that he was naked, his eyes had a blank stare and were open wider than normal, and he was holding a knife in one hand. Bah closed the door, which the officers unsuccessfully attempted to prevent him from doing. The ESU officers arrived later and made various entries into Bah's apartment, including removing the peephole in the apartment door and inserting a chemical light, picking the lock on the door, using a hydraulic jack to partially breach the door, and inserting a pole camera.

In Kerman v. City of New York, 261 F.3d 229, 232 (2d Cir. 2001), the facts, viewed in a light most favorable to the non-movant plaintiff on a motion for summary judgment,

were that a 911 operator received a call stating that a man at plaintiff's address was mentally ill, was off his medication, was acting crazy, and possibly had a gun. Police responded to the plaintiff's apartment, rang the doorbell, pounded on the door, and announced their presence for several minutes before a man dressed only in a towel opened the door a crack, at which point the officers slammed open the door and rushed in. See id. at 232-33. The Second Circuit, in denying the defendant police officers' motion for summary judgment, found that such a warrantless entry did not meet the exigent circumstances exception to the warrant requirement of the Fourth Amendment, and thus violated the plaintiff's constitutional rights. See id. at 235-36. On a subsequent appeal after remand, the Second Circuit stated, regarding the officers' claims of qualified immunity for their seizure of plaintiff after entering his apartment, that "it was sufficiently clear in light of preexisting law that [plaintiff] had a right not to be detained or involuntarily hospitalized by an officer who (on [plaintiff]'s version of the facts) did not know, and who patently ignored opportunities to determine, the seriousness of [plaintiff]'s condition and whether he was dangerous to himself or others." Kerman v. City of New York, 374 F.3d 93, 111 (2d Cir. 2004). Plaintiff's version of the facts, if proven, could support a finding that the officers violated clearly established law by making warrantless entries into Bah's apartment without more evidence that he was a danger to himself or others.

Because a reasonable jury could find that the defendants violated clearly established law by subjecting Bah to excessive force and entering Bah's apartment in violation of Bah's constitutional rights, the defendants are not entitled to qualified immunity as a matter of law.

III.     <u>Section 1983 Municipal Liability Claim against the City.</u>

Plaintiff brings a claim against the City under section 1983 for violation of Bah's

rights guaranteed by the Fourth and Fourteenth Amendments, 42 U.S.C. § 12101, <u>et seq.</u> (the

Americans with Disabilities Act), and 29 U.S.C. § 794 (Section 504 of the Rehabilitation Act of

1973).

Defendant City moves for summary judgment on plaintiff's claim for municipal

liability against the City on the grounds that plaintiff has not come forward with any evidence

that Bah's rights were violated as a result of a municipal policy or custom.  To prevail against a

municipal defendant on a claim under section 1983, a plaintiff must establish that his federal

constitutional or statutory rights have been violated pursuant to a "policy statement, ordinance,

regulation, or decision officially adopted and promulgated by that body's officers" or "pursuant

to governmental 'custom' even though such a custom has not received formal approval through

the body's official decision making channels."  <u>Monell v. Dept. of Soc. Servs.</u>, 436 U.S. 658,

690-91 (1978); <u>see</u> <u>Reynolds v. Giuliani</u>, 506 F.3d 183 (2d Cir. 2007).  To survive summary

judgment, "a plaintiff must show that the municipal action was taken with the requisite degree of

culpability and must demonstrate a direct causal link between the municipal action and the

deprivation of federal rights."  <u>Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown</u>, 520 U.S. 397,

404 (1997).  A municipality may not be held liable on section 1983 claims solely "by application

of the doctrine of *respondeat superior*."  <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 478

(1986).

Plaintiff's theory of municipal liability is that the City failed to adequately train

ESU officers to deal with EDPs.  In order for a <u>Monell</u> claim based on a failure to train to

succeed, plaintiff must show that the municipality's failure to train its employees about their

legal duty to avoid violating a citizen's rights amounts to "deliberate indifference." Connick v. Thompson, 563 U.S. 51, 61 (2011). The Second Circuit has identified three requirements that must be met in order to find that a municipality's failure to train constitutes deliberate indifference: (1) "the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation," (2) "the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation," and (3) "the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." Jenkins v. City of New York, 478 F.3d 76, 94 (2d Cir. 2007) (internal citations and quotation marks omitted). "In addition, at the summary judgment stage, plaintiffs must identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." Id. (internal quotation marks omitted).

