UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
OUMOU BAH, AS THE ADMINISTRATOR
OF THE ESTATE OF MOHAMED BAH,

                    Plaintiff,                  13-cv-6690 (PKC)(KNF)

        -against-

                                        MEMORANDUM
                                        <u>AND ORDER</u>
THE CITY OF NEW YORK, et al.,

                    Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

        This action arises from the fatal police shooting of Mohamed Bah, an emotionally disturbed person, who, at the outset of the encounter, was alone behind a locked door of a Manhattan apartment. When the door was opened and police entered, Bah was holding a large kitchen knife. What transpired thereafter is predominately the subject of conflicting witness testimony and forensic evidence. There is no dispute that three officers, members of the Emergency Services Unit ("ESU") of the New York City Police Department ("NYPD"), fired their weapons at Bah.

        The action, brought by Oumou Bah, as the Administrator of the Estate of Mohamed Bah, was tried to a jury that returned a verdict in favor of six NYPD officers who were from either the 26th precinct or ESU. Plaintiff prevailed against Detective Edwin Mateo of ESU on federal excessive force and state law battery claims and against Lieutenant Michael Licitra, also of ESU, on federal and state failure to supervise claims. (Tr. 1385–86.) The jury awarded compensatory damages of $2,215,000 and no punitive damages. (Tr. 1387.) The verdict has the effect of rendering the defendant City of New York (the "City") liable on the state

law battery claim and negligent supervision claim under the doctrine of *respondeat superior*.[1]

Defendants Mateo, Licitra and the City have moved for judgment as a matter of law or, in the

alternative, for a new trial.  (Doc. 273.)  They have also moved for judgment in their favor

because, they argue, defendants Mateo and Licitra are entitled to qualified immunity.

Implicit in the jury's finding of liability was that Mateo did not have a reasonable

belief, even if mistaken, that Bah posed a significant threat of death of serious injury to himself

or another person.  Separately, the jury responded to certain questions posed on the issue of

qualified immunity.  The jury responded that "the ESU officers reasonably believed, even if

mistakenly, that Mr. Bah was in urgent need of medical assistance when Mr. Bah became silent

inside the apartment," (Verdict Sheet, Q. 17), that "Mr. Bah had a knife in his hand during his

encounter with the ESU Officer defendants" (id., Q. 11), and that Mateo "reasonably believed,

even if mistakenly, that Mr. Bah was threatening, stabbing, or slashing with a knife at one or

more officers in the moments before discharging his firearm."  (id., Q. 12.)  But the jury also

found that defendants had not proven that "Mr. Bah was moving towards Detective Mateo with a

knife in his hand when Detective Mateo discharged his firearm." (id., Q. 13)

For the reasons that will be explained, the Court will deny defendants' motion for

judgment as a matter of law on the claims against Mateo and the City but grant the motion as to

defendant Licitra.  It will deny defendants' motion for a new trial as to Mateo and the City and

deny defendants' motion for judgment in favor of Mateo and the City on the defense of qualified

immunity.

---

[1] Defendants, in their motions in limine, conceded that "if the jury finds that the individual defendants are liable, no further determination need[s] to be made by the jury to establish plaintiff's *respondeat superior* claim against the City."  (Doc. 189 at 41 (internal quotation marks omitted)).

BACKGROUND

The procedural background and evolution of the case is found in this Court's Memoranda and Order on motions to dismiss and for summary judgment, <u>Bah v. City of New York</u>, 13 Civ. 6690 (PKC) (KNF), 2014 WL 1760063 (S.D.N.Y. May 1, 2014) (motion to dismiss) & 2017 WL 435823 (S.D.N.Y. Jan. 31, 2017) (motion for summary judgment). The trial spanned eight days with seventeen witnesses. Ten jurors deliberated to verdict. (<u>See</u> Tr. 10.)

Much of the trial testimony related to the conduct of the officers of the 26th precinct prior to the arrival of the ESU officers and, in large measure, is not material to the present motions. Because the totality of circumstances are relevant to a claim of excessive force, the Court has considered the entirety of the trial evidence. <u>County of Los Angeles v. Mendez</u>, 137 S. Ct. 1539, 1546 (2017). The Court's recitation of facts, which largely focuses on what Mateo and Licitra knew, observed and did, is not intended to be exhaustive of all the evidence that it has considered. On the motion under Rule 50, the evidence is viewed in a light most favorable to the plaintiff, the non-movant. <u>ING Glob. v. United Parcel Serv. Oasis Supply Corp.</u>, 757 F.3d 92, 97 (2d Cir. 2014). On the motion under Rule 59, the Court "is free to weigh the evidence [itself], and need not view it in the light most favorable to the verdict winner." <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 134 (2d Cir. 1998).

It is undisputed that in the early evening of September 25, 2012, police officers from the 26th precinct in Manhattan responded to a 911 call from Mohamed Bah's mother, who sought an ambulance to take her emotionally disturbed son to the hospital. The precinct officers knocked on the door of the apartment, and Bah open the door part way. (Tr. 146.) One officer saw Bah standing naked with a large kitchen knife at his side and observed Bah saying words in

a grunting tone. (Tr. 146, 149–51.) ESU was called to the scene and informed about the knife. (Tr. 155–56.) It is not disputed that the ESU officers brought to the scene various equipment, including a ballistic shield, an Arwen (which fires non-lethal projectiles), two Tasers (which deliver electrical discharges), a water cannon (which is similar to a fire extinguisher but filled with plain water) and a Y-bar (which is capable of holding an individual at bay).