It is not sufficient to demonstrate that policy makers knew officers frequently failed to follow the Patrol Guide or other internal procedures on which they were trained. Section 1983 provides a remedy for the violation of rights protected by the Constitution or federal law. See id. It does not provide a remedy for violations of best police practices. A violation of the Patrol Guide or departmental policy does not, in and of itself, amount to the violation of a right protected by the Constitution or federal law. See United States v. Wilson, 699 F.3d 235, 238, 243 (2d Cir. 2012) (finding that "the Fourth Amendment does not generally incorporate local statutory or regulatory restrictions," such that a seizure in violation of departmental policy and state law did not amount to a constitutional violation). Nor does the fact that such a policy violation occurred, without more, indicate inadequate training on the part of

the City.  See De Michele v. City of New York, No. 09 Civ. 9334 (PGG), 2012 U.S. Dist. LEXIS

136460, at *68-69 (S.D.N.Y. Sep. 24, 2012).

   To support plaintiff's claim that the City failed to adequately train ESU officers,

plaintiff first points to the NYPD Firearms Discharge Review Board's report on the incident that

acknowledged that "[t]here is some history with the emergency service unit and emotionally

disturbed persons' response to door openings," including several occasions where the

emotionally disturbed person has charged the door when officers made a partial door breach to

insert a camera.  (Pl.'s Rule 56.1 CS ¶ 651.)  Plaintiff also points to Licitra's testimony that he

did not know that NYPD policy required an officer to issue a warning before firing a Taser,

(Pl.'s Rule 56.1 CS ¶ 337), as showing the NYPD's deliberate indifference towards whether

Licitra retained, understood, or implemented his training, (Pl.'s Mem. in Opp. to Summ. J., 26).

McCormack did not issue a warning to Bah before firing his Taser.  (Defs.' Reply to Pl.'s Rule

56.1 CS ¶ 339.)  Plaintiff further indicates that Licitra received no instruction that Taser probes

not be shot into a target's neck.  (Pl.'s Rule 56.1 CS ¶ 342.)  Kress did not receive any training

regarding checking that his Taser was in good working order, (Pl.'s Rule 56.1 CS ¶ 332), and

Mateo received no formal continuing ESU training regarding EDPs after his initial ESU training,

(Pl.'s Rule 56.1 CS ¶ 317).  Lastly, at the time of Bah's death, the City had not yet adopted the

Crisis Intervention Team ("CIT") approach to handling situations involving EDPs.  (Pl.'s Mem.

in Opp. to Summ. J., 27.)

   These facts, viewed in a light most favorable to plaintiff, do not establish that any

deficiency in the officers' training, if there was any, was so closely related to the officers' use of

force that it could be said to have caused the officers' use of that force.  Plaintiff admits that

NYPD policy requires officers to give subjects warnings before using a Taser on them and states

that subjects should not be shot in the neck.  (Defs.' Reply to Pl.'s Rule 56.1 CS ¶ 336, 340.)
But these Patrol Guide policies do not amount to a constitutional standard applicable to all
circumstances.  Pre-Taser warnings and avoidance of the neck area may be an across-the-board
good police practice but a <u>Monell</u> clam must be premised on a right protected by the Constitution
or federal law.  The Constitution does, indeed, prohibit the use of force that is unreasonable or
excessive under the circumstances, and no police policy may condone or permit such use.

Moreover, one officer's lack of knowledge of these policies is insufficient to
show inadequate training by the City.  Further, Licitra did not fire a Taser at Bah, so Licitra's
lack of knowledge of those policies is irrelevant to the force actually used on Bah.  While
McCormack did not issue a warning to Bah before firing his Taser, plaintiff has produced no
evidence indicating that he did not know the policy required a warning, or that a warning would
have prevented a deprivation of Bah's rights.

Plaintiff has identified no deficiency in Mateo's training.  Thus the fact that he
has not received formal training regarding EDPs since his initial ESU training is irrelevant.