Various attempts were made by ESU officers to observe Mr. Bah. The door was opened, and a pole camera was inserted into the apartment. (Tr. 878.) Bah could be seen standing with a knife in his hand. (Tr. 881.) For the purposes of this motion, it is not disputed that at various times Bah held a large knife in his hand, although the timing and nature of Bah's actions with the knife are disputed. It is also undisputed that three officers, Detective Mateo, Officer Andrew Kress and Officer Michael Green, discharged their firearms at Bah and that Bah died of gunshot wounds. The time from when ESU received the call until Bah was shot was about 46 minutes. (Tr. 474.)

Edwin Mateo was a Detective assigned to ESU on September 25, 2012. (Tr. 718.) He was about to eat with Officer Kress when he received a call to respond to a job at 113th Street and Morningside Avenue. (Tr. 718–19.) Upon arriving, Mateo entered the building wearing a bullet proof vest, helmet and ballistic vest and carrying an Arwen loaded with five or six rounds. (Tr. 724–26.) The Arwen is capable of firing a rubber projectile about the size of a racquetball. (Tr. 728.) One of the ESU officers carried a water cannon into the building that may be used to distract or subdue an individual. (Tr. 726–28.) Officer Kress was equipped with a Taser and ballistic shield. (Id.) Officer Green was carrying a "Y-bar" that could be used to hold a person at a distance. (Tr. 543–44.) Sergeant McCormack recalled carrying a sledge hammer. (Tr. 378–79.) Mateo walked up to the fifth floor to apartment 5D where Bah was located. (Tr. 733, 735.)

Officer Kress was up against the door and tried to communicate with Bah; Kress does not believe there was ever any reply from Bah. (Tr. 608, 735.) Kress had a Taser in one hand and the ballistic shield in the other. (Tr. 736.) Mateo lined up immediately behind Kress and slightly to the right. (Tr. 740.) An ESU officer inserted a "rabbit tool" (which is a hydraulic jack) into the door to prevent the occupant from unexpectedly opening the door to gain a tactical advantage. (Tr. 744, 749.) Mateo heard Bah say something that sounded like a prayer in a language that Mateo did not understand and the words "Allah, Allah, Allah." (Tr. 742–743.)

At some point, the peephole was removed to enable an officer to look into the apartment with the aid of a chemical light. (Tr. 747–48, 996–97.) It was too dark to see anything useful. (Tr. 998–99.) The "rabbit tool" was used to pry open the door so that a pole camera could be inserted. (Tr. 749–50.) The pole camera was inserted and produced a grainy black and white image of a person, who could be seen pacing back and forth. (Tr. 400, 879, 1011.)

After the pole camera was removed, the door opened, and Lieutenant Licitra gave the order to "go." (Tr. 1016, 1022.) Officer Kress entered the apartment carrying the ballistic shield; he was about 5 feet away from Bah. (Tr. 614.) Officer Green remembers hearing Kress say "Drop the knife. Drop the knife." (Tr. 580.) Mateo, who is 5' 11," was able to see into the apartment from behind Officer Kress and saw Bah in the threshold of the darkened apartment. (Tr. 760–61, 763.) According to Mateo, Officer Kress pushed his way in, and Bah was "thrusting his knife" against Kress's ballistic shield. (Id.; Tr. 768.) Kress testified that Bah, who was described as "tall" and "muscular," was trying to stab him and that he used the shield to deflect the knife attacks. (Tr. 614, 1057.) Officer Kress fired his Taser at Bah. (Tr. 615, 763.) Mateo entered the apartment, moved past Kress and fired one or two rounds from the Arwen.

(Tr. 774–76.)  Bah was not attacking Kress when Mateo fired the Arwen.  (Tr. 777.)  Bah was about arms-length from Mateo and about a foot from the barrel of the Arwen when Mateo fired the Arwen.  (Tr.  778, 781–82.)  Mateo could not see where the projectile hit Bah.  (Tr. 782.)

After he fired the Arwen, Mateo, at some point during this rapid encounter, fell to the ground.  (Tr. 782–83.)  He now knows that the fall was caused by the firing of a second Taser by Sergeant McCormack.  (Tr. 787–88.)  Mateo felt muscle spasms and froze up.  (Tr. 787–89.)  When he fell, most of his body landed outside the apartment with, according to Mateo's account, only his knees (or shins) to his feet inside the apartment.  (Tr. 785; but see Tr. 1024 (all but feet outside the apartment).)  He landed on the left side of his body and remained laying on his side.  (Tr. 789.)

The emotional intensity of the events, the limits of recollection, the possible bias and self-interest of a party and other factors are captured in the following exchange between Mateo and plaintiff's counsel concerning the moments prior to the firing of the first shot:

> Q.    Oh.  So you did say at some point when you were on the
>        ground "shoot him, he's stabbing me," right?
> A.    That's correct.
> Q.    And at that point Mr. Bah wasn't stabbing you, was he?
> A.    He was advancing at me.
> Q.    Was he stabbing you, sir, at that moment when you were on the ground?
> A.    No.
> Q.    The first time you said "he's stabbing me," did anyone shoot the guns?
> A.    A taser came over my left side. The guns, no.
> Q.    After you said—when you're on the ground now, and you
>        say "shoot him, he's stabbing me," you start to fire, right?
> A.    That's correct.
>
>                         *   *   *   *
>
> Q.   Okay.  And when you said "shoot him, he's stabbing me," he
>       wasn't stabbing anyone at that time, was he?
> A.   He was advancing right towards me.
>
>                         *   *   *   *

Q. The question is at the time you said "shoot him, he's stabbing me," Mr. Bah wasn't stabbing anyone.

A. I can't recall.

(Tr. 798–800.)

Mateo had been called as a witness for the plaintiff. On cross-examination by his own lawyer, he explained his actions as follows:

Q. Good afternoon, Detective Mateo. Can you just explain to the jury, on September 25, 2012, why did you shoot your weapon?