Even if Kress did not receive any training regarding checking his Taser to ensure
it was in good working order, plaintiff has not identified any problem with Kress's Taser, and
even if there was a problem, has not shown that checking the Taser would have discovered the
problem or that discovery of the problem would have prevented any violation of Bah's rights.

Plaintiff alleged in the amended complaint that seven police encounters with
EDPs have resulted in fatalities due to inadequately trained NYPD officers.  (Amended
Complaint ¶¶ 63-68.)  However, plaintiff has put forth no evidence whatsoever regarding these
alleged police encounters, let alone any evidence to support the allegation that these fatal
encounters between NYPD officers and EDPs were caused by inadequate training.  Plaintiff

contends that the City's failure to implement the CIT approach to police interactions with EDPs before the incident involving Bah demonstrates the City's deliberate indifference in failing to adequately train officers.  (Pl.'s Mem. in Opp. to Summ. J., 27.)  The only evidence plaintiff submits regarding the CIT approach is (1) a NYPD news release dated October 5, 2016, that briefly describes the CIT approach and states that the City had recently implemented the approach, and (2) what appears to be a series of online posts on the website of an organization called Communities for Crisis Intervention Teams that comment on news related to police interaction with EDPs and provide hyperlinks to other materials.  (Decl. of Debra Cohen in Opp. to Summ. J., Ex. 67.)

This evidence does not put into dispute any facts material to a determination of whether the City acted with deliberate indifference by not training officers in the CIT approach to EDPs before the death of Bah.  Even if plaintiff had brought forth evidence sufficient to show that the seven police encounters described in the complaint resulted in fatalities because the responding officers mishandled the situation, in order to survive summary judgment plaintiff would have additionally needed to point out the specific deficiencies in the current training regimen, show that those deficiencies directly led to the officers' mishandling of the situation, and show that the CIT approach would have led to a different result.  This plaintiff has not done.

The Firearms Discharge Review Board's report suggests that the NYPD was aware that breaching the door of an EDP like Bah had in the past caused other EDPs to charge the door.  (Pl.'s Rule 56.1 CS ¶ 651.)  However, the mere fact that breaching doors in the past had caused EDPs to charge the door is not sufficient to show deliberate indifference on the part of the City.  To the contrary, the report determined that breaching the door as the officers did was inconsistent with NYPD policy.  (Pl.'s Rule 56.1 CS ¶ 649.)  Plaintiff has produced no evidence

suggesting that the officers' breaching of the door in this case was due to any lack of training. Nor has plaintiff produced any further evidence at all regarding other instances of EDPs charging a door once breached.

Standing alone, a failure to train or supervise does not establish a section 1983 claim against a municipality.  Under <u>Jenkins</u> and other authority, the specific training and supervision deficiencies must lead with some frequency to a deprivation of a right protected by the Constitution or federal law.  See <u>e.g.</u>, <u>Jenkins</u>, 478 F.3d at 94; <u>Walker v. New York</u>, 974 F.2d 293, 298 (2d Cir. 1992).

On the evidence presented in this motion, no reasonable jury could find for plaintiff on plaintiff's <u>Monell</u> claim. The Court thus grants summary judgment against plaintiff on plaintiff's claim for municipal liability under section 1983 against the City.

IV.    <u>Motion in Limine to Preclude Expert Testimony.</u>

    a.    <u>Applicable Law.</u>

Rule 702, Fed. R. Evid., provides that a qualified expert may offer an opinion if his or her "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," and if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  <u>Nimely v. City of New York</u>, 414 F.3d 381, 395 (2d Cir. 2005).  While Rule 702 "embodies a liberal standard of admissibility for expert opinions," the Rule "[does] not represent an abdication of the screening function traditionally played by trial judges."  <u>Id.</u> at 395-96.

In ruling on the admissibility of expert testimony, a district court must first determine whether a proffered expert is qualified.  See <u>id.</u> at 396 n.11.  If the proffered expert is qualified, the district court must then assess whether his or her proposed testimony satisfies the

other criteria set forth in Rule 702, i.e., that it is reliable.  The reliability inquiry is guided by the

factors enumerated by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509

U.S. 579 (1993).  These factors include "whether a theory or technique had been and could be

tested, whether it had been subjected to peer review, what its error rate was, and whether

scientific standards existed to govern the theory or technique's application or operation."