A. On the evening of September 25, 2012, myself and Police Officer Kress, now detective—the reason why I shot my weapon, discharged my weapon, was I was in fear for my life, my partner's life as well, and I was in a fight for my life.

Q. All right. So just what was it that you saw or observed that caused you to employ your firearm?

A. I observed Mr. Bah coming at me and he was stabbing me, he was stabbing my vest, my lower torso area . . . .

(Tr. 807–809.)

Kress, Green and Mateo all discharged their firearms at Bah. Three shots from Kress's Sig Sauer hit Bah in the torso. (Tr. 907–08.) Green and Mateo were both using Glocks. (Tr. 573, 792.) Green fired twice, and Mateo fired five times. (Tr. 574, 580, 790.) Five bullets fired from Glocks hit Bah, meaning at least three and as many as five bullets from Mateo's Glock struck Bah. (Tr. 907–08.)

Mateo's testimony concerning his position relative to Bah at the time he fired the five shots at Bah is as follows:

Q. All of those five bullets were fired at Mr. Bah while you were in the position that we've described and you've testified to. Your left side is on the ground, right arm you're firing at him; is that right?

A. That's correct.

Q. While you were firing at Mr. Bah from that position, Mr. Bah was standing at his full height?

A. Yes, yes, yes.

(Tr. 790.) Mateo also testified that after firing the first two shots, Bah was still moving towards him; when he fired the third shot Bah was falling. Mateo cannot recall whether Bah had fallen to the ground when he fired the fourth and fifth shots. (Tr. 792–93.)

The autopsy report supported the conclusion that the shots fired from the Glock were fired in a downward—not upward—trajectory. (Tr. 926.) The shot to the head, fired from a Glock, entered above the left ear and lodged in the lower part of the neck. (Tr. 908, 915.) There was stippling on the skin at the entrance wound, indicating that the muzzle of the gun was two feet or less from the point of entry. (Tr. 910–11.) Plaintiff's pathology expert, Michael Baden, M.D., testified that the shots from the Glock could not have been fired in the manner described by Mateo. (Tr. 927.) He opined that the gunshot wound to the head was most likely fired when the shooter and Bah were both on the ground. (Tr. 928.) Both Green and Mateo, the two Glock shooters, denied shooting Bah in the head. (Tr. 577, 791.)

There was evidence of an abrasion on Mateo's left arm but no evidence of any cut; he could not say how or when the abrasion was caused. (Tr. 830, 837–38.) There was a mark on Mateo's bullet-proof vest that was assertedly consistent with thrusts of a knife. (Tr. 834.) The mark, which Mateo claims was from a knife, was in the area of the medical pouch. (Tr. 834–37.)

Kress remembers Mateo yelling that Bah was stabbing him, Mateo. (Tr. 617.) Kress did not see Mateo being stabbed. (Id.) He testified that the shots that were fired "did sound like numerous rounds being fired simultaneously." (Tr. 623.) Kress was asked by plaintiff's counsel whether "right before you fired your shot, was Mr. Bah approaching you with the knife or was he at that moment stabbing at you with the knife?" (Tr. 665.) He responded "I don't remember that—the exact sequence of it. At some point he was stabbing me." (Id.) He

believed he fired his weapon after Bah had stabbed at his bullet proof vest for a second time. (Tr. 621.)

Sergeant McCormack, who was in close proximity to Mateo and Kress and discharged his Taser over Mateo's left shoulder at Bah, never saw Bah with a knife. (Tr. 475, 486, 490, 493.) McCormack saw both wires of his Taser touching Mateo's shoulder shortly before Mateo fell to the ground. (Tr. 493.) McCormack remembers Mateo shooting "as he [was] falling and maybe even as he[] [was] on the ground." (Id.) He remembers Mateo saying "[h]e's stabbing me, he's stabbing me, he's stabbing me, shoot him, shoot him, shoot him." (Tr. 494.) When Mateo said those words, it was "around that time that gunfire started." (Tr. 494.) Mateo shot Bah, according to McCormack, after McCormack "tased" Mateo. (Tr. 494)

Green testified that Mateo backed into him, knocking Green to the ground and shocking and immobilizing Green indirectly through Green's contact with Mateo. (Tr. 571–572) Green also testified that he saw Bah stab the knife at Kress's vest. (Tr. 588.) Green shot at Bah twice. (Tr. 574, 580.) In Green's recollection of events, he witnessed Bah stabbing at Kress and shot Bah after pushing Mateo off of him and standing upright. (Tr. 581.) Green testified that he did not see or hear Mateo fire his weapon. (Tr. 572–573.) He does not know who shot first, but he recalls "all the pops going off at the same time." (Tr. 574.) Licitra recalled that all shots were fired in a period of "two seconds." (Tr. 1039.)

McCormack testified that he had called for the NYPD Hostage Negotiations Team ("HNT"), that at the time the ESU entered the apartment, the HNT "had arrived and that they were preparing." (Tr. 522.) Lieutenant Licitra had talked to Sergeant O'Toole from the HNT, who reported that his detectives were talking with Ms. Bah and "would reassess" when the conversation with Ms. Bah concluded. (Tr. 1034.) The door to the apartment was closed when

O'Toole arrived, but the truck with his helmet and vest had not yet arrived. (Tr. 693–94.) O'Toole tried to reach Mr. Bah by phone three times with no answer. (Tr. 703.)