Nimely, 414 F.3d at 396.  They "do *not* constitute a 'definitive checklist or test.'"  Kumho Tire

Co. v. Carmichael, 526 U.S. 137, 150 (1999) (emphasis in original) (quoting Daubert, 509 U.S.

at 593).  The key issue is whether the expert "employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field."  Id. at 152.  A

court's "inquiry must be tied to the facts of a particular case."  Id. (internal quotation marks and

citation omitted).

       "[E]xpert testimony should be excluded if it is speculative or conjectural, or if it is

based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in

essence an apples and oranges comparison . . . ."  Boucher v. U.S. Suzuki Motor Corp., 73 F.3d

18, 21 (2d Cir. 1996) (per curiam) (internal quotation marks and citations omitted).  "[O]ther

contentions," however, "that the assumptions are unfounded go to the weight, not the

admissibility, of the testimony."  Id. (internal quotation marks omitted).  A district court should

determine "whether the expert acted reasonably in making assumptions of fact upon which he

would base his testimony," but "[a]dmission of expert testimony based on speculative

assumptions is an abuse of discretion."  Id. at 21-22.  "[N]othing in either Daubert or the Federal

Rules of Evidence requires a district court to admit opinion evidence that is connected to existing

data only by the *ipse dixit* of the expert."  Kumho Tire Co. 526 U.S. at 157.

Finally, a district court must determine whether the proposed testimony will "assist the trier of fact." Nimely, 414 F.3d at 397. This requirement relates primarily to relevance. Daubert, 509 U.S. at 591. The Second Circuit "requires the exclusion of testimony which states a legal conclusion" because such testimony does not aid the trier of fact. United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994). In addition, expert testimony that usurps "the role of the jury in applying th[e] law to the facts before it by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." Nimely, 414 F.3d at 397 (internal quotation marks and citations omitted; alteration in original).

In determining whether expert testimony is helpful to the trier of fact, courts should be mindful that expert testimony is subject not just to Rule 702, but also to Rule 403. Expert testimony "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Nimely, 414 F.3d at 397 (citing Rule 403, Fed. R. Evid.).

> b. The Baden Report and Proposed Testimony.

Dr. Baden's opinions relate to bullet trajectories and Bah's emotional state during his encounter with the police. Defendants move to preclude Dr. Baden from testifying at trial. The Court grants defendants' motion in part and denies it in part. Dr. Baden may testify at trial regarding the trajectories of the bullets fired at Bah, including the locations from which they were likely fired from. Dr. Baden will be precluded from testifying regarding Bah's psychological state, including his mental pain and emotional suffering and his reaction to the officer's methods of dealing with EDPs. Testimony regarding each topic will be addressed in turn.

i.   <u>Bullet Trajectories.</u>

Defendants move to preclude Dr. Baden from testifying regarding the trajectories of the bullets fired at Bah.  Defendants claim that Dr. Baden is not qualified to testify regarding bullet trajectory.  (Defs.' Mem. in Supp. of Preclusion, 12.)  Defendants' argument is baseless. From 1977-80 Dr. Baden chaired the Forensic Pathology Panels of the U.S. House of Representatives Select Committee on Assassinations and testified before Congress regarding the assassinations of President John F. Kennedy and Dr. Martin Luther King, Jr. regarding the trajectories of the bullets and the location of the shooters.  (Decl. of Debra Cohen in Opp. to Preclusion, Ex. 2, Baden Decl. at ¶ 8.)  Dr. Baden has testified hundreds of times in the past regarding the trajectory of gunshot wounds, including the distance the weapon was discharged from the body and the direction from where the bullet came.  (<u>Id.</u> at ¶¶ 6-7.)  The Court finds that Dr. Baden is qualified to testify regarding bullet trajectories.