Upon his arrival and before he entered the building, Lieutenant Licitra spoke to Bah's mother, who told him that her son was not acting normally. (Tr. 994.) He learned from Lieutenant Gallitelli of the 26th Precinct that a "male black opened the door, that he had a knife in his hands, and then the door was closed." (Tr. 995.) Licitra was the highest ranking ESU officer. (Tr. 996.) He recalls that Sergeant McCormack and Officers Mateo, Kress, Green and Zaberto, all from the ESU, were present on the fifth floor when he arrived. (Tr. 993.) Licitra gave the order to enter the apartment. (Tr. 1017–18.) From the time Licitra gave the command to enter the apartment until the shots were fired, Licitra gave no further commands. (Tr. 1023.) Licitra heard Mateo say "shoot him, he's stabbing me" but gave no order to his men. (Tr. 1026.) At some point in the encounter, he saw Bah engage in underhanded stabbing motion directed toward Officer Kress and Detective Mateo. (Tr. 1038.) Licitra estimated that the time from the opening of the door to the firing of shots was about 15 seconds. (Tr. 1039.)

LEGAL STANDARD

I.  Rule 50 Standard

Rule 50(a), Fed. R. Civ. P., provides that "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party," the Court may, upon motion by the opposing party, grant judgment as a matter of law in the movant's favor. On a renewed motion under Rule 50(b), Fed. R. Civ. P., the Court may "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."

"A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict." Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005). "Under such circumstances, the district court may set aside the verdict only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against" the movant. Id. (alterations and internal quotation marks omitted) (quoting Song v. Ives Labs., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992)). In construing Rule 50, the Supreme Court has explained that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000). Accordingly, when assessing a Rule 50 motion, "the [C]ourt should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. (internal quotation marks omitted).

II.    Rule 59 Standard

In determining whether a new trial is appropriate under Rule 59(a), Fed. R. Civ. P., the Court applies a less stringent standard than on a motion for judgment as a matter of law. See Manley v. Ambase Corp., 337 F.3d 237, 244–45 (2d Cir. 2003); Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970 (2d Cir. 1987). "[F]or a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the

evidence." <u>Manley</u>, 337 F.3d at 245 (second alteration in original) (internal quotations and citation omitted) (quoting <u>Song</u>, 957 F.2d at 1047).

DISCUSSION

I. <u>Excessive Force: Detective Edwin Mateo</u>

Defendants urge that plaintiff failed to meet her burden to establish that Mateo used excessive force and that, as a result, they are entitled to judgment as a matter of law. Alternatively, they argue that Mateo is entitled to a new trial or to judgment in his favor on the defense of qualified immunity. Plaintiff had proceeded on several theories against Mateo that are no longer in the case. The jury found against the plaintiff on claims against Mateo for unlawful entry into the apartment and for intentionally placing Bah in apprehension of imminent harmful or offensive contact without justification. The jury found that Mateo had used excessive force but that Kress and Green had not.

The Court gave a complete set of instructions to the jury on the use of excessive force, including force likely to be lethal. (<u>See</u> Appendix A to this Memorandum and Order.) In its essence, the instructions required the jury to conclude that the use of deadly force was unreasonable unless, based upon the totality of the circumstances, the officer, immediately prior to, and at the time, he made the decision to employ deadly force, had probable cause to believe that he or others faced a significant threat of death or serious physical injury. (Tr. 1346–47.) The jury was also instructed that the officer's belief could be mistaken so long as it was a reasonable belief. (<u>Id.</u>) The unchallenged instructions on the use of force were consistent with existing law, including <u>County of Los Angeles v. Mendez</u>, 137 S. Ct. 1539 (2017); <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985); and <u>Callahan v. Wilson</u>, 863 F.3d 144 (2d Cir. 2017), <u>cert. denied</u>, 138 S. Ct. 1261 (2018).

Unsurprisingly, the testimony of the witnesses as to the sequence of events was not entirely consistent. But there was ample credible evidence that Bah held a knife inside a small, dark apartment. He did not drop the knife when commanded to do so by Kress. There was largely unchallenged evidence that two firings of a Taser and one or two shots from the Arwen had not incapacitated Bah. Kress held a ballistic shield, Mateo held the Arwen loaded with several undischarged projectiles,[2] and Green, who was behind Mateo and on the landing outside the apartment, held a Y-bar until toppled by Mateo. Green testified that he fired because he saw Bah attacking Kress. Kress fired only after Bah had stabbed at his bullet proof vest. McCormack remembered that the shooting began "around [the] time" he heard Mateo say that they should shoot Bah because he was stabbing Mateo.[3] (Tr. 494.) The jury may well have concluded Kress and Green, based upon what they saw and what they heard, including Mateo's claim that he was being stabbed, formed a reasonable belief that one or more officers were in danger of serious physical injury at the moment they fired their weapons.

Mateo's testimony was inconsistent both internally and with other evidence in the case. Mateo testified that at the time he fired his weapon at Bah, Bah was "stabbing [him], he was stabbing [his] vest, [his] lower torso area" and "advancing right towards [him]." (Tr. 800, 807.) But Mateo also testified that when he first said to his fellow officers that Bah was stabbing him, Bah was not stabbing him and, when pressed, said he could not recall whether Bah was stabbing anyone else.

---

[2] Plaintiff had initially asserted that Mateo's use of the Arwen was an unlawful use of excessive force. In closing, however, plaintiff abandoned that position. Plaintiff's counsel argued that the Arwen was fully loaded but that Mateo discharged only one projectile. "Let's be straight. He has five more rubber bullets in there. . . . I submit to you, if he had fired those rubber bullets—and he's got them, he is right there—Mr. Bah, according to him, is right at the end of the barrel, he wouldn't even be here. We wouldn't be here at all." (Tr. 1294.) The point was that the use of this type of non-lethal force, in plaintiff's view, would have momentarily incapacitated Bah and ended the incident.
[3] Green testified that he never heard Mateo say "[s]hoot him, he's stabbing me." (Tr. 574.)