Defendants argue that Dr. Baden has failed to advance any methodology in support of his findings regarding bullet trajectories.  (Defs.' Mem. in Supp. of Preclusion, 12.) However, Dr. Baden reports that the methods supporting his conclusions regarding bullet trajectories are based off of "the distribution of the entrance wounds and the ballistic analysis of the recovered bullets," as well as the presence of "stippling."  (Decl. of Debra Cohen in Opp. to Preclusion, Ex. 1, Baden Report, 2.)  Defendants go on to argue that Dr. Baden's conclusions go against common knowledge and elementary geometry.  (Defs.' Mem. in Supp. of Preclusion, 13.)  Defendants are free to use common knowledge and geometry to impeach Dr. Baden on cross examination, but have not shown his testimony to be unreliable.

Defendants next argue that Dr. Baden's testimony regarding bullet trajectories will not be helpful because it makes no use of expert knowledge and usurps the province of the

jury to make factual and credibility determinations.  (Defs.' Mem. in Supp. of Preclusion, 14.)

Defendants take issue with Dr. Baden's statement in his report that the bullet trajectories are not

consistent with Mateo's testimony.  (Id. at 15.)  Contrary to defendants' assertions, Dr. Baden

does not say that Mateo's testimony is not credible; he simply says it is not correct.  The jury's

role is in no way usurped by such testimony, as the jury must still weigh the credibility of each

witness and the likelihood of the competing versions of events.  Defendants' argument that Dr.

Baden merely presents a narrative that regurgitates what he has been told by the plaintiff ignores

Dr. Baden's review of autopsy reports, scene and autopsy photographs, and X-rays, and the fact

that Dr. Baden's expertise could assist the jury in interpreting these materials, which would not

be readily informative to most lay-people.

ii.    Bah's Mental State.

The Court turns next to Dr. Baden's proposed testimony regarding Bah's

psychological state, including his mental pain and emotional suffering, and his reaction to the

officers' methods of dealing with EDPs.  First, defendants argue that Dr. Baden lacks training,

experience, and education regarding psychiatric matters or interaction with EDPs.  (Defs.' Mem.

in Supp. of Preclusion, 7.)  Second, they argue that Dr. Baden's testimony regarding Bah's state

of mind and possible alternative outcomes if the officers had acted differently would be

unreliable speculation not based on any discernable methodology.  (Id. at 9.)  Lastly, defendants

argue that such testimony is irrelevant to the disputed legal issues and thus unhelpful to the jury.

(Id. at 10-11.)  Plaintiff responds that Dr. Baden is qualified based on his training in psychiatry

as a medical student, his internship and residency on the Bellevue Hospital Psychiatric wards,

and his years of service on two medical review boards; one of which investigates the treatment

and deaths of patients in mental institutions, the other which investigates the medical and

- 20 -

psychiatric care, as well as deaths, of prisoners.  (Pl.'s Mem. in Opp. to Preclusion, 8.)  Plaintiff argues that Dr. Baden's testimony will be reliable because it is based on his training and experience in evaluating confrontations between EDPs and police and helpful to the jury's evaluation of whether excessive force was used and whether Bah endured psychological suffering.  (Id. at 9-10.)

Dr. Baden appears to be an extraordinarily well qualified forensic pathologist and medical examiner.  However, it is not immediately clear to the Court how these occupations involve an expertise in psychiatry or the behavior of EDPs.  None of Dr. Baden's teaching positions, government appointments, or professional organizations appear to deal directly with psychiatry.  Dr. Baden has long served on two boards that appear to be in some way involved with investigations involving psychiatric care and deaths in state institutions.  However, in the brief materials submitted by plaintiff, neither Dr. Baden's role with these boards nor any specifics regarding the actual investigations are mentioned.  It is not clear whether Dr. Baden's duties are administrative or whether he actually conducts investigations.  It is not clear whether the investigations involve psychiatric matters or the evaluation of encounters with EDPs.