Mateo testified that he fired all five shots with his left side on the ground while Bah was standing at his full height. (Tr. 790–91) He held his firearm up at an angle from the ground. (Tr. 791.) Mateo, like Green, the other Glock shooter, denied shooting Bah in the head. (Tr. 577, 791.) Plaintiff's expert pathologist, Dr. Baden, concluded that all five shots that hit Bah from a Glock were fired in a downward trajectory and not from a person lying on the ground firing at an upright Bah. A reasonable jury could have accepted Dr. Baden's testimony that the shots fired by Mateo could not have been fired at the angle, direction and proximity Mateo said they were fired. A reasonable jury could have concluded that Mateo shot Bah in the head while both were on the ground, the muzzle of the gun was within two feet of Bah's head and Bah no longer posed a serious threat to anyone.

The question of what a given officer-defendant reasonably believed at the time he fired his weapon was rightfully entrusted to the good judgment of a properly instructed jury. This jury of ten citizens was instructed that in assessing the reasonableness of the force employed, it should take "account of the fact that police officers often have to make difficult split-second decisions about the amount of force necessary in situations that are sometimes tense, uncertain, dangerous, and rapidly evolving. Officers have no duty to retreat when faced with a significant threat to themselves or others." (Tr. 1345.) But the officer employing lethal force must have had probable cause to believe that he or others faced a significant threat of death or serious physical injury. (Tr. 1346–47.) The jury was instructed that the probable cause standard requires an assessment of the totality of the circumstances and does not require certainty or that the officer, in fact, be correct. (Tr. 1346.) Jurors were told that a mistaken but reasonable belief could justify the use of force. (Tr. 1346–47.) This jury unanimously concluded that Mateo's use of force was not reasonable under the law.

The jury heard the testimony of the witnesses, assessed their credibility, resolved the inconsistencies and contemplated the relative weight of the evidence. This jury differentiated the actions of Mateo from that of the other defendants on the excessive force claim. The jury declined to award punitive damages against Mateo and absolved him on the assault and unlawful entry claims. On this record, a reasonable jury could find in plaintiff's favor on the excessive force claim against Mateo. The jury's verdict was not against the greater weight of the credible evidence and there was no miscarriage of justice. With respect to the claims asserted against Mateo and the City, the motions for judgment as a matter of law or for a new trial will be denied.

II.    Qualified Immunity: Detective Edwin Mateo

This jury reasonably concluded that Mateo's actions amounted to a constitutional violation. Nevertheless, he is entitled to qualified immunity if his conduct did not violate clearly established law.

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

Saucier v. Katz, 533 U.S. 194, 205 (2001).

The qualified immunity doctrine focuses on whether the federal constitutional or statutory right that the plaintiff claims the officer violated "was clearly established at the time of the challenged conduct." Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 255 (2d Cir. 2014) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)). An officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are

sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Id. (quoting al-Kidd, 563 U.S. at 741). To that end, "'clearly established law' should not be defined at a high level of generality," but rather "must be 'particularized' to the facts of the case." White v. Pauly, 137 S. Ct. 548, 552 (2017) (quoting al-Kidd, 563 U.S. at 742).

On qualified immunity, the officer's actions are assessed in view of the clearly established law at the time the officer acted. Pearson v. Callahan, 555 U.S. 223, 244 (2009). In the 1985 decision in Tennessee v. Garner, the Supreme Court concluded that the use of deadly force in an effort to arrest an unarmed fleeing person who was believed to have engaged in a misdemeanor burglary violated the principles underlying the Fourth Amendment. Garner, 471 U.S. at 11. The use of lethal force "to prevent escape," said the Court, would not be constitutionally unreasonable "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Id. In 1985, a reasonable officer may have been uncertain of whether the Garner doctrine was limited to the use of deadly force to stop fleeing suspects.

In 2003, nine years before the events at issue, the Second Circuit, in O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29 (2d Cir. 2003), decided a case in which officers entered a small trailer to apprehend a man who was seen beating a woman. Id. at 33. They believed the individual only had long barreled firearms and no handgun. Id. at 34. At first believing the suspect to be unarmed, one officer approached the individual with his weapon holstered. Id. As the officer approached, the individual spun around. Id. Thinking that the suspect may have grabbed a gun during a brief period in which he was out of view and seeing the suspect spin around, an officer shot and killed the individual, who turned out to be unarmed. Id.

The Court's rejection of defendants' summary judgment motion based upon qualified immunity made it plain that the standard articulated in <u>Garner</u> applies whenever an officer discharges his firearm at an individual on foot: "It is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." <u>Id.</u> at 36.

The Supreme Court, however, has cautioned on multiple occasions that, generally, "<u>Garner</u> . . . do[es] not by [itself] create clearly established law." <u>Kisela v. Hughes</u>, 138 S. Ct. 1148, 1153 (2018) (internal quotation marks omitted) (quoting <u>White</u>, 137 S. Ct. at 552). This is so because <u>Garner</u> establishes "excessive-force principles at only a general level." <u>White</u>, 137 S. Ct. at 552. Although the Supreme Court, for this reason, has "stressed the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment,'" <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 590 (2018) (quoting <u>White</u>, 137 S. Ct. at 552), it has also clarified that "general statements of the law are not inherently incapable of giving fair and clear warning to officers," <u>Kisela</u>, 138 S. Ct. at 1153 (quoting <u>White</u>, 137 S. Ct. at 552). Thus, the Court may deny qualified immunity based on the standard articulated in <u>Garner</u> in an "obvious case." <u>Id.</u> (quoting <u>White</u>, 137 S. Ct. at 552).

Plaintiff has not pointed to any case presenting similar circumstances. But neither is there a claim in the post-trial briefing that a reasonable officer at the time could have believed that it was lawful to shoot a person, who was incapacitated, face-up on the ground. This version of events would present an obvious case. The fact that the person may have engaged in some form of threatening conduct in the moments before the shooting would not justify shooting him after he ceased posing a threat. <u>See</u> <u>O'Bert</u>, 31 F.3d at 40; <u>cf.</u> <u>Plumhoff v. Rickard</u>, 134 S. Ct. 2012, 2022 (2014) ("[I]f police officers are justified in firing at a suspect in order to end a

severe threat to public safety, the officers need not stop shooting *until the threat has ended*." (emphasis added)).