Dr. Baden's report barely fills three full pages.  It is long on narrative and short on opinion.  No explanation of how Dr. Baden came to his conclusions regarding Bah's emotional and psychological state are offered other than the formulaic statement that "[i]n my opinion, to a reasonable degree of medical certainty, on the basis of my education, training and experience as a forensic pathologist and medical examiner, and on the materials that I have reviewed. . . ." (Decl. of Debra Cohen in Opp. to Preclusion, Ex. 1, Baden Report, 3.)  Yet Dr. Baden comes to some very specific conclusions regarding Bah's psychological and emotional state: that the actions of the officers intensified his emotional disturbance, that the outcome would have been

different had his mother or a mental health worker talked to him, and that Bah suffered an hour of mental pain and emotional suffering.  (Id.)  Such specific conclusions are unreliable without demonstrating Dr. Baden's analysis of the materials on which he based those conclusions and his underlying methodology, especially in light of plaintiff's vague assertions of his expertise in psychiatry.  Further, all three of these conclusions could reasonably be drawn by the jury based on the undisputed evidence submitted by the parties and a lay person's limited knowledge of EDPs.  Testimony to this effect from someone without demonstrated expertise in these matters and a reliable methodology would be unhelpful to the jury.

Dr. Baden may testify at trial regarding bullet trajectories but may not testify regarding Bah's emotional state, including testimony that the actions of the officers intensified his emotional disturbance, that the outcome would have been different had his mother or a mental health worker talked to him, or that he suffered an hour of mental pain and emotional suffering.

  c. <u>The Maloney Report and Proposed Testimony.</u>

Maloney's report mainly evaluates the procedures used by the defendants during the course of their response to the situation at Bah's apartment.  Defendants move to preclude Maloney from testifying at trial.  The Court denies defendants' motion and will allow Maloney to testify.  However, the Court notes that an officer's failure to follow accepted police practices does not, without more, amount to a violation of an individual's rights such that it would render the officer liable to plaintiff under section 1983.

First, defendants argue that Maloney is not qualified to render an opinion regarding police tactics with respect to interactions with EDPs because he has no experience dealing with EDPs or training ESU officers, particularly with respect to barricaded EDPs.

(Defs.' Mem. in Supp. of Preclusion, 17.)  Defendants' contentions are simply incorrect.

Maloney has been involved with the training of the ESU, specifically with role play regarding

barricaded EDPs, including how to open doors in a barricaded EDP situation.  (Decl. of Debra

Cohen in Opp. to Preclusion, Ex. 5, Maloney Decl. ¶ 4.)  He has trained ESU personnel

regarding the deployment of Tasers and the use of Y-bars and water cannons, including the use

of Tasers in EDP situations.  (Id. at ¶ 5.)  The Court finds that Maloney's experience qualifies

him to testify regarding police tactics with respect to interaction with EDPs.

         Second, the defendants argue that Maloney's report and opinions are unreliable

because he advances no methodology for his conclusions nor articulates a source for his opinions

as to accepted police practices, such that the Court would be taking Maloney's word that his

conclusions are based on his relevant experience.  (Defs.' Mem. in Supp. of Preclusion, 19-20.)

Defendants further argue that Maloney criticizes the conduct of the ESU officers but fails to

indicate how accepted police practices are in tension with the actions taken.  (Id. at 21-22.)  The

Court finds that Maloney's report is reliable.  Maloney states that he draws on his experience,

education, and training in making his conclusions, including his time as a Master Firearms

Instructor.  (Decl. of Debra Cohen in Opp. to Preclusion, Ex. 3, Maloney Report, 1.)  The

testimony of a police procedures expert may be found reliable by virtue of the expert's

experience.  See Fate v. Vill. of Spring Valley, No. 11 Civ. 6838 (JPO), 2013 U.S. Dist. LEXIS

83425, at *17 (S.D.N.Y. June 12, 2013).  Maloney cites to NYPD measures and protocols in

support of his opinions.  (Decl. of Debra Cohen in Opp. to Preclusion, Ex. 3, Maloney Report,

3.)  Contrary to defendants' contentions, Maloney explains in his report how accepted police

practices differ from the actions taken by the ESU officers responding to Bah's apartment.  (See

id.)