The questions submitted to the jury at the defendants' behest on the qualified immunity question were not to impeach the jury's verdict on liability but to establish facts that may assist on a qualified immunity inquiry. They established several relevant points. First, that Bah had a knife in his hand "during his encounter" with the ESU officers. (Q. 11.) Second, that that Mateo reasonably believed, even if mistakenly, that "in the moments before discharging his firearm," Bah "was threatening, stabbing, or slashing with a knife at one or more officers." (Q. 12.)[4] But, third, that the defendants had not proven that Bah was moving towards Mateo with a knife in his hand "when Detective Mateo discharged his firearm." (Q. 13.) Notably, the second inquiry did not delve into the nature of "threatening, stabbing, or slashing," and the affirmative response could have been as a result of thrusts by Bah that were deflected by the ballistic shield held by Kress or other forms of movements that do not pose a serious danger to any officer. Critically, while Question 13 asked about the exact moment of discharge, Question 12 asked about "the moments before discharging his firearm."

Plaintiff's pathology expert testified that the shot to the head entered Bah's skull above the ear but travelled downward to the back of the neck and that this trajectory was consistent with Bah and the shooter both being on the ground. (Tr. 928–29.) Mateo was the only Glock shooter who claimed to be on the ground while shooting. One ESU officer testified that after Bah was initially shot, Bah's body twisted as he fell backwards to the ground, resulting in Bah landing face up. (Tr. 890–91.) The muzzle of the gun was within two feet of Bah's head when the shot to the head was fired.

---

[4] Defendants' counsel expressly disclaimed that an affirmative response to Question 12 quoted above would be inconsistent with any finding of liability under the Court's excessive force instruction. (Tr. 1268; see Tr. 965–971.)

In a case tried to a jury in this District two years ago, officers were accused of having used excessive force in a 2009 fatal shooting of an emotionally disturbed individual armed with a knife after first having used Arwen-type and Taser-type weapons to attempt to incapacitate the individual. Estate of Jaquez v. City of New York, 104 F. Supp. 3d 414, 418–19 (S.D.N.Y. 2015). The final shot was fired to the back of the individual's head while he was on the ground. Id. at 421. The district court granted summary judgment on all uses of force except for the final shot while the individual was on the ground. Id. at 440–41.

Three of the lawyers for who appeared for the defendants in the present case were lawyers for the defendants in the Jacquez case. The Jacquez jury was asked whether the individual "was pushing himself up from the floor when [the officer] fired the final shot," a question which the jury answered affirmatively. 10 Civ. 2881 (KBF) (Doc. 252, Q. 1.) It was also asked whether the individual had a knife in his hand when the shot was fired, a question which the jury also answered affirmatively. (Id., Q. 2.) The responses to the questions caused the district court to grant judgment for the defendant on qualified immunity. Estate of Jaquez v. City of New York, 706 F. App'x 709, 711 (2d Cir. 2017) (summary order).

In the case before this Court, defendants made a strategic decision to refrain from requesting questions for the jury concerning whether Bah was on the ground when any of the shots were fired, whether Bah was engaging in any threatening behavior while on the ground, whether Mateo fired the shot that struck Bah in the head, and when Bah was struck in the head by that bullet.[5] Defendants were not taken by surprise by the plaintiff's theory of the case. Months before, the Court denied defendants' motion for summary judgment on qualified immunity because it would, the Court reasoned, "violate a clearly established right" if "the final

---

[5] Defendants did not ask, for example, whether the sequence and speed of firing was such that a reasonable officer would not have reassessed the threat of death or serious physical injury after firing each shot.

shot to the head that killed Bah was fired at close range while Bah was lying wounded on the ground after being previously shot multiple times by the officers." Bah v. City of New York, 13 Civ. 6690 (PKC) (KNF), 2017 WL 435823, at *5 (S.D.N.Y. Jan. 31, 2017). Evidence developed during discovery that supported this version of events precluded summary judgment, yet defendants made no attempt to present questions to the jury that would allow the jury to dispel this version of events.

Defendants' failure to submit questions that would clarify the events at issue is crucial to resolving their motions. "Qualified immunity is an affirmative defense on which the defendant has the burden of proof." Outlaw v. City of Hartford, 884 F.3d 351, 367 (2d Cir. 2018). As a result, "[t]o the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question." Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007). Absent "such a request, [the defendant] is not entitled to have the court, in lieu of the jury, make the needed factual finding." Id. Because plaintiff did not request that the Court ask the jury the questions necessary to determine whether qualified immunity is warranted, defendants have not carried their burden, and qualified immunity for Mateo will be denied.[6]

III. Liability of the Supervising Officer: Lieutenant Michael Licitra

The jury was instructed that it could find Lieutenant Licitra liable "only if you find that [he] engaged in conduct that caused Mr. Bah to be deprived of a federal constitutional

_____

[6] The Court rejects the argument that the jury's rejection of punitive damages in response to Question 10 meant that Mateo did not act maliciously or wantonly, as plaintiff's liability theory would suggest. Malicious or wanton conduct would have been necessary for a punitive damages finding but not sufficient under the Court's instruction. (Tr. 1362 (instructing that "if you find that the legal requirements for punitive damages are satisfied, then you may decide to award punitive damages, or you may decide not to award them").)

right." (Tr. 1352.) The Court instructed the jury that Licitra's liability could be premised on one of three theories: [1] Licitra "ordered other defendants to engage in the unlawful conduct, [2] intentionally failed to take steps to stop the conduct when . . . [he] had an opportunity to do so, or [3] was grossly negligent in supervising other defendants in conduct that was a constitutional violation by other defendants." (Id.)