Third, defendants claim that Maloney's expert testimony would intrude on the province of the jury and the role of counsel, and is thus unhelpful.  (Defs.' Mem. in Supp. of Preclusion, 22.)  Defendants claim that Maloney simply constructs a factual narrative that presents evidence in a manner favorable to plaintiff.  (Id. at 23.)  Defendants correctly note that much of Maloney's report is a factual narrative of the officers' actions drawn from the evidence he reviewed.  (See generally Decl. of Debra Cohen in Opp. to Preclusion, Ex. 3, Maloney Report.)  However, this narrative is interspersed with critiques of the officers' actions and comparisons of their actions to what are, in Maloney's opinion, accepted police practices.  It is these critiques and comparisons that are helpful to the jury, as they are likely outside the scope of knowledge of the average juror.  The narrative of the facts is necessary in order to give context to these critiques and comparisons.  The Court notes, however, that this case is not about determining the most efficient or humane way to deal with an EDP.  The jury arriving at an answer to the question of whether the defendant officers' actions conformed with accepted police practices is not an end in and of itself, but rather a means by which the jury can understand the full set of circumstances surrounding the force used on Bah so as better to conduct their analysis, which will take into account the totality of those circumstances, as to whether the force used on Bah was reasonable and whether Licitra or Gallitelli were negligent in their supervision of the officers under their command.

The Court thus finds that defendants' objections are without merit, and Maloney will be allowed to testify at trial.

V.      Plaintiff's Motion for Sanctions for Spoliation of Evidence.

Plaintiff moves for sanctions against defendants for the spoliation of evidence, making serious allegations regarding the intentional destruction of certain evidence.  (See Pl.'s

Mem. in Supp. of Sanctions, 9, 12.)  Among the evidence that plaintiff claims was spoliated is

Mateo's duty shirt, the knife that was allegedly in Bah's possession during the incident, two

Taser cartridges, Taser wires, the traps from two sinks in Bah's apartment, the clothes that Bah

was wearing when he was shot, and a piece of wall from Bah's apartment that contained a

ballistic impact mark.  (See id. at 1-2.)

   Defendant has offered an affidavit stating that the evidence warehouse that was

storing the knife and some of the other evidence was flooded during Superstorm Sandy, that all

evidence within was contaminated, and that nothing may be removed from the warehouse.  (See

Defs.' Decl. in Opp. to Sanctions, Ex. E, Decl. of John Capozzi.)  This brief affidavit fails to

mention in what manner and to what extent evidence stored there during the flooding was

contaminated or how much of the evidence was destroyed or is otherwise lost, misplaced, or

unaccounted for.  (See id.)  It fails to state what steps have been taken to attempt to recover any

evidence not contaminated or destroyed by the flooding.  (See id.)  It fails to state what was done

with evidence that was considered to be contaminated.  (See id.)  It fails to state why nothing

may be removed from the warehouse.  (See id.)

   The knife that Bah allegedly used to attack defendant officers has never been

tested for DNA or fingerprints or made available for plaintiff to examine.  (See Pl.'s Mem. in

Supp. of Sanctions, 12.)  Plaintiff's submissions repeatedly allege that Bah at no point wielded a

knife during his interactions with police on the day he was killed.  (Pl.'s Rule 56.1 CS ¶ 169;

Pl.'s Mem. in Opp. to Summ. J., 5.)  Defendants allege that the knife, which was stored in the

above mentioned warehouse, was contaminated or destroyed along with the rest of the evidence

stored there during the flooding.  (Defs.' Mem. in Opp. to Sanctions, 4.)  Defendants' declaration

is insufficient.  The Court will hold a hearing regarding the alleged spoliation and plaintiff's

requested sanctions.  Defendants should be prepared to give a full response to the questions listed above, including why the knife cannot be provided to plaintiff.

CONCLUSION

The defendants' motion for summary judgment (Dkt. No. 120) is GRANTED in part and DENIED in part.  Defendant City is entitled to summary judgment on plaintiff's section 1983 municipal liability claim.  All defendants are entitled to summary judgment on plaintiff's section 1983 claims for violations of due process and equal protection and state law negligence claims.

The defendants' motion to exclude plaintiff's expert reports and to preclude plaintiff's experts from testifying at trial (Dkt. No. 135) is GRANTED as to Dr. Baden's testimony regarding Bah's emotional state and DENIED in all other respects.

The Court will hold an evidentiary hearing regarding plaintiff's motion for sanctions for spoliation of evidence (Dkt. No. 132).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:        New York, New York
              January 31, 2017