There was no evidence at trial that Licitra ordered Mateo to engage in the use of excessive force, and plaintiff never argued otherwise. Plaintiff's arguments focused principally on failing to take steps to stop the use of deadly force and the theory of gross negligence.

Licitra was faulted by plaintiff for allowing the officers to enter the apartment in which an emotionally disturbed person had barricaded himself when the Hostage Negotiating Team was on the scene and would have been ready to begin its work after completing preparatory steps. It is not difficult to wonder if the situation would have ended differently if the Hostage Negotiating Team had been given an opportunity to work the problem. But Licitra made the decision to have his officers enter the apartment,[7] and within 15 seconds after the door opening, shots were fired. Of course, before he authorized entry, he understood that Bah was in need of hospitalization, had a large kitchen knife in hand and had been largely unresponsive in the apartment for about 45 minutes. Hindsight would have taught a different lesson if Bah had seriously injured himself during further delay. But, assuming Licitra's judgment was flawed, it is not a basis for finding a Fourth Amendment violation. Indeed, the jury found that the ESU

---

[7] The Court notes that Bah, rather than the ESU officers, might have opened the door, as plaintiff's counsel conceded at oral argument on the motion. (May 17, 2018 Hearing Tr. 32.) If Bah opened the door while holding a knife, Licitra would likely have had little choice but to order the officers under his command to move forward, as plaintiff's counsel also conceded at oral argument on the motion. (Id. ("[O]nce the door was fully opened, I don't think there's much dispute that the officers had to move forward into the apartment.").)

officers' entry into Bah's apartment was reasonable and that it was reasonable to conclude that Bah was "in urgent need of medical assistance." (Verdict Sheet, Q. 3, Q. 17.)

Plaintiff's police practices expert criticized Licitra for not having a plan in place. "It was a very small apartment—I believe it was 370 square feet—and there was an individual inside there that they saw armed with a knife." (Tr. 1118) "The supervisor could have discussed with all members what their roles would be, what everybody is going to do once the door is breached." (Tr. 1096–97.) "There were adequate less lethal weapons available at the scene." (Tr. 1099.) At no point did Licitra order his officers to maintain "firearms control," nor did he instruct them not to fire when Mateo said "shoot him, he's stabbing me." (Tr. 1026.)

It was uncontradicted that upon the door opening, Licitra gave the instruction to his officers to "go." (Tr. 1016, 1022.) The landing in front of the fifth floor apartment was small, about five feet by five feet (Tr. 179; Def. Ex. 12E), and Licitra stood on the first or second step leading to the landing. (Tr. 1014.) He was fully aware of the non-lethal force available to the officers upon entering. (Tr. 1016, 1020.) Licitra explained that he gave no more specific instruction on firearm use because all ESU officers are "highly trained" and that "default shooter" was the "lead bunker" (i.e. the officer carrying the ballistic shield) who, in this circumstance, was Kress. (Tr. 1036, 1046.) "[I]f the time came where a firearm needed to be used, he [i.e. the default shooter] would be the only one that would do so." (Tr. 1036.)

For a supervisor to be held liable under a failure to intervene theory, the plaintiff must show that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." Guerrero v. City of New York, 16 Civ. 516 (JPO), 2017 WL 2271467, at *3 (S.D.N.Y. May 23, 2017). As

the unrebutted evidence showed, the shooting was over in an extremely brief period of time—perhaps two seconds. (Tr. 1039.) Without the opportunity to see the circumstances that prompted an officer to yell "shoot him, he's stabbing me," it would have been imprudent, if not reckless, to shout back "don't shoot" in the hopes that the officer was not being stabbed. There is no evidence that Licitra had a realistic opportunity to intervene. No reasonable jury could have found in plaintiff's favor on this theory.

With respect to gross negligence, the supervisor must have had "reason to know of facts creating a high degree of risk of physical harm to another and deliberately act[ed] or fail[ed] to act in conscious disregard or indifference to that risk." Poe v. Leonard, 282 F.3d 123, 140 n.14 (2d Cir. 2002); accord Raspardo v. Carlone, 770 F.3d 97, 124 (2d Cir. 2014). Moreover, it is not sufficient that there be gross negligence in some aspect of the supervisor's exercise of his duties. The actions of the supervisor must be the proximate cause of the plaintiff's constitutional deprivation. Id. at 116. In concrete terms Licitra, to be liable, must have been grossly negligent in supervising those officers under his command, including Mateo, in the use of constitutionally excessive force and that gross negligence must have been the proximate cause of Bah's injury.

No evidence was presented that the events that unfolded—specifically, Sergeant McCormack misfiring a Taser that shocked Mateo, causing Mateo to fall and shout "he's stabbing me, shoot him" or Mateo firing his weapon after Bah had fallen to the ground—were reasonably foreseeable. No evidence was presented that Licitra had reason to believe that Mateo was not adequately trained in the use of force or had shown a propensity to use excessive force. Licitra had worked with Kress, McCormack, Green and Mateo before this incident. (Tr. 1004.)

No reasonable jury could have found in favor of plaintiff on any of the charged theories of liability against Licitra.

Alternatively, Licitra would be entitled to qualified immunity. On a supervisory liability claim the law must be clearly established both as to the act of the subordinate and the actions of the supervisor. Grice v. McVeigh, 873 F.3d 162, 169 (2d Cir. 2017) (citing Poe, 282 F. 3d at 140).

The jury concluded that Licitra "reasonably believed, even if mistakenly, that Mr. Bah was in urgent need of medical assistance when Mr. Bah became silent inside the apartment." (Verdict Sheet, Q. 17.) Under those circumstances and the unchallenged evidence that Bah had a large knife with him behind the barricaded door, it was objectively reasonable for a supervisor to believe that he was warranted in having trained emergency services officers enter the apartment and to rely on their training and experience in the event force became necessary. Plaintiff has not identified, and the Court has not found, any similar case that could clearly establish the law, and this is far from the obvious case. (P. Mem. Opp. 24–26.) Plaintiff's own expert conceded that it "would be impossible" to train officers on every type of situation that could emerge with an emotionally disturbed person behind a closed door. (Tr. 1123.) Defendants' motion will be granted with respect to the claims against Licitra.

CONCLUSION

Defendants' motion for judgment as a matter of law on the sufficiency of the evidence on the federal excessive force and state law battery claims against Mateo and the state law battery claim against the City of New York is DENIED. (Doc. 273.) Defendants' alternative motions for a new trial or for qualified immunity on the excessive force and state law battery claims against Edwin Mateo and the state law battery claim against the City of New York

are DENIED. (Id.) Defendants' motion for judgment as a matter of law on the sufficiency of the evidence on the federal and state supervisory liability claims against Licitra or, alternatively, on qualified immunity is GRANTED. (Id.) Defendants' motion for a new trial on the federal and state supervisory liability claims against Licitra is DENIED as moot. (Id.) Plaintiff may file a fee application within 21 days.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       May 21, 2018

# APPENDIX A

Excerpts from the Excessive Force Jury
Charge

*    *    *

## A.    <u>Unlawful Excessive Force, Unlawful Entry, and Supervisory Liability</u>

There are three essential elements for plaintiff's federal constitutional claims that she must prove by a preponderance of the evidence:

First, Ms. Bah must prove that the acts complained of were committed by the defendants acting under color of state law;

Second, Ms. Bah must prove that the defendants acted intentionally or recklessly and that those acts deprived Mr. Bah of rights, privileges, or immunities secured by the Constitution or laws of the United States; and

Third, Ms. Bah must prove that the defendants' acts were the proximate cause of the injuries sustained by Mr. Bah.

I will now examine each of the three elements.

*    *    *

### i.    <u>Use of Excessive Force</u>

Ms. Bah has asserted that the defendants deprived Mr. Bah of his right to be free from excessive force.  The Fourth Amendment to the United States Constitution protects persons from being subjected to excessive force by a law enforcement official.  A law enforcement official may employ only the amount of force reasonably necessary under the circumstances. The defendants contend that their actions were justified, reasonable under the circumstances, and in accordance with existing law.

To determine whether a defendant's acts caused Mr. Bah to suffer the loss of a federal right, you must determine whether the amount of force used by that defendant was

objectively reasonable under the totality of the facts and circumstances known to the defendant at the time of the incident. The question must be answered based upon what was known and understood by the defendant when the force was employed. In other words, you must determine whether the amount of force actually used exceeded the amount of force that a reasonable officer would have employed under similar circumstances. The "reasonableness" of a particular use of force must be judged objectively from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

In making your determination as to whether excessive force was used, you should take into account the totality of the circumstances. This may include whether it was feasible for the defendant to warn the plaintiff before using deadly force and whether such a warning was given. A warning may include words such as "stop," or "freeze," or "get on the ground." If a warning is feasible, it must be given.

The legal definition of "reasonable" takes account of the fact that police officers often have to make difficult split-second decisions about the amount of force necessary in situations that are sometimes tense, uncertain, dangerous, and rapidly evolving. Officers have no duty to retreat when faced with a significant threat to themselves or others. Moreover, you need not determine that the particular type and amount of force used was the only option available. That the officers could have used less force to accomplish the intended purpose does not necessarily mean that the force they did use was excessive. Police officers are entitled to make a reasonable selection among alternative techniques for making an arrest. In this regard, the law does not require that an officer use the least amount of force possible, so long as you find that the use of force was within that range of conduct identified as reasonable. However, if you find that

the amount of force used was greater than a reasonable officer would have employed, the plaintiff will have established the loss of a federal right.

An officer is entitled to use deadly force—that is, force that is likely to have deadly effects—to apprehend a person if the decision to do so is reasonable. However, the use of deadly force is unreasonable unless the officer had probable cause to believe that the person poses a significant threat of death or serious physical injury to the officer or to others at the time the force was used. Probable cause means that under the totality of the circumstances, a reasonable officer could have thought there was a fair probability that he or others faced a serious threat of physical harm. Probable cause does not require certainty, and it does not require that the officer be correct. In other words, probable cause may exist when an officer is mistaken as to whether he or others faced a serious threat, so long as you find that, based on the totality of facts, such a belief on his part was reasonable. In addition, whether there was probable cause to believe that a plaintiff posed a significant threat of death or serious physical injury depends upon only the defendant's knowledge of the circumstances immediately prior to, and at the time, he made the decision to employ deadly force. If the officer did not have a reasonable belief based upon the totality of circumstances that he or others faced a serious threat, then the use of deadly force would be unreasonable.

You have heard testimony regarding the New York City Police Department Patrol Guide and other NYPD polices. It is important to understand that the Patrol Guide and the federal constitution are not coextensive. A particular action could violate a provision of the Patrol Guide without violating the constitution. Similarly, an officer could violate the constitution without violating any portion of the Patrol Guide. In this case, it is the federal constitution that controls. Therefore, you must determine whether the plaintiff's constitutional

rights were violated, not whether all parties complied with the rules and regulations of the NYPD.

The question of whether a defendant used reasonable or excessive force is an objective one. This question should be answered with regard to what a reasonable officer would have done under the totality of the circumstances. In determining whether the use of force was reasonable or excessive, whether a defendant had good intentions or bad intentions is irrelevant.

\*        \*        \*